**UNITED STATES v. UNITED STATES GYPSUM CO. et al.**

Civil No. 8017.

District Court of the United States for the

District of Columbia.

June 15, 1946.

See, also, 51 F.Supp. 613, and 53 F.Supp. 889.

Wendell Berge, Asst. Atty. Gen., Roscoe T. Steffen and Edward Knuff, Sp. Assts. to the Atty. Gen., and Francis R. Shields, Sp. Atty., of New York City, and Kenneth R. Lindsay, Sp. Atty., of Washington, D. C., for plaintiff.

Bruce Bromley, of New York City, Hugh Lynch, Jr., of Washington, D. C., and George S. Collins, of New York City, for defendants United States Gypsum Company, Sewell L. Avery and Oliver M. Knode.

Nicholas J. Chase, of Washington, D. C., and Elmer E. Finck and Paul W. Lapey, both of Buffalo, N. Y., for defendant National Gypsum Company.

Nicholas J. Chase, of Washington, D. C., and Elmer E. Finck, of Buffalo, N. Y., for defendant Melvin H. Baker.

Clausen, Hirsh and Miller, of Chicago, Ill., and Charlton Ogburn, of New York City, for defendant Certain-teed Products Corporation.*

Harold F. McGuire and F. W. H. Adams, both of New York City, Leonard B. Ettelson and Stephen Allie, both of Chicago, Ill., and Peter Keber, of New York City, for defendant Henry J. Hartley.

Walter G. Moyle and Ernest H. Oliver, both of Washington, D. C., and Andrew J. Dallstream and Norman Waite, both of Chicago, Ill., for defendants The Celotex Corporation and Bror G. Dahlberg.

Joseph P. Tumulty and Joseph P. Tumulty, Jr., both of Washington, D. C., Alfred W. Varian and Herbert M. Simon, both of New York City, and Elmer E. Finck, of Buffalo, N. Y., for defendants Ebsary Gyp-

* By nunc pro tunc order of the court dated April 21, 1945, effective March 17, 1945, Clausen, Hirsh and Miller, of Chicago, Ill., and Charlton Ogburn, of New York City, were substituted in the place of Harold F. McGuire and F. W. H. Adams, both of New York City, Leonard B. Ettelson and Stephen Allie, both of Chicago, Ill., and Peter Keber, of New York City, as attorneys for the defendant Certain-teed Products Corporation.

sum Company, Inc., and Frederick G. Ebsary.

James O'Donnell, Jr., of Washington, D. C., and Benjamin P. DeWitt, of New York City, for defendants Newark Plaster Company and Frederick Tomkins.

George E. H. Goodner and Scott P. Crampton, both of Washington, D. C., and David I. Johnston, Roy C. Lytle, James R. Keaton, and Frank Wells, all of Oklahoma City, Okla., for defendant Samuel M. Gloyd, doing business under the name of Texas Cement Plaster Company.

Before STEPHENS, Associate Justice, United States Court of Appeals for the District of Columbia (Presiding), and GARRETT, Presiding Judge, and JACKSON, Associate Judge, United States Court of Customs and Patent Appeals, designated as Justices of the District Court of the United States for the District of Columbia.**

STEPHENS, J.:

This is an action in equity instituted by the United States, hereinafter referred to as the Government, to restrain the defendants from alleged violations of Sections 1, 2 and 3 of the Sherman Act. Injunctive relief is sought under Section 4.[1] The corporate defendants are: United States Gypsum Company (hereinafter referred to as USG), National Gypsum Company (National), Certain-teed Products Corporation (Certain-teed), The Celotex Corporation (Celotex), Ebsary Gypsum Company, Inc. (Ebsary), and Newark Plaster Company (Newark). The individual defendants are Samuel M. Gloyd, doing business under the name of Texas Cement Plaster Company

(Texas), Sewell L. Avery, Oliver M. Knode, Melvin H. Baker, Bror G. Dahlberg, Henry J. Hartley, Frederick G. Ebsary, and Frederick Tomkins. Avery was president of USG from 1905 to 1936, and since then has been chairman of the Board of Directors. Knode is president of USG. Baker is president of National. Dahlberg is president of Celotex and chairman of the Board of Directors of Certain-teed. Hartley is president of Certain-teed. Ebsary is president of Ebsary. Tomkins is president of Newark. ·

The defendants are engaged in the mining of gypsum rock and in the manufacture and in the sale in interstate commerce, in the "Eastern area" of the United States, of gypsum board, gypsum plaster, and miscellaneous gypsum products defined in a bill of particulars as gypsum block, gypsum tile, and Keene's cement. The "Eastern area" includes all of the states of the United States from the East Coast westward to and including New Mexico, Colorado, Wyoming, and the eastern half of Montana.[2]

Gypsum board consists of two outer sheets of heavy tough paper, front and back, called "liners," between which there is a lightened gypsum core which is firmly bonded to the paper. Gypsum wallboard is a product used as a finished interior wall. Gypsum lath or plasterboard is a product used as a base to which a coat of plaster may be applied. In the manufacture of gypsum products the raw gypsum rock is first subjected to calcination—the process of driving off the water of crystallization by heating. Calcined gypsum, or stucco, when mixed with water, resumes the origi-

---

** Holding a three-judge statutory court pursuant to the provisions of the Act of February 11, 1903, 32 Stat. 823, as amended by the Act of June 25, 1910, 36 Stat. 854, the Act of March 3, 1911, 36 Stat. 1167, and the Act of April 6, 1942, 56 Stat. 198, 15 U.S.C.A. § 28.

1 Act of July 2, 1890, 26 Stat. 209, as amended by the Act of March 3, 1911, 36 Stat. 1167, and by the Act of August 17, 1937, 50 Stat. 693, 15 U.S. C.A. §§ 1, 2, 3 and 4.

2 As more particularly described in the complaint, the "Eastern area" includes the District of Columbia and the States of Alabama, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, West Virginia, Wisconsin, Wyoming, and that portion of the State of Montana east of the counties of Phillips, Petroleum, Musselshell, Yellowstone, and Carbon.

nal content thereof so that the manufactured product is chemically substantially the same as the raw rock and has the same properties. In the reforming process the manufacture of the products above described is made possible. The products are extensively used in the building industry.

In the early periods of its manufacture gypsum board was crudely made by pouring buckets of calcined gypsum mixed with water in thin layers between multiple pieces of rough felt paper, smoothing the product with rollers, hardening it on racks and trimming the pieces to size. This was a hand operation. In 1912 the defendant USG commenced the development of more efficient methods of manufacture of gypsum products. An important advance was in the making, by virtue of patent No. 1,034,746, issued in 1912 to USG on application of an inventor-employee named Clarence W. Utzman, of "closed-edge board." [3] Prior to 1912 gypsum board had been made with exposed edges. This required trimming, and there was also breakage in shipping and use, with consequent wastage. The making of closed-edge board solved this problem. Various other improvements were developed, including a board making machine, the use of foam as a substitute for sawdust as an "aggregate" in the gypsum core to lighten the board, and the use of starch to improve the bond between paper and core. Metallized board, gypsum board covered with metallic foil, was devised for purposes of insulation; and a gypsum lath perforated in such manner as to increase the fire resisting qualities of wall structure was devised. These improvements were covered by patents—product, process, and machine—many of which were issued to USG; others were acquired by that company. A demand arose in the trade for these improved products, and companies other than USG commenced to copy them. There ensued many years of litigation in which USG strove to enforce, and eventually succeeded in enforcing, its patent rights.

Prior to 1917 the Bestwall Manufacturing Company (Bestwall) commenced the manufacture of closed-edge board. USG sued for infringement and won. Bestwall Mfg. Co. v. United States Gypsum Co., 7 Cir., 1921, 270 F. 542. Bestwall had, however, in the course of the litigation, been acquired by The Beaver Products Company, Inc. (Beaver), and USG by a supplemental bill sued both of these companies for infringement and again prevailed. United States Gypsum Co. v. Bestwall Mfg. Co., D.C.N.D.Ill.1925, 15 F.2d 704. These decisions made the manufacture of closed-edge board by a competitor of USG impossible without infringement of USG's patent rights. This is admitted by the Government. Prior to the last mentioned decision, Augustus S. Blagden, president of Beaver, made overtures of settlement to Sewell L. Avery, president of USG; he continued these efforts after the decree under the supplemental bill. Avery, at a meeting in December, 1925, specified as terms of settlement the payment of damages by Beaver for infringement of USG's patents, acknowledgment by Beaver of the validity of USG's patents, payment of royalties, and the right in USG to fix prices of gypsum board made and sold by Beaver under the Utzman closed-edge patent. A settlement agreement was executed on July 29, 1926, Beaver paying $250,000 cash damages and USG granting Beaver a license to make, use and sell the patented products, to use the patented processes and to make and use the patented machines. The terms of the license contract are stated in greater detail below.

In September, 1925, after the decision against Beaver, USG sued The American Gypsum Company (American) and the Universal Gypsum and Lime Company (Universal) for infringement, and served a notice of infringement upon the Niagara Gypsum Company (Niagara). On September 17, 1926, a settlement and license agreement was entered into with Universal similar to that with Beaver, except that the

---

[3] Claim 1 of the patent reads as follows: "A plasterboard comprising a body, a covering of fibrous material adhering to one face of the body folded to inclose an edge of the body and overlie a portion of the opposite face thereof, and a covering of fibrous material for said opposite face of the body overlying said folded-over portion of the first mentioned covering but having its edge spaced from the edge of the board."

lump sum payment was approximately $35,-000. A license agreement was entered into between USG and the Atlantic Gypsum Products Company (Atlantic) on March 5, 1927. In this instance no damages were paid. Texas signed a license agreement on April 11, 1927. This contract was not by way of settlement of an existing claim of infringement, although it recited that Texas had equipped its plant to make closed-edge board and that USG was threatening to sue if such board were produced.

These four license contracts are for convenience referred to in the record as the "1926–1927 contracts." The licenses granted were under two Utzman patents No. 1,034,746 (the product patent) and No. 1,029,328 (a process patent), and under a third Utzman patent No. 1,330,413 (a machine patent), expiring February 10, 1937, under a Birdsey patent No. 1,358,508 (a product patent for partially closed-edge board), and under some sixty or more other patents and applications for patents. The material provisions of the contracts were these: USG granted an indivisible and non-exclusive license until the expiration of the Utzman machine patent on February 10, 1937. It reserved the right to fix during the life of the Utzman product patent, expiring August 6, 1929, the minimum prices at which the licensees might sell board embodying the disclosure of that patent, but at not more than the prevailing market price. The licensees agreed to pay specified royalties on all gypsum board manufactured by them, whether patented or unpatented, until February 10, 1937, the date of the expiration of the machine patent; they acknowledged and agreed not to contest the validity of the patents under which the licenses were granted; they agreed that all of the patented products sold by them and known in the trade as "seconds" should be invoiced and marked as "seconds." USG agreed that the licensees might sell patented gypsum board to manufacturers of plaster and gypsum products who did not themselves make board (referred to in the record as "manufacturing distributors"), the royalties payable to remain based upon the regular selling price of the licensees to the regular

dealer trade. The licensees agreed to keep separate records showing the quantity of all board sold by them, and periodically to render reports to USG showing the quantities and prices of their sales. USG reserved the right to inspect and to make copies of the licensees' memoranda from such records.

In May, 1929, following further litigation, four more license contracts were entered into between USG on the one part and Certain-teed, National, Ebsary, and Niagara, on the other part. In 1923 Certain-teed, originally a manufacturer of roofing products, entered the gypsum industry with the acquisition of the Acme Cement Plaster Company (Acme). In 1926 it commenced the manufacture o. open-edge gypsum board at the former Acme plant in Texas. On January 20, 1928, it purchased the assets of Beaver. Beaver was then making a closed-edge board. Certain-teed refused to assume the Beaver-USG settlement agreement and license. USG thereupon, on or about February 21, 1928, instituted suit in the District Court of the United States in Illinois against Certain-teed and Beaver, seeking an injunction against the distribution of the proceeds of sale to the Beaver stockholders and asserting that Certain-teed should be required to assume all liabilities of Beaver under its settlement agreement and license. Certain-teed was required to put up a million dollar bond, or otherwise to suffer a temporary injunction, as security for damages which might be found due to USG. On May 22, 1929, Certain-teed settled this suit with USG, agreeing to pay damages of approximately $64,000 and to fulfill the obligations of Beaver under its original settlement agreement and license; USG executed in Certain-teed's favor a patent license agreement and the suit was dismissed and the bond released. A supplemental license agreement between USG and Certain-teed covering a bundling process patent, more particularly referred to below, was executed on July 3, 1929. On May 16, 1929, National settled two patent infringement suits which USG had brought against it, one on November 5, 1926, the other on May 7, 1928, paying on account of damages approximately $178,000 and entering into a.

patent license agreement with USG. National had commenced the manufacture of a modified closed-edge gypsum board in 1926. Ebsary, which had commenced making open-edge gypsum board in 1928, was granted a patent license by USG on May 22, 1929. This license was not a part of settlement of an infringement claim, since Ebsary had not manufactured closed-edge board and there was no infringement suit or basis therefor against it.

Niagara commenced making an open-edge gypsum board, but later made board with a semi-protected edge covered by a Clark application for a patent owned by American. This board had been developed by American in an attempt to compete with USG's closed-edge board. USG claimed that this board infringed its Birdsey patent No. 1,358,508 covering the manufacture of board with a partially closed edge. Priority over the Clark application had been awarded Birdsey by the Commissioner of Patents; this was affirmed by the Court of Appeals of the District of Columbia in 1926. Clark v. Birdsey, 56 App.D.C. 136, 10 F.2d 1001. A contract of settlement was entered into between Niagara and USG. This contract is not in evidence but is referred to in a later license agreement between Niagara and USG dated October 8, 1929, in which it appears that the earlier contract provided for money damages to USG in the sum of approximately $28,000 and a patent license to Niagara. These four license contracts between USG on the one part and Certain-teed, National, Ebsary and Niagara on the other part, are called the "May 1929 contracts" in the record. The provisions of these four contracts were in substance the same as those of the 1926-1927 license agreements except that in the May 1929 contracts USG's right to fix minimum prices was not limited as in the previous agreements, and sales to manufacturing distributors and jobbers were permitted only on USG's written consent. These contracts involved the same patents as the 1926-1927 agreements, with a Birdsey "bundle" patent No. 1,696,877 added covering a method of bundling gypsum board for shipment by binding several boards together into a stack through the application of a gummed tape lengthwise along the edges of the boards. Use of this bundling process was required by the contracts.

There remain to be described the litigation and negotiations leading up to the execution of certain "November 1929 contracts" and the terms thereof.[4] In 1929 USG owned three applications for patents of Carlisle K. Roos covering cellular core gypsum board produced by the employment of foam or a foaming agent in the core of the board to produce a multitude of cells or voids thereby lightening the board, eliminating the use of sawdust, which had been an unsatisfactory material, as an "aggregate," and resulting in quicker drying. These applications were in interference with an application for a patent by Erick Christian Bayer, a foreign patentee, the American rights to whose patent had been acquired by USG. The Roos applications prevailed in the interference proceeding and Roos patents Nos. 2,017,022,[5] 2,079,338, and 2,080,009[6] were ultimately issued to USG (October 8, 1935, May 4, 1937, and May 11, 1937, respectively). On May 23, 1929, after the last of the May 1929 license agreements had been executed, Avery of USG described the scope and nature of the Roos bubble board invention and outlined

---

[4] As will be noted, most of these license agreements were executed on various dates during October, 1929, but they became effective on November 5, 1929, and have been referred to throughout the record as the "November 1929 contracts."

[5] Claim 9 of the patent reads as follows: "A light weight building material composed of a hard mass of cellular structure which comprises set cementitious material having permanently fixed therein foam cells that possess their original form and which are arranged throughout the structure in foam-like formation."

[6] Claim 17 of the patent reads as follows: "A wallboard comprising a porous body of hardened cellular cementitious material enclosing a plurality of voids encased in tough pliable films, and cover sheets therefor which are applied by means of pressure when said cementitious material is in a plastic state whereupon said cover sheets remain bonded to said cementitious material after the same has set and hardened."

its advantages, including weight reduction, lower freight cost, elimination of the sawdust problem, easier handling and quicker drying, and offered the various licensees above referred to a license on this invention.

Shortly after this, Universal through its president and co-receiver, Eugene Holland, claimed that USG, by using starch in its board to obtain adhesion between the core and paper liners, was infringing two patents owned by Universal known as the Hite and Haggerty patents Nos. 1,230,297 and 1,500,452, respectively. The Hite patent covered a heat insulating material and method of making the same. The Haggerty patent covered a gypsum plaster wallboard employing starch or a cooked carbohydrate in the core of the board to insure a good bond between the core and the paper covering sheets.[7] This had solved the "peeler" trouble in the gypsum board industry and made possible modern high speed production of gypsum board. Without it, high temperatures used to expedite drying of the board would result in defective board in the form of "peelers." In 1927 Universal had brought suit in the United States District Court in Buffalo, New York, against National for infringing of the Haggerty patent, demanding an injunction and an accounting, and the court had ruled that the Haggerty patent was valid and infringed (Universal Gypsum & Lime Co. v. Haggerty, D.C.W.D.N.Y.1927, 21 F.2d 544), and National had posted a substantial bond rather than suffer enforcement of a temporary injunction. Avery told Holland that it was not USG's policy to infringe patent rights and that he would investigate the claim. In June and July of 1929 negotiations were going on between USG and its various licensees in respect of a possible license covering the bubble board invention, and the various companies were investigating to ascertain whether the invention had merit. During this same period Holland continued to discuss with Avery separately the matter of the alleged infringement of the Haggerty and Hite starch patents. As a result of these discussions USG agreed to purchase and did purchase these patents. Universal was in receivership and the sale was a favorable one from its standpoint because it provided Universal with substantial funds permitting it to reorganize and emerge from receivership with its accounts paid. The original and ancillary proceedings were in seven different Federal district courts and the sale was approved by all of these courts on or about November 5, 1929. The sale was consummated in a license contract of November 5, 1929, which settled a claim of USG against Universal for infringement of USG's partially closed-edge patent and the claim of Universal against USG for infringement of the Hite and Haggerty patents.[8] The Hite and Haggerty patents were assigned to USG with reservation of royalty to Universal. Universal was itself granted a license under these patents and under the Birdsey patent No. 1,358,508 and under patents which might be issued under the Roos and Bayer applications and under numerous other patents. This license contract superseded the 1926 license agreement between USG and Universal. In August, 1929, USG had announced its arrangement to purchase the Haggerty and Hite patents and offered its licensees new licenses which would replace the prior license contracts and include in one document the outstanding patents of the earlier licenses, the Haggerty and Hite patents, and the applications for patents on the Roos bubble board invention. This offer was made subject to the approval of the district courts above referred to.

Niagara on October 8, 1929, Certain-teed

---

7 Claim 2 of the patent reads as follows: "A wallboard consisting mainly of gypsum and having a paper liner, cooked starch being incorporated with the gypsum in about the proportion of 2 lbs. of starch to 40 lbs. of gypsum, to insure adhesion of said paper liner."

8 Although Birdsey patent No. 1,358,508 for partially closed-edge gypsum board was included within the patents which were the basis of the USG-Universal license contract of September 17, 1926, there was apparently still outstanding at the time of the execution of the license contract of November 5, 1929, an infringement claim by USG against Universal under this Birdsey patent. See page 2 of the license contract of November 5, 1929, Government Exhibit 6.

on the 15th, National on the 17th, Ebsary on the 18th, and Atlantic on the 21st, entered into new patent license contracts with USG which superseded the previous agreements between these companies and USG, and these new contracts covered the Hite and Haggerty patents and also the anticipated patents under the Roos and Bayer applications.

As stated above, USG had in September, 1925, instituted a suit against American for infringement of USG's closed-edge patent. It had also in the same month commenced a suit against American for infringement of the Birdsey patent on partially closed-edge board. American attempted to obtain a more favorable settlement than had been granted to other infringers. USG's infringement suit with respect to the Birdsey patent had been postponed pending settlement negotiations, reinstated, and ultimately tried and decided in favor of USG. Settlement discussions by American were resumed, with renewed efforts to obtain concessions, with USG. On November 25, 1929, American finally settled its outstanding litigation with USG on the terms originally offered, i.e., on terms similar to those of the earlier settlements with other companies, and accepted a license from USG similar to the license contracts of the other licensees. American paid in settlement of past infringement approximately $152,000. On April 23, 1930, Kelley Plasterboard Company, Inc. (Kelley) took a similar license.[9] Texas did not enter into a license contract in 1929, but continued as a licensee under its license of April 11, 1927, although it was not subject to price control after August 6, 1929, the date of the expiration of the Utzman closed-edge patent. Upon the expiration on February 10, 1937, of its license of April 11, 1927, Texas accepted a further license contract similar in form to the November 1929 contract with the other licensees. This completed the execution of the nine contracts generally referred to in the record as the "November 1929 contracts" (although the Texas contract was not executed until 1937 and the Kelley contract not until April 23, 1930) with Niagara, Certain-teed, National, Eb-

sary, Atlantic, Universal, American, Kelley, and Texas. Each of these contracts extended licenses under the Haggerty and Hite patents, under patents which might be issued under the Roos and Bayer applications, and under a large number of patents still vital which had been the subject of the previous contracts, including the Utzman machine patent No. 1,330,413, Birdsey patent No. 1,358,508 on the partially closed-edge board, the bundle patent No. 1,696,877, and under patents which might be issued under several additional applications for patents. These November 1929 contracts were in general in the same terms as the earlier contracts. Each contained a "most favored nation" clause providing that if subsequent to the effective date of a particular agreement USG should grant to any other person, except to Universal, a license more favorable in terms, then USG would grant to the particular licensee a license on the same terms. The Texas contract alone in its "most favored nation" clause did not contain the exception to Universal. The price fixing clause contained a provision that the minimum prices fixed by USG should not be more than those at which USG determined to sell gypsum board or other products embodying the inventions claimed in the patents to its own like trade in the same market. Use of the Birdsey bundling process by the licensees was made optional.

It will be noted that the nine license contracts last above described involve only five of the named defendants—USG, Certainteed, National, Ebsary, and Texas, leaving Celotex and Newark unmentioned. It will be noted also that the five companies—Niagara, Atlantic, Universal, American, and Kelley—parties to the November 1929 license contracts are not defendants. This is to be explained as follows: Niagara was acquired by USG in 1929. National acquired Universal in 1935 and Atlantic in 1936. Newark acquired the stock of Kelley in 1937 and merged with Kelley in 1939. Celotex acquired American in 1939. Upon acquiring these companies respectively National, Newark and Celotex took over the licenses which had been entered into by

---

[9] On January 3, 1939, USG consented to the assignment of this license to Newark.

Universal, Atlantic, Kelley and American with USG.

In addition to the 1926–1927, May 1929, and November 1929, contracts which related to gypsum board as such, certain additional contracts, sometimes referred to in the record as "subordinate contracts," relating to metallized board and perforated lath, were executed as follows: At various times in 1934–1935 USG as owner of Roos patent No. 1,914,345 covering the use of metallic foil as a thermal insulating element in wallboard granted licenses to various other companies. The license contracts in evidence are those of National of October 5, 1934, Kelley of October 12, 1934,[10] Certain-teed of November 2, 1934, Atlantic of November 30, 1934, American of December 4, 1934,[11] Universal of April 4, 1935, and Ebsary of August 14, 1935. In these contracts USG granted licenses to make, use and sell plasterboard having a metallized surface embodying the inventions disclosed and claimed in the patents or patent applications covered by the contracts and reserved the right to fix the minimum prices on board embodying the inventions in question, but at not more than USG's own price in the same market. The licensees agreed to pay a royalty for all plasterboard having a metallized surface manufactured and sold by them and covered by the claims of the patents issued or to be issued under applications for patents. The licensees agreed not to sell metallized board to other board manufacturers except upon USG's written consent, and not to sell to anyone on consignment. They agreed to acknowledge and not to contest the validity of the patents issued or to be issued and to record the quantities of metallized board manufactured "and/or sold," USG reserving the right to inspect and copy such records. Each licensee was accorded the position of a "most favored nation" with respect to licenses under these patents.

Similarly USG was the owner of Roos patent No. 1,938,354 covering a fire resistant plasterboard. This board had holes of given size punched through it at designated intervals. Upon application of a coat of plaster the same pushed its way through the holes and hardened into a mechanical key with consequent improvement of the fire resistant qualities of the wall in which such plasterboard was used. USG granted patent licenses to Certain-teed on June 8, 1936, American on July 10, 1936, Ebsary on February 2, 1937, and Kelley on June 23, 1937, for the manufacture, use and sale of this board. In substance the terms of these licenses were the same as those of the metallized board license contracts. Later USG offered a revised perforated lath license to its licensees royalty free, i.e., extended an offer to include the perforated board patent in the basic board license agreement at no additional royalty. Such revised licenses were accepted by Certain-teed, Ebsary and Kelley.[12]

Minimum price bulletins were sent out by USG to its licensees under the various license contracts, except during the period from August 6, 1929 (the date of expiration of the Utzman product patent No. 1,034,746), until the date of the execution of the November 1929 contracts. The price bulletins are limited in their application to patented board manufactured and sold by the licensees under their respective licenses. The price on board was calculated on the basis of a mill price plus freight from the nearest mill (freight-wise) to the point of destination. The bulletins provided for prices on various quantities of board such as carloads, less-than-carloads, and truckloads. In particular markets, such as metropolitan areas, where it was economic to deliver gypsum board in truckload quantities, prices were established for such quantities and the areas in which such prices were to apply were defined. Outside of such areas a higher price was fixed. Provision was made in various instances for a variation in price to cover pool car shipments, railroad switching charges, and "pick-ups" at a mill. The bulletins contained provisions purposed to prevent the

---

[10] On January 3, 1939, USG consented to the assignment of this contract to Newark.

[11] This contract was assigned to Celotex on April 12, 1939.

[12] On January 3, 1939, USG granted Newark, which had merged with Kelley, a royalty free perforated lath license, at the same time canceling the Kelley revised license.

violation of the minimum price requirements through such devices, in connection with a sale of board, as the giving away of board as "dunnage," making advertising allowances to the customer, granting of fictitious damage claims, splitting of commissions with the customer by commission salesmen, paying of unearned warehousing charges, fictitious hiring of customers' trucks, giving away of plaster or other products, or the sale of such products at a price unusually below the licensee's prevailing market price. There is set out in the margin a more detailed description of the price bulletins.[13]

During the periods when price bulletins were sent out by USG to its licensees each licensee, in the main, sold gypsum board

---

[13] There were two general classes of provisions. The first related to prices as such and the second related to protecting the prices set. The first class of provisions made an affirmative statement of the minimum price which might be charged by a licensee for board embodying the licensed inventions. For this purpose the overall market was variously divided. The basic list of prices was for carload shipment to dealers so set up as to divide the market territorially by the use of mill basing points, the delivered price to dealers being determined by taking the lowest combination of mill base price plus freight from that point to destination. A standard billing weight was given per thousand square feet of different thicknesses of board. These were for standard dimensions, a differential being added to the base price for odd sized products. Special prices were stated for cut stock of stated thicknesses f. o. b. certain mills in named markets. Superimposed on this basic price system were variations stating flat delivered prices for delimited areas, defining as single delivery points described metropolitan areas, stating special base prices for some thicknesses of board shipped from named base points for delivery in limited territories, providing for variations in price and/or allocation of charges (i. e., to dealer or shipper) for special shipments such as mixed cars, pool cars, and stopover cars, with territorial variations; and there were provisions for special prices for particular jobs, types of jobs, or types of purchasers other than dealers, e. g., contractors, prefabricated house makers, Century of Progress, and the like. Special discounts were provided for sales "to other manufacturers" where permitted. In fine, prices were varied according to the following factors in various combinations: style of product, amount of product, territory, form of shipment, nature of use, and type of purchaser.

The bulletins covering perforated lath were less detailed and less numerous (apparently because of the subsequent inclusion of the perforated board patent in the basic board license agreement) but they involved the same factors as above named.

The provisions described above were substantially duplicated with respect to a separate set of prices applicable to delivery f. o. b. dealers' trucks at given mills or warehouses. This type of transaction was called a "pick-up," and it appears that the bulletins did not contemplate such deliveries at any other places than at those listed or delivery of less than a stated minimum number of square feet. There was no provision in the bulletins for sales to purchasers other than dealers, except for the provisions above referred to in respect of contractors and prefabricated house manufacturers and the like, and "other manufacturers."

The second class of provisions, referred to above as related to price protection, were first in the following form: "Allowances, Etc.: The minimum price fixed by licensor for patented board and/or lath shall not be reduced below such minimum price or prices by or through allowances, payment or rebate to customers for use of railroad siding; for switching performed after car has been originally set for unloading; for warehousing, trucking or unloading, or other service by them in connection with shipments or deliveries of patented board and/or lath. Nor shall such net cost to customer be reduced below such minimum price or prices by the establishment or continuance of warehouses with dealers or other buyers; or through allowance or adjustment on board which customer claims is of poor grade and not up to standard, except when such an allowance or adjustment on substandard board is first authorized by the licensor; or by allowance for any other reason whatsoever by a licensee direct or by a salesman of patented board out of his own compensation; or through the extension of other than regular terms to any such dealer or buyer. Quotations deducting the regular cash discount so that the quoted price is less than the minimum price to the licensee, are considered as quo-

manufactured by it at the prices and upon the terms and conditions stipulated in the bulletins. No bulletins have been sent out since July 8, 1941.

In 1932 USG set up as a department a wholly owned corporation called the Board Survey Company. Its function was to receive complaints of license violations, to investigate the facts, call them to the attention of the licensee involved, and upon occasion to the attention of the licensor USG. Board Survey Company was organized by USG for the purpose of bringing about compliance with the licenses. The licensees had no part in its formation, management or operation. From time to time a representative of USG, as licensor, met with representatives of the licensee companies for the purpose of explaining to them the provisions of the minimum price bulletins and for the purpose of securing adherence to such minimum prices by the licensees.

The defendants and their predecessors in interest were, at the time the license agreements were entered into, competitors in the manufacture and sale of substantially all of the gypsum board and a substantial part of the gypsum plaster made and sold in the "Eastern area," and the defendants now make and sell substantially all of the gypsum board and a substantial portion of the plaster in the "Eastern area." Sales of gypsum products are largely to retail dealers in building materials and mason supplies, rather than to building contractors and ultimate consumers.

The Government's complaint covers 33 closely printed pages, including 123 numbered paragraphs, and there is an appendix of an additional 94 pages. The charges are generalized in paragraphs 44 to 46(a), inclusive, of the complaint as follows:

"44. Defendants are, and have been for many years last past, parties to contracts in restraint of trade and commerce in gypsum board, plaster, and miscellaneous gypsum products among the several States, in violation of Section 1 of the Sherman Antitrust Act. Defendants are, and have been for many years last past, actively engaged in a continuing combination and conspiracy in restraint of trade and commerce in said gypsum products among the several States, in violation of Section 1 of the Sherman Antitrust Act. Defendants are monopolizing, and have monopolized for many years last past, trade and commerce in said gypsum products among the several States, in violation of Section 2 of the Sherman Antitrust Act. Defendants are, and have been for many years last past, attempting to monopolize trade and commerce in said gypsum products among the several States and are, and have been for many years last past, actively engaged in a continuing combination and con-

---

tations to sell at less than the minimum price and therefore in violation of the license agreement. On quotations to U. S. Government regular minimum delivered price less 2% of delivered price (cash discount) shall be the minimum price.

"Also, where a salesman selling patented board to a customer is authorized by licensee or its agent to sell the same wholly or partly on a commission basis, or where a salesman not employed by licensee makes a sale of patented board to a customer on a commission basis and licensee or his agent accepts such sale, in either of such events the commission paid by the licensee is a deduction from the price at which the board is sold by licensee, and where after deducting such commission, the amount is less than the minimum price, licensor shall regard the sale as made at a price less than the minimum price fixed by licensor and a violation of the terms of the license agreement. Licensor also regards sales of patented board by commission salesmen, without the written consent of licensor, as a violation of the terms of the license agreement." See pages 3–4

of Government Exhibit 37, a bulletin of February 24, 1937.

Later another form was used, to wit: "Rebates, Allowances, Etc.

"Any sale of patented products, though ostensibly made at or above the minimum price established by licensor, will nevertheless be considered a violation of the provisions of the license if licensee directly or indirectly reduces the actual price charged by licensee below such minimum price by granting the customer rebates, unearned or unwarranted refunds, credits or discounts, by reducing the price of other products, by hiring customers' trucks, by granting allowances for advertising or other purposes, by splitting of salesmen's compensation or commissions with customers, by overshipment of patented products, by including board under the guise of dunnage, or by making any other payment or allowance in the form of money or otherwise which has for its purpose and effect reducing the price charged by licensee below such minimum price." See page 2 of Government Exhibit 37, a bulletin of February 6, 1939.

spiracy to monopolize trade and commerce in said gypsum products among the several States, in violation of Section 2 of the Sherman Antitrust Act. Defendants are, and have been for many years last past, parties to contracts in restraint of trade and commerce in said gypsum products between the States and the District of Columbia, in violation of Section 3 of the Sherman Antitrust Act. Defendants are, and have been for many years last past, actively engaged in a continuing combination and conspiracy in restraint of trade and commerce in said gypsum products between the States and the District of Columbia, in violation of Section 3 of the Sherman Antitrust Act. Said unlawful contracts, combination, conspiracy, monopoly, and attempt to monopolize will be referred to hereinafter as the combination.[14]

"45. Said combination has been formed, has been carried out, and is being carried out by each of the defendant companies (acting, in part, through those of their officers and directors made defendants herein) and by other companies hereinafter referred to engaged in the manufacture of said gypsum products. Said companies have entered into, have carried out, and are carrying out said combination for the purpose, and with the effect, of restraining, dominating, and controlling the manufacture and distribution of said gypsum products in the Eastern area by:

"(a) Concertedly raising and fixing at arbitrary and non-competitive levels the prices of gypsum board manufactured and sold by said companies in the Eastern area;

"(b) concertedly standardizing gypsum board and its method of production by limiting the manufacture of board to uniform methods, and by producing only uniform kinds of board, for the purpose, and with the effect, of eliminating competition arising from variations in methods of production and in kinds of board manufactured and distributed in the Eastern area;

"(c) concertedly raising, maintaining, and stabilizing the general level of prices for plaster and miscellaneous gypsum products manufactured and sold by said companies in the Eastern area;

"(d) concertedly refraining from distributing gypsum board, plaster, and miscellaneous gypsum products manufactured by said companies through jobbers in the Eastern area, and concertedly refusing to sell said products to jobbers at prices below said companies' prices to dealers, for the purpose, and with the effect, of eliminating substantially all jobbers from the distribution of said gypsum products in the Eastern area;

"(e) concertedly inducing and coercing manufacturing distributors to resell, at the prices raised and fixed by said companies as aforesaid, gypsum board purchased from said companies.

"46. Said combination was entered into and has been, and is being, carried out by the defendant companies in part under the guise of numerous license agreements purporting to relate to the use of certain patents owned by the defendant U.S.G. in the manufacture of gypsum board. To give color of legality to said combination, the defendant companies, and other companies hereinafter named, concertedly agreed among themselves to enter into, and did enter into, said license agreements. Said license agreements are not bona fide patent license agreements reasonably designed to secure to U.S.G. the pecuniary reward for valid patent monopolies, but were entered into and executed for the illegal purposes described in paragraphs 44 and 45 hereof. The formation and operation of said combination is more fully set forth in paragraphs 47 to 120 hereof.

"(a) Many of the patents mentioned and described in said license agreements by which the said combination has been, and is being carried out in part, are process or machine patents. The said patents mentioned and described in the said license agreements, even assuming they are valid, are not basic article or product patents and do not singly or all together cover completely the business of mining and selling gypsum, or cover completely gypsum board, which is one of the forms in which unpatented gypsum is sold by the defendants, but at most constitute minor additions to the established and unpatented art of making gypsum board and afford no legal justification for the said combination."

Paragraphs 47 to 120 of the complaint detail the generalized charges above set forth. It is not possible to state this detail within a reasonably limited space, but it will be of some aid to an understanding of the questions presented by the motions now before the court if these paragraphs are summarized. They allege that:

The combination was formed during the period between September, 1925, and early in the year 1930. The plan for stabilization of prices grew out of the efforts of the parties to the early patent infringement disputes to settle their differences. Avery as president of USG, Blagden as president of Beaver, and Griswold as vice-president of American decided to induce the industry to enter into license agreements containing price fixing provisions under USG's dominant Utzman closed-edge board patents, Blagden and Griswold agreeing to act as contact men with the industry. In negotiations in 1926 the industry responded favorably, but there was disagreement over the terms of the proposed licenses and only Beaver and Universal signed agreements in that year; but further efforts of the proponents of the plan resulted in the signing of the contracts in 1927 by Atlantic and Texas. Increasing competition in the industry, and declining prices for all gypsum products during 1927 and 1928, revived interest in price stabilization, and Holland as president of Universal agreed with Avery to promote the stabilization plan. From time to time in the latter part of 1928 and the early part of 1929 conferences and meetings were held by companies not yet licensed. The Utzman patent on closed-edge board was to expire, however, in August, 1929, and in view of that fact Avery for USG assured prospective licensees that, if the agreements pro-

---

14 For convenience the term "combination" will sometimes be used in this opinion, as it is in the complaint, to refer to the alleged unlawful contracts, combination, conspiracy, monopoly and attempt to monopolize.

414

posed were signed, USG would look for an additional patent under the color of which prices could be controlled. In reliance upon this assurance Certain-teed, National, Ebsary, and Niagara signed the May 1929 contracts. But not all of the agreement between USG and these companies was put into formal writing. On the contrary, in addition to the signed license agreements, informal side agreements were made between USG and its licensees that they would discontinue making unpatented open-edge board and second-class closed-edge board; that they would dispose of inventories of such board at prices fixed by USG; that thereafter they would manufacture and sell a closed-edge board manufactured and bundled by the processes and methods used by USG; that USG would advance and stabilize the prices for board; that all companies would increase their prices for other gypsum products; and that USG would continue to control prices through the use of other patents after expiration of the Utzman product patent in August, 1929.

Immediately after the May 1929 license contracts were executed USG, pursuant to its agreement to find a patent under which to continue price control, offered additional licenses under the foam process. Universal then sought to induce USG to purchase the Hite and Haggerty starch patents by a claim that the use of farinaceous paste in the foam process infringed them. USG knew that this claim had no basis in fact, and knew also that there were other and non-infringing methods of reinforcing the bubbles in the foam, and had advised its licensees to that effect. Nevertheless, the sale by Universal to USG was agreed to and consummated and the November 1929 contracts were signed—all for the purpose of giving color of legality to price control by USG pending issuance of patents under the foam process. Again, in addition to the former writings, there were side agreements to the effect that the use of adhesives in the manufacture of board to increase the bond between core and liners—there had been such use for many years prior to 1929 by the licensees other than Ebsary and Kelley—would be considered to fall within the scope of the Hite and Haggerty patents for the purpose of permitting price control by USG during the life of these patents; that Ebsary and Kelley would commence to use adhesives for the same purpose; and that the licensees, as soon as they could equip their plants, would manufacture and bundle by substantially the same processes as those employed by USG.

USG and certain of its licensees entered into separate patent license agreements relating to metallized board and perforated lath, for the purpose of extending and strengthening the operation of the basic license agreements.[15] At the time of the execution of the metallized board agreements, during 1934–1935, none of the licensees, except National, intended to manufacture such board, but, as USG well knew, to purchase it from USG or National for resale to dealers and consumers; USG, notwithstanding this, required the licensees to execute these agreements in order to be enabled to purchase metallized board for resale; USG fixed the minimum prices and terms and conditions of sale of metallized board with the knowledge and notwithstanding the fact that a substantial part thereof sold by the licensees, except National, was purchased from National and USG. USG, as an inducement to the licensees to sign the perforated lath contracts in 1936–1937, agreed to fix prices on such lath at a differential above plain lath; the agreements were signed in reliance upon this inducement and USG fixed the prices at a differential above the price of plain lath, and the licensees sold perforated lath at such prices. At the time of the execution and throughout the period of operation under the perforated lath contracts, USG, Certain-teed, and American were informed, sometimes by patent counsel, and believed, that the perforated lath patent was void; and the companies entered into these license agreements principally for the purpose of enabling USG to fix the prices of perforated lath sold by it and its licensees. These agreements were not bona fide license agreements, and the exercise of price control by USG under them was not reasonably adapted to protect the pecuniary rewards of a patentee under a lawful patent monopoly.

In paragraphs 121 to 123 of the complaint the alleged effect of the combination is stated. It is, in substance, charged that:

By means of the combination the defendants have controlled and dominated for more than ten years the manufacture and distribution of 100 percent of the gypsum board and 80 percent of the plaster and miscellaneous gypsum products manufactured and sold in the "Eastern area," and they will continue to do so, unless restrained, until 1954 when the last of the USG patents on the foam process expires. Since 1929 all gypsum board sold by all manufacturers and manufacturing distributors in the "Eastern area" has been sold at uniform and non-competitive prices dictated by USG, with resultant elimination of price competition in the distribution of gypsum board from manufacturers to dealers. For the purpose of maintaining these uniform and non-competitive prices, the defendants have standardized the manufacture of board, have limited its distribution to themselves and certain manufacturing distributors, and have eliminated wholesale distributors who might fail to maintain such prices. The uniform and non-competitive prices have been, throughout the period of the operation of the combination, substantially higher than those prevailing at the time of its formation in 1929, and have failed to reflect substantial reductions in manufacturing costs. Each of the defendants has thereby realized substantial profits. The uniformity among the defendants in the distribution of gypsum board has reflected itself in uniformity in the distribution of plaster and miscellaneous gypsum products by the defendants. They now distribute certain products on the basis of many of the terms and conditions of sale prescribed by USG for gypsum board.

It will be seen that the charges above summarized reduce themselves in essence to the following: (1) That the license contracts entered into between the defendant USG, as licensor, and the other de-

---

[15] The licensees who executed contracts relating to metallized board and perforated lath have been named in the statement of facts above.

fendants, **as** licensees, are themselves illegal as in restraint of trade in view of the nature of the patents upon which the contracts are based, in view of the fact that USG and the plurality of defendant licensees manufacture all of the gypsum board in the "Eastern area," and in view of the terms and conditions of the contracts, including those providing for the establishment of minimum prices on patented gypsum board to be made and sold by the defendants. (2) That the license contracts, even if valid on their face, were not entered into as bona fide license agreements, reasonably designed to secure to USG the pecuniary reward for valid patent monopolies, but were executed by the defendants merely to give color of legality to a combination to restrain trade, by control of the prices and terms and conditions of sale of gypsum board, plaster, and miscellaneous gypsum products throughout the gypsum industry. (3) That the defendants' operations were carried beyond the proper limits of a patent monopoly and licensing thereunder by raising and fixing at arbitrary and non-competitive levels the price of gypsum board made and sold by the defendants, by improper standardization of gypsum board and its method of production, by raising, maintaining and stabilizing the level of prices of unpatented materials—plaster and miscellaneous gypsum products—by effectuating improper restriction upon distribution of gypsum board, plaster and miscellaneous gypsum products, and by fixing the prices at which manufacturing distributors resold gypsum board.

The theory of the Government's charge, with respect to connecting the various defendants with the violations of law alleged, is that as each defendant became a party to a license agreement, either immediately or through acquisition of a company already licensed, it did so with knowledge of the existence and operation of the combination and thereby became a party thereto.

The defendants' answers to the charges made in the complaint cover 165 pages including 638 paragraphs. It is not possible in reasonable space to state the answers in detail. They may be generalized as follows:

The defendants admit the execution of the 1926–1927, May 1929, and November 1929, patent license agreements, and admit the fixing of prices thereunder by USG upon gypsum board and lath manufactured and sold under such contracts, by virtue of price bulletins sent out by USG from the date of execution of the several license agreements until July 8, 1941, except for the period from August 6, 1929, the date of expiration of the Utzman closed-edge board patent, No. 1,034,746, to the date of the execution of the November 1929 contracts, and except that Texas was sent no bulletins from August 6, 1929, to February 10, 1937, the date of execution of its second license contract. The defendants admit that they sold such gypsum board at the prices stated in the bulletins. The defendants USG, National, Certain-teed, Ebsary, and Newark admit the execution of the metallized board contracts and admit that USG determined minimum prices for board manufactured and sold under such contracts from the date of their execution until the date of the filing of the complaint. The defendants USG, Certain-teed, Ebsary, and Newark admit the execution of the perforated lath contracts and admit that USG determined minimum prices for board manufactured and sold under those contracts from the date of their execution until May, 1938. But the defendants deny that they have violated Sections 1, 2, and 3 of the Sherman Act, or any of such sections, by being parties to contracts in restraint of trade and commerce, or by combining and conspiring to restrain trade and commerce, or by attempting to monopolize and monopolizing trade and commerce in gypsum board, plaster, and miscellaneous gypsum products, or in any manner charged in the complaint, or at all. They deny the allegations of paragraph 46 of the complaint to the effect that the license agreements were entered into by concerted action to give color of legality to the combination and that they were not bona fide license agreements, reasonably designed to give to USG the pecuniary reward for valid patent monopolies; they assert that on the contrary the license agreements were bona fide in both law and fact and were reasonably designed to secure to USG the pecuniary reward to which it was entitled for its valid patent monopolies. The defendants admit the setting up by USG in 1932 of the Board Survey Company as a wholly owned corporation whose function was to bring about compliance with the licenses, but they assert that the licensees had no part in the formation, management, or operation of this company. The defendants admit that from time to time the licensor met with the licensees for the purpose of explaining the provisions of the minimum price bulletins with respect to patented gypsum board and securing adherence to the minimum prices by the licensees; but they assert that all discussion at these meetings was limited to patented gypsum board, that the prices of plaster or unpatented products were never discussed, and that there was never any agreement reached among those in attendance as to what should or should not be done as to a particular matter. The defendants deny that any side agreements

were entered into. The denials of the defendants with respect to monopoly do not include a denial that within the group of defendants there is manufactured and sold substantially all of the gypsum board produced and sold in the "Eastern area." The contention of the defendants in this respect is that to the extent that they have a "monopoly" upon the production and sale of gypsum board, the same is legitimatized by the patent license agreements. The defendants deny that the license agreements and the operations thereunder were applied to unpatented plaster and miscellaneous gypsum products, to purchased board, to standardization of products, to the elimination of jobbers and non-conforming wholesalers, or to the fixing of resale prices of manufacturing distributors.

The answers will be further detailed as is necessary in the discussion to follow.

The instant proceeding was filed on August 15, 1940.[16] A three-judge court was constituted on September 15, 1942. Preliminary to trial the Government propounded to the defendants 361 interrogatories,[17] to many of which objections were filed. Hearings were had and rulings made on these objections. Thereafter the defendants, by virtue of amended answers containing pleas of *res judicata* based upon a disposition favorable to the defendants therein of the criminal case first described in the margin, filed motions for summary judgment. These motions were argued orally and briefs were submitted, and the motions were denied on August 10, 1943 (51 F.Supp. 613). Thereafter the defendants moved to strike, or alternatively for partial judgment dismissing, paragraph 46 (a) of the Government's complaint as amended, which paragraph presented an issue as to the validity of certain of the patents upon which the November 1929 license agreements were based. These mo-

tions were orally argued and briefs were submitted upon them, and an order was entered on November 15, 1943 (53 F.Supp. 889), dismissing all of the Government's claim contained in paragraph 46(a) except the first and last sentences thereof.

The instant case came on for trial on November 15, 1943, and continued, with some intermissions, until the close of presentation of evidence by the Government on April 20, 1944. The testimony of 28 witnesses was heard and 641 exhibits, mostly of a documentary character, were received in evidence. Much of the testimony and most of the exhibits (448) were received in evidence subject to connection; 86 exhibits were offered but rejected. The record comprises since the commencement of the actual trial 7585 pages, exclusive of the exhibits. The latter comprise several thousand additional pages. At the close of the Government's case the defendants moved to strike from the record all of the exhibits and testimony received subject to connection, on the ground that no *prima facie* showing of any conspiracy had been made, that such exhibits and testimony had not been shown to be in furtherance or in execution of any conspiracy, and that such exhibits had not otherwise been connected. The defendants moved also to dismiss the complaint with prejudice under Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, on the ground that upon the facts and the law the plaintiff had shown no right to relief. Briefs were submitted in advance of oral argument in support of and in opposition to the motions. After oral argument the mo-

---

[16] There have been two previous related proceedings. These were criminal indictments, both returned on June 28, 1940. One, United States v. United States Gypsum Co. et al., No. 66008, in the District Court of the United States for the District of Columbia, charged USG, National, Certain-teed, Ebsary, Newark, and numerous officers and employees of these companies and of The American Gypsum Company (acquired by Celotex), with conspiring illegally to fix prices on gypsum board and to eliminate jobbers from the gypsum board industry; the other indictment, United States v. Certain-teed Products Corp. et al., No. 66007, in the District Court of the United States

for the District of Columbia, charged USG and Certain-teed with a conspiracy illegally to fix prices on perforated gypsum lath. The criminal case first described came on for trial in the fall of 1941, and on November 19, 1941, at the conclusion of the Government's case, a verdict was directed in favor of the defendants. A nolle prosequi was filed in the second case on September 17, 1942.

[17] Fifty-one interrogatories were served upon USG, Avery, and Knode; 53 upon National and Baker; 56 upon Certain-teed and Hartley; 42 upon Celotex and Dahlberg; 53 upon Ebsary and Frederick G. Ebsary; 59 upon Newark and Tomkins; 47 upon Texas.

tions were submitted and taken under advisement on May 29, 1944. On June 6, 1944, additional briefs were filed, and on January 17, 1945, the court requested further briefs. The last of these was filed on March 14, 1945.

We proceed to discussion of the several questions of law and fact raised by the motions.

## I

### THE DUTY OF THE COURT ON MOTIONS TO DISMISS UNDER RULE 41(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

At the threshold there must be discussed the question of the duty of the court on motions to dismiss under Rule 41(b). The rule provides, so far as here pertinent:

". . . After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that *upon the facts and the law* the plaintiff has shown no right to relief. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue, operates as an adjudication upon the merits." [Italics supplied]

The defendants assert that under this rule it is the duty of the court to weigh the evidence, to draw inferences therefrom, and, if it finds the evidence insufficient to make out a case for the plaintiff, to render a decision for the defendant on the merits and make findings of fact and conclusions of law. To the contrary, the Government contends that "The sole question presented to the trial judge by such a motion is one of law, namely, whether the plaintiff's evidence and all the inferences fairly to be drawn from it, considered in the most favorable light, make out a prima facie case for relief. . . ." [18] This contention is, in effect, that the court should conduct itself under a motion to dismiss under Rule 41(b) as would a court in a jury trial on a defendant's motion for a directed verdict at the close of the plaintiff's case. We think that this is not correct, but that the duty of the court is that asserted by the defendants as above stated.

The so-called *prima facie* case rule governing the action of judges in jury trials rests upon the established division of functions, in such proceedings, between jury and judge, whereby the jury tries the facts and the judge determines the law. The judge, before verdict, has no function as to the facts except in the limited sense of determining whether there is "a case for the jury." If there is substantial proof of the elements of the plaintiff's charge, the case must go to the jury, even if the judge, if he were the trier of the facts, would himself decide the case against the plaintiff. Putting it otherwise, a judge in a jury trial does not withdraw a case from the jury on a defendant's motion at the end of the plaintiff's case unless the judge can fairly say that no reasonable juryman could find for the plaintiff. Pennsylvania R. Co. v. Chamberlain, 1933, 288 U.S. 333, 53 S. Ct. 391, 77 L.Ed. 819; Gunning v. Cooley, 1930, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Baltimore & Ohio R. Co. v. Groeger, 1925, 266 U.S. 521, 45 S.Ct. 169, 69 L.Ed. 419; Slocum v. New York Life Ins. Co., 1913, 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879, Ann.Cas.1914D, 1029; Jackson v. Capital Transit Co., 1938, 69 App.D.C. 147, 99 F.2d 380, certiorari denied 1939, 306 U. S. 630, 59 S.Ct. 464, 83 L.Ed. 1032; Hopkins v. Baltimore & Ohio R. Co., 1936, 65 App.D.C. 167, 81 F.2d 894.

But in an action tried without a jury the judge is the trier of both the facts and the law. This fundamental distinction between jury and non-jury trials should not be ignored; and if the reason for the jury trial practice does not exist in non-jury trials, where the judge is the trier of the facts, the jury trial practice ought not to be applied but should give way in favor of a practice consistent with the actual function of the judge in non-jury cases and consistent with the spirit of the Federal Rules of Civil Procedure. Rule 1 expressly provides that the rules "shall be construed to secure the just, speedy, and inexpensive determination of every action." Therefore, a court should dispose of a case at the first opportunity which is ap-

---

[18] The Government's contention is phrased in the language of Schad v. Twentieth Century-Fox Film Corp., 3 Cir., 1943, 136 F.2d 991, 993. This case is discussed below.

propriate under the rules and in accord with the rights of the parties. When a court sitting without a jury has heard all of the plaintiff's evidence, it is appropriate that the court shall then determine whether or not the plaintiff has convincingly shown a right to relief. It is not reasonable to require a judge, on motion to dismiss under Rule 41(b), to determine merely whether there is a *prima facie* case, such as in a jury trial should go to the jury, when there is no jury—to determine merely whether there is a *prima facie* case sufficient for the consideration of a trier of the facts *when he is himself the trier of the facts*. To apply the jury trial practice in non-jury proceedings would be to erect a, requirement compelling a defendant to put on his case and the court to spend the time and incur the public expense of hearing it if the plaintiff had, according to jury trial concepts, made "a case for the jury," even though the judge had concluded that on the whole of the plaintiff's evidence the plaintiff ought not to prevail. A plaintiff who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no legal right under the due process clause of the Constitution, to hear the defendant's case, or to compel the court to hear it, merely because the plaintiff's case is a *prima facie* one in the jury trial sense of the term. Porter v. Wilson, 1915, 239 U.S. 170, 36 S.Ct. 91, 60 L.Ed. 204. In Lambuth v. Stetson & Post Mill Co., 1896, 14 Wash. 187, 44 P. 148, a lawsuit in which a jury had been waived, the defendant moved for a nonsuit and dismissal after the plaintiff had put in his evidence and rested. The motion was granted because in the view of the trial judge a fair preponderance of the proof established facts which prevented recovery by the plaintiff. On appeal the plaintiff claimed that the trial judge had no right to weigh the evidence. The Supreme Court of Washington rejected this contention and, in doing so, stated:

"But, where the entire trial is before the court which must finally pass upon the law and facts of the case, there is no good reason why it should not be allowed to determine the facts necessary to a proper application of the law at any time during the trial. It would be worse than useless for the court, after its attention had been called to the insufficiency of the evidence offered by the plaintiff to establish the facts necessary to enable him to recover, and after being satisfied that such was the nature of the evidence introduced by the plaintiff, to require the defendant to put in evidence to disprove that which had been already sufficiently disproved.

"When the trial is before a jury, the court cannot weigh the testimony upon a motion for a non-suit, for the reason that it cannot weigh it at any time; but when the trial is without a jury, the court must eventually weigh the testimony for the purpose of determining where the preponderance is, and there is no reason why it should not so weigh it at the earliest possible time when the rights of the plaintiff will not be cut off by its so doing; and when the plaintiff has introduced all of his proof and rested, no right of his will be cut off if the court then determines what has been proven. It cannot be presumed that plaintiff's case will be strengthened by the evidence put in by the defendant. If, when plaintiff had submitted his evidence, the defendant had rested without putting in any proof, it is clear that the court would have had to determine the questions of fact made by the pleadings upon a preponderance of the testimony. Hence, under the rule contended for by the appellant, the court might be put in the anomalous position of denying the motion for a non-suit, and immediately thereafter, upon the refusal of the defendant to put in any proof, deciding the case in his favor.

"No good purpose could be subserved by refusing to a trial court the right to determine the law in the light of the evidence upon a motion for a non-suit, the same as upon final submission.

"It was the right of the court, upon the motion for non-suit, to decide as to the preponderance of the evidence, and it having decided that such preponderance was with the defendant, and there having been testimony to support such finding, the judgment rendered thereon must be affirmed." [14 Wash. at pages 190–191, 44 P. at page 149]

The Government attacks this reasoning upon the ground that it has no application to a conspiracy case such as the instant case where, according to the Government, "most of the plaintiff's evidence . . . has to come from hostile or *quasi* hostile witnesses. In such cases the plaintiff makes no effort to put in more than a prima facie case in the first instance, recognizing that when the defendants put on their witnesses many additional facts may be brought out. . . ."

No proper distinction can be drawn under the Federal Rules of Civil Procedure between a plaintiff's burden in a conspiracy case and in other cases. The argument of the Government assumes that a plaintiff has some vested or due process interest in hearing the defendant's witnesses and seeing the defendant's documentary evidence,

even though the plaintiff has not been able to establish his own case. This assumption has been rejected, as above pointed out, by the Supreme Court in Porter v. Wilson, supra. The argument is especially lacking in cogency in view of Rules 43(b) and 26 to 37, inclusive, of the Federal Rules of Civil Procedure. These permit a party to call an adverse party and interrogate him by leading questions and contradict and impeach him, and also permit a party to call an officer, director, or managing agent of a public or private corporation, or of a partnership or association which is an adverse party, and cross-examine and contradict and impeach him in all respects as if he had been called by the adverse party. These rules also permit depositions pending action, interrogatories to parties, discovery and production of documents and things for inspection, copying, or photographing, and requests for admissions of facts and of genuineness of documents. These rules were availed of in the instant case. Most of the Government's evidence came either from the lips of officers or employees of the defendants, or from documents obtained from the files of the defendants.

■ The Notes to the Federal Rules of Civil Procedure state, concerning Rule 41 (b):

". . . This provides for the equivalent of a nonsuit on motion by the defendant after the completion of the presentation of evidence by the plaintiff. Also, for actions tried without a jury, it provides the equivalent of the directed verdict practice for jury actions which is regulated by Rule 50."

The Government, in arguing for the "*prima facie* case" construction of the rule, emphasizes the statement that a motion to dismiss under Rule 41(b) is "the equivalent of the directed verdict practice for jury actions which is regulated by Rule 50." But this statement carries the "equivalence" of motions under the two rules unduly far, indeed begs the question which is under discussion. Rule 50(a) provides:

". . . A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. . . ."

Motions under Rules 41(b) and 50(a) are similar in that a motion under either rule leaves the defendant with a right to present his own case if the decision on his motion goes against him; and the motions under the two rules are similar in that both provide a defendant with a method of mid-trial attack upon the plaintiff's case, and a means of determining whether or not the defendant must present his evidence. But beyond these likenesses, motions under Rule 41(b) and Rule 50(a) should be assimilated only so far as is consonant with reason and with the spirit of the Federal Rules of Civil Procedure. To say that Rule 41(b), applying to non-jury cases, provides the equivalent in all respects of motions for a directed verdict in jury trials under Rule 50(a) is to ignore the difference between the functions of the judge in jury cases where the judge is not the trier of the facts and in non-jury cases where he is the trier of the facts.

The Government argues further that Rule 41(b) should be interpreted to require only a jury trial method of viewing the evidence at the end of the plaintiff's case for the reason that as a matter of trial convenience this will save time; otherwise, urges the Government, a judge must "*twice weigh* the evidence," if (it is assumed the Government means) the defendants' motion to dismiss is denied. But this is an unavoidable incident of permitting a mid-trial motion. It is true that under the construction here put upon Rule 41(b) the judge will have to evaluate the plaintiff's evidence, and if he concludes that it substantially supports the plaintiff's cause of action and therefore denies the motion and hears the defendant's case, the judge will then be required again to consider the plaintiff's evidence, in comparison with that of the defendant. But some such burden as this is unavoidable, even under the construction of Rule 41(b) urged by the Government. For if at the close of the plaintiff's evidence the court on a defendant's motion to dismiss, determining merely whether there is such evidence as would warrant sending the case to a jury and finding that there is, denies the motion and puts the defendant to his proof, then at the close of the defendant's case the judge will have to weigh the plaintiff's evidence against that of the defendant; while the

judge's first consideration of the plaintiff's evidence will not be technically a weighing of it, but more accurately speaking a survey, nevertheless the judge will have given consideration to the plaintiff's evidence twice.

There is no authority in this jurisdiction on the question under discussion. Elsewhere there is a division. Supporting the position taken here are the following: Gary Theatre Co. v. Columbia Pictures Corp., 7 Cir., 1941, 120 F.2d 891; Bach v. Friden Calculating Machine Co., 6 Cir., 1945, 148 F.2d 407; Young v. United States, 9 Cir., 1940, 111 F.2d 823; cf. United States v. Blauner Construction Co., D.C.D.Mass.1941, 37 F.Supp. 968.

 The cases relied upon by the Government to support its contention concerning Rule 41(b) are: Federal Deposit Ins. Corp. v. Mason, 3 Cir., 1940, 115 F.2d 548; Schad v. Twentieth Century-Fox Film Corp., 3 Cir., 1943, 136 F.2d 991; Shaw v. Missouri Pac. R. Co., D.C.W.D. La.1941, 36 F.Supp. 651; id., D.C.W.D.La. 1941, 39 F.Supp. 652. See also Reich v. Vegex, 3 Cir., 1943, 137 F.2d 647. Of these cases it is necessary to discuss only Federal Deposit Ins. Corp. v. Mason and Schad v. Twentieth Century-Fox Film Corp. The second of these is based in part upon the first, and the others mentioned proceed upon the same theory as do these two cases. The decision in Federal Deposit Ins. Corp. v. Mason was based solely upon the statement in the Notes to the Federal Rules of Civil Procedure that for actions tried, without a jury Rule 41(b) provides "the equivalent of the directed verdict practice for jury actions which is regulated by Rule 50." Schad v. Twentieth Century-Fox Film Corp. was based in part upon the position just expressed, but in addition upon the view that if Rule 52(a) concerning findings of fact applies to rulings on motions to dismiss under Rule 41(b), it does not contemplate not making findings of fact in the event that a motion is *denied.* The court concluded from this that if a judge in a non-jury proceeding is to weigh the evidence on a motion to dismiss at the close of the plaintiff's case, he must, under Rule 52(a), in the event of the *denial* of the motion, make findings of fact in the plain-

tiff's favor, and this before hearing the defendant's evidence, with the consequence, the court thought, of possible denial of due process to the defendant. In both of these cases the court fails to take account of the difference between a court's function in jury proceedings and in non-jury proceedings. Schad v. Twentieth Century-Fox Film Corp. is, moreover, wrong in its view of the requirement of Rule 52(a) concerning findings of fact. That rule provides, so far as here pertinent:

". . . In all actions tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment . . . ."

When this is read in connection with Rule 41(b), it is clear that findings of fact are not to be made upon *denial* of a motion to dismiss. Under Rule 41(b) it is *dismissal,* not refusal to dismiss, that operates "as an adjudication upon the merits" and entitles a party to "entry of the appropriate judgment." If a motion to dismiss is denied, the mid-trial attack allowed the defendant has failed and the case is not complete. No final adjudication on the merits can be made, therefore, until the defendant's case has been heard and evaluated by the judge in comparison with the case of the plaintiff. It would, therefore, be useless to make findings of fact upon *denial* of a motion to dismiss. It may be noted, however, that even if Rule 52(a), read in connection with Rule 41(b), be construed as requiring findings of fact upon the denial of a motion to dismiss, there could hardly be denial of due process to the defendant in the making of such findings. Findings of fact under such circumstances would be merely interlocutory. It is not to be assumed that a trial judge is incapable, after hearing a plaintiff's case and determining from it alone that the plaintiff would be entitled to prevail, of holding his mind open to hear the defendant's evidence before reaching a final determination as to the rights of the two parties. We conclude that under Rule 41(b) it is the duty of the court to weigh the evidence, to draw inferences therefrom and, if it finds the evidence insufficient to make out a case for the plaintiff, to render a decision for the defendant on the merits.

Once this view is taken it is clear that it becomes the duty of the court, on *granting* a motion to dismiss under Rule 41(b), to make findings of fact. Rule 52(a) requires findings of fact and conclusions of law "In all actions tried upon the facts without a jury." Obviously, if the defendant were to rest his case at the time he made his motion to dismiss, the court on granting the motion would be under a duty to make findings. Under Rule 50(a) the defendant is not required to rest; he has a right to offer evidence in the event his motion to dismiss is denied. But the existence of this right is not persuasive that the court is not to make findings of fact if, under the view here taken of Rule 41(b), the defendant, without resting, moves to dismiss and the court *grants* the motion. A case has been "tried upon the facts" when the plaintiff's evidence, weighed by the judge, has been found insufficient. A dismissal under Rule 41(b) operates "as an adjudication upon the merits." Attention is called to the fact that in three of the cases (to wit, Gary Theatre Co. v. Columbia Pictures Corp., United States v. Blauner Construction Co., and Young v. United States) cited above as supporting the position here taken on the duty of the court on a motion to dismiss under Rule 41(b), findings of fact were made under Rule 52(a) on the granting of a motion to dismiss; and in the fourth case cited (Bach v. Friden Calculating Machine Co.), where the trial court failed to make findings of fact, the Circuit Court of Appeals required them to be made. The argument of the Government against making findings of fact hangs from its view, which we here reject, that on a motion to dismiss under Rule 41(b) the court does not weigh the evidence but merely follows the jury trial practice of determining whether or not a *prima facie* case has been established. There would, of course, be little point in making findings of fact on the decision of the mere "question of law" whether a plaintiff, if his evidence and legitimate inferences to be drawn therefrom are looked at in the most favorable light, has made a case sufficient to present to a jury if the proceeding were a jury proceeding.

If the court decides on a motion to dismiss under Rule 41(b) that upon the facts and the law the plaintiff has shown no right to relief, conclusions of law, as well as findings of fact, must be made under Rule 52(a), and the court must direct the entry of the appropriate judgment, *i.e.,* a judgment of dismissal on the merits.

We proceed to consider and weigh the evidence, pausing first, however, to determine a paramount question of law.

II

THE LEGALITY OF THE LICENSE AGREEMENTS

Are the patent license contracts described in the statement of facts at the outset of this opinion lawful: This question is to be answered in the light of the nature of the principal patents upon which the agreements were founded (the Utzman, Roos and Haggerty patents), in the light of the fact that the defendants make and sell substantially all of the gypsum board in the "Eastern area," and in the light of the terms and conditions of the license agreements, including especially the provisions for establishment and protection by USG of minimum prices on patented gypsum board manufactured and sold by the licensees. This question must be answered in the affirmative if no material distinction exists between the instant case and United States v. General Electric Company, 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362.

For purposes of comparison reference to the General Electric case must be made at some length. The case presented two questions. The first involved the legality under the Sherman Act of a system of distribution adopted by the General Electric Company (hereinafter referred to as General Electric) and used by the Westinghouse Electric and Manufacturing Company and the Westinghouse Lamp Company (both hereinafter referred to as Westinghouse, the Lamp Company being a wholly owned subsidiary and selling agent of the Electric and Manufacturing Company), whereby electric lamps were distributed direct to the consumer through a complex del credere agency arrangement. It was charged that this system of distribution was merely a device to enable General Electric to fix the resale price of lamps in the hands of

purchasers—which it was asserted the "agents" were in fact. This first question did not turn on the rights of a patent owner, but some consideration of it is necessary to an understanding of the second question. The latter involved the validity under the Sherman Act of a license granted March 1, 1912, by General Electric to Westinghouse to make, use and sell lamps under patents owned by General Electric. It was charged that the license provided that Westinghouse would, with regard to lamps manufactured by it under the license, follow the prices and maintain the terms and conditions of sale observed by General Electric in the distribution of lamps which it made.

Prior to 1912 in a suit between the United States and the three defendants in the General Electric case and thirty-two other corporations, a consent decree was entered dissolving, as illegal, a combination charged with restraint of interstate commerce in electric lamps, and enjoining fixing of resale prices for purchasers, but permitting the owner of patents to fix the prices at which a licensee should sell lamps. In 1912, after the consent decree, a new plan was evolved by General Electric whereby through a comprehensive system lamps were distributed directly to the consumer. Recognizing that the plan was devised to enable General Electric "to deal directly with consumers and purchasers, and . . . to avoid selling the lamps owned by the [General Electric] company to jobbers or dealers, and prevent sale by these middle men to consumers at different and competing prices," the Court said that the question (in this first aspect of the case) is "whether, in view of the arrangements, made by the company with those who ordinarily and usually would be merchants buying from the manufacturer and selling to the public,—such persons are to be treated as agents, or as owners of the lamps consigned to them under such contracts." (272 U.S. at pages 483, 484, 47 S.Ct. at page 194; 71 L.Ed. 362) The Court reviewed the provisions of the contracts for distribution and held they were bona fide agency agreements and that they involved no sale to the agents and hence no resale price fixing. That the decision in this aspect of the case did not turn upon the fact that a patented article was involved was made clear by the statement of the Court that "there is nothing as a matter of principle, or in the authorities, which requires us to hold that genuine contracts of agency like those before us, however comprehensive as a mass or whole in their effect, are violations of the Anti-Trust Act. The owner of an article, patented or otherwise, is not violating the common law, or the Anti-Trust law, by seeking to dispose of his article directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer." (272 U.S. at page 488, 47 S.Ct. at page 196, 71 L.Ed. 362)

The second question in the case arose out of the following facts. General Electric was the owner of three patents, the Just & Hanaman "basic" patent of 1912 for the use of tungsten filaments in the manufacture of electric lamps, the Coolidge patent of 1913 covering a process of manufacturing tungsten filaments by which their tensile strength and endurance were increased, and the Langmuir patent of 1916 for the use of gas in electric lamp bulbs to increase the intensity of the light. These three patents, so the Court stated, "cover completely the making of the modern electric lights with the tungsten filaments, and secure to the [General] Electric Company the monopoly of their making, using and vending." (272 U.S. at page 481, 47 S.Ct. at page 193, 71 L. Ed. 362) The nature of these patents and their relation to the art are detailed later in this topic. The license, founded upon the foregoing patents (and others), granted by General Electric to Westinghouse on March 1, 1912, gave Westinghouse, in consideration of royalties to be paid, the right to manufacture, use and sell electric lamps having tungsten filaments, and contained certain restrictive provisions as to the prices, terms and conditions under which Westinghouse might sell the product made under the license. The detailed provisions of the license will also be discussed below. Additional licenses of none price fixing character but containing quantity restrictions were granted to persons other than Westinghouse; these licenses will be

adverted to below. The Government contended that the license to Westinghouse not only obligated that company to follow the prices, terms and conditions of sale to be fixed from time to time by General Electric and observed by it, but also required Westinghouse to adopt the General Electric agency distribution plan. Westinghouse had, as a matter of fact, adopted the agency plan of distribution and had followed the same restrictions in the case of its own agents as those prescribed by General Electric, but it contended that it was not required to do so. The Court considered this point of dispute immaterial, saying: "It does not appear that this provision was express in the license, because no such plan was set out therein; but even if the construction urged by the Government is correct, we think the result must be the same." (272 U.S. at page 489, 47 S.Ct. at page 196, 71 L.Ed. 362)

By unanimous decision the Court sustained the validity of the General Electric-Westinghouse license. It held that the restrictive provisions were not violative of the Sherman Act. In reaching this conclusion, the Court analyzed the rights of the owner of a patent, recognized that a patentee's right to acquire a profit by the price at which the product is sold is a substantive right, and held that the terms and conditions contained in the license were such as were reasonably adapted to secure to the owner of the patent the pecuniary reward to which he is entitled. The Court necessarily passed upon the validity of the restrictions in the license because they were a part of the license contract which was before the Court.[19] Further reference to the license agreement is made later. In discussing the rights of a patent owner, the Court said:

"The owner of a patent may assign it to another and convey, (1) the exclusive right to make, use and vend the invention throughout the United States, or, (2) an undivided part or share of that exclusive right, or (3) the exclusive right under the patent within and through a specific part of the United States. But any assignment or transfer short of one of these is a license, giving the licensee no title in the patent and no right to sue at law in his own name for an infringement. Waterman v. Mackenzie, 138 U. S. 252, 255 [11 S.Ct. 334, 34 L.Ed. 923]; Gay-ler v. Wilder, 10 How. 477, 494, 495 [13 L.Ed. 504]; Moore v. Marsh, 7 Wall. 515 [19 L.Ed. 37], and Crown [Die and Tool] Company v. Nye Tool [& Machine] Works, 261 U.S. 24, 30 [43 S.Ct. 254, 67 L.Ed. 516]. *Conveying less than title to the patent, or part of it, the patentee may grant a license to make, use and vend articles under the specifications of his patent for any royalty or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.* It is well settled, as already said, that where a patentee makes the patented article and sells it, he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee's rights. Adams v. Burke, 17 Wall. 453 [21 L. Ed. 700]; Bloomer v. McQuewan, 14 How. 539 [14 L.Ed. 532]; Mitchell v. Hawley, 16 Wall. 544 [21 L.Ed. 322]; Hobbie v. Jennison, 149 U. S. 355 [13 S.Ct. 879, 37 L.Ed. 766]; Keeler v. Standard Folding Bed Co., 157 U.S. 659 [15 S. Ct. 738, 39 L.Ed. 848]. But the question is a different one which arises when we consider what a patentee who grants a license to one to make and vend the patented article may do in limiting the licensee in the exercise of the right to sell. The patentee may make and grant a license to another to make and use the patented articles, but withold his right to sell them. The licensee in such a case acquires an interest in the articles made. He owns the material of them and may use them. But if he sells them, he infringes the right of the patentee, and may be held for damages and enjoined. *If the patentee goes further, and licenses the selling of the articles, may he limit the selling by limiting the method of sale and the price? We think he may do so, provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly. One of the valuable elements of the exclusive right of a patentee is to acquire profit by the price at which the article is sold. The higher the price, the greater the profit, unless it is prohibitory. When the patentee licenses another to make and vend, and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods. It would seem entirely reasonable that he should say to the licensee, 'Yes, you may make and sell articles under my patent, but not so as to destroy the profit that I wish to obtain by making them and selling them myself.'* He does not thereby sell outright to the licensee the articles the latter may make and sell, or vest absolute ownership in them He restricts the property and interest the licensee has in the goods he makes and proposes to sell.

"This question was considered by this Court in the case of Bement [& Sons] v. National Harrow Company, 186 U.S. 70 [22 S.Ct. 747, 46 L. Ed. 1058]. A combination of manufacturers owning a patent to make float spring tool harrows, licensed others to make and sell the products under the patent, on condition that they would not during the continuance of the license sell the products *at a less price, or on more favorable terms of payment and delivery to pur-*

---

[19] The license agreement was Exhibit A to a stipulation of facts upon which the case was submitted.

chasers, than were set forth in a schedule made part of the license. That was held to be a valid use of the patent rights of the owners of the patent. It was objected that this made for a monopoly. The Court, speaking by Mr. Justice Peckham, said ([186 U.S. at] p. 91 [22 S.Ct. 755]):

"'The very object of these laws is monopoly, and the rule is, with few exceptions, that *any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal.'*

"Speaking of the contract, he said ([186 U.S. at] p. 93 [22 S.Ct. 756]):

"'*The provision in regard to the price at which the licensee would sell the article manufactured under the license was also an appropriate and reasonable condition. It tended to keep up the price of the implements manufactured and sold, but that was only recognizing the nature of the property dealt in, and providing for its value so far as possible. This the parties were legally entitled to do. The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it or sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article.'*

"The question which the Court had before it in that case came to it on a writ of error to the Court of Appeals of New York, and raised the federal issue whether a contract of license of this kind, having a wide operation in the sales of the harrows, was invalid because a violation of the Anti-Trust law. This Court held that it was not." [Italics supplied] [272 U.S. at pages 489–491, 47 S.Ct. at pages 196, 197, 71 L.Ed. 362]

The Court in the General Electric case held that Bement v. National·Harrow Company, 1902, 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, had not been overruled by Motion Picture Patents Co. v. Universal Film Co., 1917, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas. 1918A, 959, in which it had held that the owner of a patented machine could not grant a license for its use conditioned upon the use in it of certain unpatented products.

The Court distinguished certain cases in which it had ruled that restrictions as to price of patented articles were invalid (Boston Store v. American Graphophone Co., 1918, 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551, Ann.Cas.1918C, 447; Straus v. Victor Talking Machine Co., 1917, 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A.1917E, 1196, Ann.Cas.1918A, 955; Bauer & Cie v. O'Donnell, 1913, 229 U.S. 1, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R.A.,N.S., 1185,

Ann.Cas.1915A, 150; Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20; Bobbs-Merrill Co. v. Straus, 1908, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086), holding that those cases were but "instances of the application of the principle of Adams v. Burke, 17 Wall. 453, 456 [21 L. Ed. 700] . . . that a patentee may not attach to the article made by him, or with his consent, a condition running with the article in the hands of purchasers, limiting the price at which one who becomes its owner for full consideration shall part with it." (272 U.S. at pages 493, 494, 47 S.Ct. at page 198, 71 L.Ed. 362) - The Court said that these cases "do not consider or condemn a restriction put by a patentee upon his licensee as to the prices at which the latter shall sell articles which he makes and only can make legally under the license." (272 U.S. at page 494, 47 S.Ct. at page 198, 71 L.Ed. 362)

The right of a patent owner to control the terms and conditions including the minimum price under which a licensee may make and sell the patented product as established in the Bement and General Electric cases has not been denied or qualified in later cases. On the contrary, the later cases reaffirm that right. In Carbice Corp. v. American Patents Development Corp., 1931, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, holding that a patent licensor cannot exact as a condition of a license that unpatented materials used in connection with the invention (a manufacture) shall be purchased from the licensor, the Supreme Court nevertheless recognized that a patent owner "can grant licenses upon terms consistent with the limited scope of the patent monopoly, United States v. General Electric Co., 272 U.S. 476, 489 [47 S.Ct. 192, 71 L.Ed. 362]." (283 US. at page 31, 51 S.Ct. at page 335, 75 L.Ed. 819) In General Talking Pictures Corp. v. Western Electric Co., 1938, 304 U.S. 175, 546, 58 S.Ct. 849, 82 L.Ed. 1273, on rehearing 1938, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81, further rehearing denied 1939, 305 U. S. 675, 59 S.Ct. 355, 83 L.Ed. 437, the Court upheld a license to manufacture amplifiers under the licensee's patent where the license was "to manufacture . . ., and to sell only for radio amateur recep-

tion, radio experimental reception and radio broadcast reception" (305 U.S. at page 126, 59 S.Ct. at page 117, 83 L.Ed. 81), and held that sales by such a licensee for use in the commercial field constituted an infringement, *i.e.,* a violation of the license. In holding that this restriction was valid, the Court said: "That a restrictive license is legal seems clear. Mitchell v. Hawley, 16 Wall. 544 [21 L.Ed. 322]. As was said in United States v. General Electric Co., 272 U.S. 476, 489 [47 S. Ct. 192, 196, 71 L.Ed. 362], the patentee may grant a license 'upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.' The restriction here imposed is of that character." (305 U.S. at page 127, 59 S.Ct. at page 117, 85 L.Ed. 81.) This was upon rehearing. In the opinion written when the case was first heard, the Court said: "Unquestionably, the owner of a patent may grant licenses to manufacture, use or sell upon conditions not inconsistent with the scope of the monopoly." (304 U.S. at page 181, 58 S.Ct. at page 852, 82 L.Ed. 1273) In Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, the Court held that certain restrictions in motion picture distributors' licenses to exhibitors exceeded the scope of a copyright monopoly, but, expressly referring to the Bement and General Electric cases, recognized that "a patentee has power to control the price at which his licensee may sell the patented article . . . ." (306 U.S. at page 228, 59 S.Ct. at page 475, 83 L.Ed. 610) In Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852, wherein control of jobbers' resale prices was held illegal, a provision in patent licenses whereby licensee refining companies were required to sell the patented product—Ethyl gasoline—"at a certain fixed price differential above the average net sales price of the licensees' best non-premium grade of commercial gasoline" (309 U.S. at page 448, 60 S.Ct. at page 621, 84 L.Ed. 852), was not questioned; and the General Electric case was referred to and its principle recognized. In United States v. Masonite Corp., 1942,

316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461, rehearing denied 1942, 316 U.S. 713, 62 S. Ct. 1302, 86 L.Ed. 1778, the Court disapproved an "agency" arrangement set up in the "hardboard" industry, but said that the case did not present "any question as to the validity of a license to manufacture and sell, since none of the 'agents' exercised its option to acquire such a license from Masonite. Hence we need not reach the problems presented by Bement v. National Harrow Co., 186 U.S. 70 [22 S. Ct. 747, 46 L.Ed. 1058], and that part of the General Electric case which dealt with the license to Westinghouse Company." (316 U.S. at page 277, 62 S.Ct. at page 1077, 86 L.Ed. 1461) In United States v. Univis Lens Co., 1942, 316 U.S. 241, 62 S. Ct. 1088, 86 L.Ed. 1408, the Court held that fixing the price of a patented article beyond the first sale constituted an improper extension of the scope of the patent monopoly, but said that in this view of the case there was no occasion for reconsideration of the General Electric case, and the Court in no way rejected the proposition announced by the lower court in United States v. Univis Lens Co., D.C.S.D.N.Y. 1941, 41 F.Supp. 258: "Nor does the owner of a patent violate the Sherman Anti-Trust Law by fixing prices in license agreements under which articles may be manufactured and sold by the licensees. United States v. General Electric Co., 272 U.S. 476 [47 S. Ct. 192, 71 L.Ed. 362] . . . ; E. Bement & Sons v. National Harrow Co., supra . . . ." (41 F.Supp. at page 264) In Mercoid Corp. v. Mid-Continent Investment Co., 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L. Ed. 376, rehearing denied 1944, 321 U.S. 802, 64 S.Ct. 525, 88 L.Ed. 1089, and Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 1944, 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396, rehearing denied 1944, 321 U. S. 802, 64 S.Ct. 526, 88 L.Ed. 1089, cases dealing with combination patents covering installed heating systems, which neither the patent owner nor the licensees manufactured or installed, the Court held that the patent monopoly could not be extended to include the imposition of otherwise illegal restrictions on the sale of unpatented stoker switches used in the heating system, but

426

the Court in no way discountenanced the Bement and General Electric cases. The Mercoid cases are referred to again below.

█ The General Electric case has been stated above in broad outline, and from the facts and questions presented in the case and the decision thereon and the language quoted from the opinion, it is seen that the primary propositions for which the case stands are that a patentee may divide his monopoly by licensing the right to make, use and vend the patented product, and that he may fix the terms and conditions, including the price, under which the patented product shall be sold, subject only to the limitation that such terms and conditions do not yield to the patentee more than the normal and reasonable reward of a patent monopoly. Additional propositions for which the case stands, corollary to these primary propositions, will be stated later.

█ The problem presented in such cases as the General Electric case and the instant case is that of determining whether or not the monopoly accorded to an inventor under the patent laws has been extended beyond its proper operation under those laws and into the field denounced by the Sherman Act. The patent laws and the Sherman Act exist side by side, each being entitled to full recognition and application by the courts.[20] The nature of a patent

20 In a Senate debate preceding the enactment of the Sherman Act, Senator Sherman, its proponent, stated:

" . . . · It is the unlawful combination, tested by the rules of common law and human experience, that is aimed at by this bill, and not the lawful and useful combination. Unlawful combinations made by individuals are declared by the several states to be against public policy and void, and in proper cases they may be punished as criminals. If their business is lawful they can combine in any way and enjoy the advantage of their united skill and capital, provided they do not combine to prevent competition. A limited monopoly secured by a patent right is an admitted exception, for this is the only way by which an inventor can be paid for his invention." (21 Cong.Rec. 2457 (1890) )

The use of the term "limited monopoly" by Senator Sherman makes it pertinent to comment that there is a distinction between a patent monopoly and other monopolies granted by the Government. A patent to land, either upon purchase from the Government or by virtue of satisfaction of the homestead or mining laws, grants to the patentee a right to land upon which, prior to the issuance of the patent, the applicant had no claim; on the contrary, it was wholly owned by the Government in trust for the people; such a patent moreover grants the land in perpetuity. A patent monopoly is not only limited in time to seventeen years but also it grants nothing that either the Government or anyone else has theretofore owned or possessed. It is the applicant's invention or discovery—as a result of his own energy and of his ingenuity beyond the ordinary skill of the art—of "any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof" (Rev.Stat. § 4886 (1875), as amended, 35 U.S.C.A. § 31) which is the basis for the issuance of a patent. An inventor is under no legal obligation · to disclose or to use the fruit of his thought and labor. The patent laws, upon the theory that the public will benefit by disclosure and use of inventions, offer him, in consideration of disclosure, an exclusive right to make, use and vend for a period of seventeen years. It is true, as stated by Mr. Justice Story in Pennock and Sellers v. Dialogue, 1829, 2 Pet. 1, 7 L.Ed. 327, that the promotion of the progress of science and the useful arts is the main objective of the patent laws and that the reward of inventors is secondary and merely a means to that end. It is true, also, as said by Mr. Justice Daniel in Kendall v. Winsor, 1858, 21 How. 322, 329, 16 L.Ed. 165, that "Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these." And it is true, as said in United States v. Masonite Corp., supra, that this. must be the point of departure for decision on the facts of antitrust cases involving patents "lest the limited patent privilege be enlarged by private agreements so as to by-pass the Sherman Act." (316 U.S. at page 278, 62 S.Ct. at page 1078, 86 L.Ed. 1461) But these statements do not narrow the ruling in the General Electric case. They but put in other words the limitation expressed in that case—that the terms and conditions of a patent license are not to yield to the patentee more than the normal and reasonable reward of a patent monopoly.

monopoly and of the rights thereunder and the relationship of a patent monopoly to the Sherman Act were discussed in an illuminating manner in United States v. Motion Picture Patents Co., D.C.E.D.Pa.1915, 225 F. 800, appeal dismissed per stipulation of counsel 1918, 247 U.S. 524, 38 S.Ct. 578, 62 L.Ed. 1248, hereinafter referred to as the Motion Picture Patents case. That case was not cited in the General Electric case, but it has been cited, and with approval, more recently by the Supreme Court. Standard Oil Co. v. United States, 1931, 283 U.S. 163, 174, 51 S.Ct. 421, 75 L.Ed. 926; cf. Hartford-Empire Co. v. United States, 1945, 323 U.S. 386, 415, 65 S.Ct. 373, 89 L.Ed. 322, rehearing denied 1945, 324 U.S. 570, 888, 65 S.Ct. 815, 89 L.Ed. 1198. In the Motion Picture Patents case motion picture producers and importers, some of whom had patents upon articles such as positive films, cameras and projecting machines, formed a combination. They created a board to censor films, established exchanges and refused to sell films to operators of theaters who did not belong to the exchanges and who did not pay royalties on their machines to the combination, regardless of when or from whom the machines were purchased. It was attempted to justify the restrictions as a protection of the patent rights of the parties to the combination. The court held that the combination was invalid as a violation of the Sherman Act for the reason that the regulations imposed did not bear a normal relation to the protection of patent rights, but were on the contrary intended to accomplish the imposition upon the trade of undue and unreasonable restraints with the direct result of monopolizing trade in all the accessories of the motion picture art, and the further end, largely achieved, of dominating the motion picture business itself. District Judge Dickinson, who wrote the opinion, pointed out that the right to make, use and vend the subject matter of a patent is the natural right of an inventor and that what the patent law does is to withhold for a limited period of time from all others than the patentee or his assigns, the right to make, use or vend the patented article; he pointed out also that *the monopoly recognized by the patent law is not the monopoly condemned by the Sherman Act.* He said: "To hold otherwise would clearly be . . . a logical absurdity, because *there can be no such thing as restraint in a trade which has no existence, and a monopoly created by law, in pursuance of a policy of the law, cannot be said to result from such restraint.* To transfer a phrase from the opinion of Judge Cochran, in Patterson v. United States [6 Cir., 1915, 222 F. 599, 620, certiorari denied 1915, 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499], which was directed to something else, but which is applicable here: 'There can be no monopolizing in the legal and accurate sense of the word where there can be no common occupation.'" (Italics supplied) (225 F. at pages 804, 805) Judge Dickinson said also:

"We have, therefore, to determine the limits of a right and a wrong which seem to overlap each other. It is the right of a patentee, through having the exclusive sale of the patented article, to control, and in that sense, to monopolize, the trade in it. It is wrong by any illegal restraint of trade to monopolize it, or any part of it. On the one hand, it cannot have been intended to make it unlawful to acquire that the right to which the law has conferred. On the other hand (as already observed), it cannot be that the grant of a patent right confers a license to do that which the law condemns.

*"The solution of the problem is to be sought by finding the special field of operation of each of these laws.* There is a field of trade, the sole occupancy of which may be in a patentee. Here he is supreme, and the keeper of the gate of entrance. There is another field which is in the common occupancy of all. Where the law has given the whole field to a patentee, with the express right of exclusion of others, and the use of the power of the law to enforce the exclusion, it is unthinkable that such exclusion is an illegal restraint of trade. Where the field, however, is open to all, competition for trade is likened to a race in which all may enter, but in which there must be no unfair jostling or hampering of others. Each one is free to exert all his powers, and distance, if he can, all competitors, and win all the prizes; but he must run fairly and accord to others a like freedom. If he possesses a patented device which will aid him in the race, he may use it, as he may use any other form of property; but he must put it only to its proper use, and if he uses it as a weapon to disable a rival contestant, or to drive him from the field, he cannot justify such use, because of his patent right, except to the extent of protecting his exclusive right. *We have, therefore, the principle, which is recognized in all the cases, that if the subject-matter of a contract, which otherwise would be illegal because in restraint of trade, is a patented article, this takes away the illegality only to the extent to which the field of the trade, controlled through the combination, is coextensive with the field within which exclusive control has been*

*granted by the law.* This is the doctrine of Henry v. [A. B.] Dick [Co.], 224 U.S. 1, 32 S. Ct. 364, 56 L.Ed. 645, Ann.Cas.1913D, 880, Bement [& Sons] v. [National] Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, the Bath Tub Case [Standard Sanitary Mfg. Co. v. United States], 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107, and all the other kindred cases to which we have been referred.21

"The difference between this private field and the common field of trade is, as a distinction, sufficiently clear; but there may be again an overlapping. The owner of a patented article has the right to enter upon this common field of trade. *His patented article may be so superior, or of such less cost than anything else upon the market, as to supplant all others and give to him the whole trade as effectually as if his patented article has originally had the field to itself. Indeed, its ownership may be sought, for the reason that it has this possibility of power.* Again, the patent may apply to only certain features of the article of trade, and yet enable the owner to reap the same advantage, and control a trade in what is beyond the exclusive rights given by the patent. The special circumstances affecting a particular contract or combination may make the principle difficult of application, and the line of legality or illegality hard to draw; but the principle remains the same. *The legality of such a contract is determined by the judgment of whether, in its whole scope and legal intendment, it is fairly limited in its operation to the proper field of trade belonging to the patentee, and whether any further advantages which flow to him are fairly incidental, and are not the evil fruit of unfair practices employed to restrain the right of others to a share of the common trade. It is the legal intendment of the contract or combination which is to be found.* The motives of the contracting parties, whether innocent or otherwise, do not determine the real character of their act; but it is determined through the judgment of the law. Motives and intentions, except as declared, or appearing from the character of the act, are too vague and difficult of ascertainment to be made the basis of the legal judgment called for in such cases. A conspiracy under this statute, as at common law, may have, as an element, the seeking of an unlawful end or the employment of unlawful means.

"We learn from the opinion in the Keystone Watch Case Case [United States v. Keystone Watch Case Co., D.C., 218 F. 502] that *the prohibited restraint of trade, beside being undue and unreasonable, must be the direct, and not a merely incidental, result of the contract or combination, before the latter will be condemned as illegal. If it is asked to be condemned, not because of the illegality of the means employed to accomplish its end, but because monopoly results as a consequence, the monopoly must be shown to be an unlawful monopoly, not the monopoly granted by the patent laws. A contract or agreement among business men, which had as its end to preserve to the owners of a patent the exclusive sale of the patented article, and as its means the exercise of due, reasonable, and fairly proper control over sales to be made, would not be condemned as void in itself, or justify any inference of guilt under the act of 1890.* Where, however, by what was agreed to be done, the end indicated, in the sense of the result to be expected, was a monopolistic control of what was not the exclusive property of any one, or such a monopoly was the direct result of undue and unreasonable restraints of trade, to be employed as the means of carrying out what was to be done, the fact that anyone or more of the persons concerned owned patents would not prevent a finding of conspiracy." [Italics supplied] [225 F. at pages 805–807]

In the Bement, General Electric and Motion Picture Patents cases are found the principles and propositions which must be applied in cases such as the instant case, *i.e.,* in cases where it is charged that patent license agreements and operations thereunder violate the Sherman Act.

The Government, however, urges that the General Electric case and the instant case are distinguishable. It is said first that in the General Electric case the patents completely covered the incandescent lamp, whereas in the instant case they do not completely cover the patented product. Second, it is asserted that in the General Electric case the licensing, so far as price fixing restrictions are concerned, extended only to Westinghouse, a single competitor of General Electric, and that the percentage of manufacturing and sale of patented electric lamps controlled by General Electric and Westinghouse was but 85% of the total business of this type; whereas, in the instant case, the licensing, all of which involved price fixing, extends to six competitors, and the licensor and licensees

21 Henry v. A. B. Dick Co. was overruled in Motion Picture Patents Co. v. Universal Film Co., supra, upon the ground that the grant of a patent to a machine is of the exclusive right to use the mechanism and produce the result with any appropriate material, but that such material is no part of the patented machine or of the combination which produces the patented result, and that therefore the owner of the patent cannot restrict use of the machine to material supplied by him. In the General Electric case the Court stated that "The overruling of the Dick case and the disapproval of the Button-Fastener case [Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 6 Cir., 77 F. 288, 35 L.R.A. 728], by the Motion Picture Film case did not carry with it the overruling of Bement [& Sons] v. [National] Harrow Company." (272 U. S. at page 493, 47 S.Ct. at page 198, 71 L. Ed. 362.

manufacture and sell 100% of the patented product in the "Eastern area." Third, it is contended that in the General Electric case the terms and conditions of the patent license related only to price fixing and were not unduly restrictive, whereas in the instant case the terms and conditions of the licenses go beyond mere price fixing and are unduly restrictive. In order to discuss these contentions, it is necessary somewhat further to detail the facts as shown by the opinion and by the record in the General Electric case. This will serve the purpose also of disclosing the corollary propositions, alluded to above, for which the General Electric case stands. The case was heard in the Supreme Court upon a record (of some 875 printed pages) which included a "stipulation by counsel for all parties which, together with the exhibits attached thereto and filed therewith, contains all the evidence upon which the case was tried in the District Court, and the said exhibits attached to said stipulation." (Record, United States v. General Electric Company et al., No. 113, Supreme Court, October Term 1926, at 875. This record is hereinafter for convenience referred to as the G.E. Record.)

*In respect of the nature of the patents in the General Electric case and in the instant case:* The first incandescent electric lamp was invented in 1880 by Thomas Edison. The original patents for such lamps had expired long before the General Electric-Westinghouse license agreement was executed in 1912. The light giving element in the lamp of 1880 was a carbon filament. In 1904 an improved carbon filament known as "metallized carbon filament" was invented. Next a tantalum filament lamp was introduced. This reduced the consumption of current substantially as compared with the standard carbon filament lamp, but it was not a satisfactory lamp for use on alternating current. Therefter a tungsten filament incandescent electric lamp was introduced and was developed to such an extent that it consumed only about one-third of the current consumed by the carbon filament lamp in its best form, and less than one-half of that consumed by the metallized carbon filament lamp, for the production of an equal amount of light. The tungsten filament lamp was therefore superior to those containing carbon filaments or metallized carbon or tantalum filaments. But the patents covering the tungsten filament lamp were not "basic" in the sense that they covered a fundamentally new and basic invention covering completely an incandescent electric lamp. They were merely for improvements upon the original invention of Edison of 1880. The tungsten filament manufactured under the Just & Hanaman patent of 1912 was brittle and in consequence expensive to manufacture and easily broken in shipment and use. The Coolidge patent of 1913 covered improvements which merely increased the tensile strength and endurance of the tungsten filament. The Langmuir patent of 1916 further improved the incandescent electric lamp by the introduction of gas into the bulb, and this improvement came to be used in many but not all of the tungsten filament lamps made. It thus appears that the Just & Hanaman, Coolidge and Langmuir patents (the three patents specifically mentioned in the opinion of the Court in the General Electric case) covered various features of the incandescent lamp having a tungsten filament, which represented a further development in the incandescent lamp field over the lamps with carbon, metallized, or tantalum filaments. At the time the General Electric-Westinghouse license was executed in 1912 about 50% of the total number of lamps sold were of the ordinary carbon filament type. After nine years of operation under the license, the percentage of tungsten filament lamps increased, because of their superior quality, to some 97% of total production. The General Electric Company occupied a dominant position in the incandescent lamp industry by reason of its patent ownership. It had patents not only on the tungsten filament lamps but also on the carbon and tantalum filament lamps, and the latter were included in the General Electric-Westinghouse license and the licensor reserved the right to fix the price of lamps having metallized carbon or tantalum filaments the same as it did in respect of tungsten filament lamps. The Court in the General Electric case drew no distinction as to General Electric's rights as the owner of

patents covering different types of lamps. The step by step progress in electric lamp production was founded upon the original basic work of Edison.[22]

The principal patents upon which the license agreements in the instant case were founded, to wit, the Utzman, Haggerty and Roos patents, typical claims of which have been set out in the statement of facts at the outset of this opinion, were product patents upon a building material called plasterboard or wallboard. The patents, as will be noted from the claims, were upon the entire product, not merely upon the edge of the board in the Utzman patent, or upon the starch in the Haggerty patent, or upon the bubbles or air cells in the Roos patents. As appears in the statement of facts, these patents covered important developments in the gypsum board manufacturing industry. The open-edge board which preceded the closed-edge board of the Utzman patent had defects in that there was in its manufacture wastage due to the necessary trimming of the board edge, the edge was weaker, and the core would sift out in handling and nailing. When the closed-edge board of the Utzman patent came into the market the open-edge board was largely displaced under the demand of the trade for the better product. The Haggerty patent, directed to the employment of starch or a cooked carbohydrate in the core of the board to insure a good bond between the core and the paper covering sheets, solved the "peeler" trouble in the gypsum board industry, and made possible the modern high speed production of gypsum board. The Roos patents, covering cellular core gypsum board produced by the employment of foam or a foaming agent in the core to produce innumerable cells or voids, thereby lightening the board and lending desirable nailing and other qualities thereto, supplanted the sawdust theretofore a necessary "aggregate" used in the core. Sawdust had become difficult to obtain and was moreover unsatisfactory as an "aggregate" because of variation in quality and character, which produced manufacturing difficulties. The use of the foam of the Roos patents solved these difficulties and produced a superior product with reduced manufacturing costs. Thus while the gypsum board manufacturing industry and the electric lamp industry deal with different materials, both nevertheless important to the occupants of modern houses and buildings, there is a parallel between the development of the two industries in the step by step improvements in an important product—gypsum board as a building material and the incandescent electric lamp as a lighting medium.

We think no substantial distinction can properly be drawn between the instant case and the General Electric case in respect of the importance of the patented improvements within the respective industries, or in respect of the nature of the patents which underlie the license agreements in the two cases. The basic patents on gypsum board had expired, we assume (it is so asserted by the Government and not denied by the defendants), before the execution of the license agreements in the instant case. The Utzman patent itself was for an improvement and it expired August 6, 1929. Likewise in the General Electric case the basic Edison patents of 1880 had expired at the time of the General Electric-

---

[22] This was recognized in General Electric Co. v. Laco-Philips Co., 2 Cir., 1916, 233 F. 96, where the court, speaking of the Just & Hanaman patent, said: "I think the invention here in suit is of great merit, entitled to firm support, and second only to Edison's. Edison found a dim pathway and transformed it into an illuminated road. Just & Hanaman have broadened that road into a boulevard, alive with blazing lights." (233 F. at page 105).

In General Electric Co. v. Independent Lamp & Wire Co., D.C.D.N.J.1920, 267 F. 824, the court, speaking of the Coolidge patent, said: "The ductile tungsten filament has gone into general use, and has in large measure, if not entirely, supplanted all other filaments, including that of Just & Hanaman, for incandescent electric lamps. It is less expensive to produce, yet it has far greater durability and utility than the squirted filament. It is a commercially new product of great utility, having properties and characteristics unknown to the natural and normal tungsten, or, in fact, to any other material." (267 F. at pages 828, 829)

Westinghouse license of 1912, and the patents upon which that license was based were improvement patents. It is true that the gypsum and the paper in gypsum board are as such not patented; but that is equally true of the metal base and the glass of the General Electric tungsten filament lamps. The patents, although on different materials, are of similar character and bear a similar relationship to the respective industries and the development thereof. The patents principally involved in the instant case no less, and no more, cover completely the patented product than do those principally involved in the General Electric case.

The patents in the instant case and those in the General Electric case are distinguishable from those involved in Mercoid Corp. v. Mid-Continent Investment Co., supra, and Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., supra. Those cases dealt with combination or "system" patents covering a domestic heating system comprising three main elements—a motor driven stoker for feeding fuel to the combustion chamber of a furnace, a room thermostat for controlling the feeding of fuel, and a combustion stoker switch to prevent extinguishment of the fire. The patents were upon the combination, not upon these constituent devices. Such patents are not comparable to a product patent, which covers the whole product, although no patent has been granted upon the constituent materials. The unpatented glass and metal base in an electric lamp and the unpatented calcined gypsum rock and paper in plasterboard are not to be compared with an unpatented constituent device in a combination patent.

*In respect of the comparative number of (price fixing) licenses and the extent of manufacture and sale of the patented product in the General Electric case and the instant case:* No material distinction can be drawn between the two cases because in the former there was but one (price fixing) competitor licensee whereas in the latter there are six. As appears from the opinions in the General Electric and Bement cases, the owner of a product patent may manufacture and sell the article himself alone if he sees fit and at such price as he may choose. Or he may "sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article." (272 U.S. at page 491, 47 S. Ct. at page 197, 71 L.Ed. 362, quoting from 186 U.S. at page 93, 22 S.Ct. at page 756, 46 L.Ed. 1058) In short the owner of a product patent may either exercise the monopoly thereof exclusively himself or he may divide its exercise. In the General Electric and Bement cases nothing indicates that the division of a patent monopoly is limited to the patentee and a single licensee. It can make no difference so far as the Sherman Act is concerned whether the patentee licenses no one, or licenses one, two, three, four, five or six or a dozen, others. Putting this otherwise, if the patent laws, despite the Sherman Act, do not legitimatize a monopoly in the manufacture and sale of a patented product by a patentee-licensor and several licensees, they cannot legitimatize a monopoly by the patentee-licensor and one licensee or by the patentee alone, *because in each instance the exclusion of the public from manufacture, use or sale within the field marked out by the patent is exactly the same, i.e., complete.* Once it is recognized that a patentee may divide his monopoly, no limit can reasonably be put upon the number of persons he may see fit to license, provided always the terms and conditions of the licenses do not go beyond those which normally and reasonably secure the rewards of a patent monopoly. If in the General Electric case the Court had held that the patent laws do not permit any division of his monopoly by a patentee and had therefore stricken down the Westinghouse license (and the additional nonprice fixing licenses), General Electric itself would then have been in control of all of the manufacturing, using and selling of the electric lamps covered by the patents. Although but one price fixing license happened to be involved in the General Electric case, it would be an irrational fixation to construe the decision of the Court as limiting licensing under price fixing restrictions to one competitor, since the public is equally excluded *and equally subjected to the patentee's price* whether there

is no licensee, one licensee or many. Cf. *United States v. Line Material Company*, D.C.E.D.Wis.1946, 64 F.Supp. 970; Laurence I. Wood, Patents and Antitrust Law (C.C.H.1942) 182-3.

No distinction, moreover, can be drawn between the General Electric case and the instant case because the percentage of manufacturing and sale of patented electric lamps controlled by General Electric and Westinghouse, the single price fixing licensee, was but 85% of the total lamp business, whereas in the instant case USG and its six competitor licensees manufacture and sell substantially all of the gypsum board in the "Eastern area." It is not possible to conclude that the General Electric case would have been differently decided if 100% of the trade in electric lamps had been within the control of the General Electric and Westinghouse companies. It is not necessary for violation of the Sherman Act that a restraint of trade shall be complete; it is sufficient if it is substantial. Paramount Famous Lasky Corp. v. United States, 1930, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; Fashion Originators' Guild v. Federal Trade Commission, 1941, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949. The control of the electric lamp industry under the General Electric-Westinghouse license was substantial. The control was recognized as legitimate not because it was limited to 85%, so far as price fixing restrictions were concerned, but because it was by virtue of a patent, and under license terms and conditions which the Supreme Court thought were normally and reasonably adapted to securing the reward which the General Electric Company as patentee was by the grant of the patent entitled to secure. Indeed, the Court expressly recognized in the General Electric case that a patentee is entitled to a complete monopoly. It said:

> "But it is said that the system of distribution is so complicated and involves such a very large number of agents, distributed throughout the entire country, that the very size and comprehensiveness of the scheme brings it within the Anti-Trust law. We do not question that in a suit under the Anti-Trust Act the circumstance that the combination effected secures domination of so large a part of the business affected as to control prices is usually most important in proof of a monopoly violating the Act. But under the patent law the patentee is given by statute a monopoly of making, using and selling the patented article. *The extent of his monopoly in the articles sold and in the territory of the United States where sold is not limited in the grant of his patent*, and the comprehensiveness of his control of the business in the sale of the patented article is not necessarily an indication of illegality of his method. . . ." [Italics supplied] [272 U.S. at page 485, 47 S.Ct. at page 195, 71 L.Ed. 362]

While it is not necessary to rest the conclusions above reached upon the following, it is of interest to note that it appears from the opinion of the Court in the General Electric case that in the year 1921 the relative percentages of business done by the companies in the electric lamp industry were: General Electric 69%, Westinghouse 16%, other licensees 8%, manufacturers not licensed 7%. While there were no price restrictions in the licenses of the other licensees, comprising 8%, the licenses granted by General Electric to Westinghouse and the other licensees contemplated a prorating of business between the licensor and all of its licensees, and also included type restrictions. The stipulation of facts discloses that "the amount of lamps licensed to be sold . . . is limited by the terms of each of such licenses." (G.E. Record, supra, at page 92) Westinghouse was given a larger percentage (15% at first, later increased to 17.25%).[23] As to the restriction in respect of types of lamps, at the time the General

---

[23] The Westinghouse percentage was accomplished by a license provision that the royalty should be 2% of the sales price on that part of the Westinghouse production which amounted to no more than 15% (later 17.25%) of the combined General Electric and Westinghouse sales of the patented lamps, but that the royalty should be increased to 10% on any sales of Westinghouse in excess of that percentage. The license provided for a reduction of the 2% royalty to 1% after the total royalties paid by Westinghouse amounted to $800,000 (later increased to $945,000) or in any event at the end of 10 years; but it was specifically provided that under no circumstances should the 10% royalty on the excess sales of Westinghouse be decreased. It is to be inferred that General Electric did not regard it necessary to reserve the right to fix the price for the manufacturers given a small percentage to sell in a limited field.

Electric-Westinghouse license was executed General Electric wrote Westinghouse concerning the other licensees, or some of them:

". . . it is understood that the arrangement with the Western Electric Company referred to will relate solely to lamps sold under the 'Sunbeam' trademark.

"Also that the arrangement with the American Ever Ready Company referred to will relate solely to lamps of the miniature and decorative types.

"It is also understood that the General Electric Company will not sell lamps of its manufacture to either the Aetna, Capital, Liberty or Gilmore Company in excess of quantities which, added to the quantities manufactured by such Licensees, respectively, will equal the aggregate quantities which such Licensees are respectively licensed to manufacture under such licenses as may be granted to them respectively superseding the license dated April 1st, 1909.

\*　　　\*　　　\*

"Our understanding is that the acceptance of the Westinghouse Company of the License of March 1st, 1912, is conditional upon the foregoing." [G. E. Record, supra, at page 113]

Absent the legitimization of a patent, a restriction upon the quantity of a product sold in interstate commerce is a violation of the Sherman Act. American Equipment Co. v. Tuthill Bldg. Material Co., 7 Cir., 1934, 69 F.2d 406.[24] A restriction upon type of product would seem equally to be a violation, in the absence of a legitimatizing patent.

From the foregoing it appears that the restrictive provisions in the General Electric licenses involved 93% of the industry, with actual price fixing provisions applicable to 85%. It is true that the opinion, so far as the second question therein involved is concerned, discusses only the legality of the Westinghouse license from General Electric in which the latter company imposed the condition that Westinghouse sales should be at prices fixed by General Electric and subject to change according to its discretion. But it is not to be assumed that the decision of the Court was not reached in the light of the facts shown by the record with reference to the terms of all of the licenses.

*In respect of the terms and conditions of the license agreements and price bulletins in the instant case, as compared with the terms and conditions, including price provisions, of the General Electric-Westinghouse license:* The terms and conditions of the license agreements and price bulletins in the instant case have been stated at the outset of this opinion; it is not necessary to restate them here. The provisions of the General Electric-Westinghouse license are summarized in the margin.[25] Comparison of the provisions in the two

but that it thought that in the case of Westinghouse the percentage was sufficiently large to necessitate the reservation of the right to fix the Westinghouse price minimum in order to protect General Electric as licensor in its own market.

[24] A patent was involved in that case, but it was not upon the product (brick) on the output of which by licensees there was a quantity restriction. The patent was for a brick loading machine, and use of the patent as a foundation for the license agreements involved was, in a broad sense, subterfuge. This case is discussed in greater detail in topic VIII.

[25] Annexed to the stipulation of facts in the General Electric case and made a part of such stipulation were Exhibit A, the license agreement of March 1, 1912, and Exhibit B, the General Electric Company's del credere agency contracts, instructions and schedules, and purchase contracts. Annexed to the license agreement were a Schedule A, listing the patents on which the license agreement was founded, and a Schedule B, the contents of which will be referred to below. Comprised within Exhibit A, the

license agreement, and Schedules A and B thereto, were the following provisions (which cover pages 111 to 180 of the Record of 875 printed pages in the General Electric case). It will be noted that, while not so segregated, they divide themselves into three general classes of provisions: general and miscellaneous provisions, including the provisions of the license agreement itself (Exhibit A) of some twenty numbered paragraphs; provisions for arriving at price; and provisions for protecting price.

The license agreement granted to the licensee a non-exclusive license under the patents listed in Schedule A, and under patents which the licensor might own or control, and under patents to be issued under patent applications owned by the licensor, for improvements on carbon filament, metallized filament, tungsten and tantalum filament lamps, and for improvements in machines, appliances or processes for the manufacture of such lamps. The license agreement impliedly forbade the licensee to contest, during the existence of the agreement, validity of the licensor's

cases discloses no material distinction. In both cases the licenses were non-exclusive; there was to be no contest of the validity of the licensors' patents; there were provisions for royalties, records and reports. In both cases the licenses were granted

patents. The licensee agreed to pay royalties, and the licensor and licensee each agreed to keep books with reference to its manufacture, sales and shipments of all electric lamps, and to keep its books open to the inspection of the other. The license provided that it was granted on the express condition that the licensor should have the right to fix the licensee's prices, terms and conditions of sale of any tantalum, metallized carbon, or tungsten filament lamp which embodied any of the inventions of the patents included in the license. These terms and conditions were set forth in Schedule B. The licensee agreed that it would sell lamps only in accordance with Schedule B and under the licensor's form of contract and in compliance with general sales rules set out in Schedule B and at prices not lower and on terms and conditions no more favorable to the purchaser than those set out in the Schedule. The licensee agreed to make reports called for in the Schedule. The reports included: a report within ten days on all appointments of agents showing date of appointment and compensation allowed; an immediate report of each purchaser's contract entered into, with the amount on which discounts were based; an immediate report of all sales to purchasers for immediate delivery without contract; a report giving the net value of all lamps sold by each agent; a report giving the net value of all lamps delivered under purchasers' contracts; a monthly report of all allowances, replacements and other adjustments made on account of claims for defective lamps, or otherwise giving the amounts of such allowances; a report of the net value of incandescent lamps of each class sold and invoiced.

Schedule B included, in addition to the general sales rules referred to above, forms for the appointment of B agents and A agents, for the purchase of incandescent lamps, instructions to manufacturers' agents, sales instructions for A agents and for B agents, price schedules of extra charges for tipless lamps, colored lamps, changes in standard base of lamp, etching letters and special lamps. Schedule B also contained a list of prices of the different types of metallized carbon, tantalum and tungsten filament (Mazda) lamps, a discount table and instructions with respect to deliveries, freight charges and the like. The licensee expressly agreed to sell lamps under the licensor's (manufacturer's)

form of contract for purchase of lamps. This contract form covered a purchaser's estimated requirements for a year and contemplated that purchases should in no event exceed the purchaser's requirement of lamps for its own use during the period of the contract; required the purchaser to agree to pay for lamps in accordance with the rate of discount specified, and to pay transportation charges in accordance with an attached delivery schedule; provided for terms of 30 days with 2% discount for payment within 10 days; reserved to the manufacturer the right to cancel if lamps sold thereunder were used on lighting circuits other than those supplied with current by the purchaser exclusively, or other than those located in the building or on the property occupied, owned or leased by the purchaser. (The licensee was thus restricted entirely to making sales to consumers.)

The license agreement prohibited the licensee from selling in the territory of the Chicago Edison Company or the Boston Edison Company except to those companies.

The general sales rules in Schedule B provided that lamps might be sold at contract prices only to purchasers who had executed the standard form of purchase contract, and to purchasers for immediate delivery without contract where the seller had definite knowledge that the lamps so sold were for the purchaser's own immediate use; required that all purchase contracts must be made on standard forms furnished or approved by the licensor; required each contract to be limited to one brand of lamp. The sales rules provided that prior to the acceptance of any contract information regarding the amount of purchases for which the contract might be made must be obtained from the licensor; provided that on lamps purchased, billed and delivered at standard package or higher prices within 30 days prior to the signing of a contract, contract prices might be allowed, but that lamps ordered before the expiration of a contract and not delivered and invoiced within 30 days after the expiration thereof, should not be included in the contract. The sales rules provided that the requirements of more than one customer could not be combined and covered by one contract except where the lamps were ordered for use in installations owned or controlled by one corporation, co-partnership or individu-

upon the condition that the licensor should have the right to fix the minimum prices at which the licensee should sell the pat-ented product, the prices to be charged by the licensor and licensee to be the same. In both cases, in respect of prices, there

al. The sales rules, as well as the contract form above, required that the terms of sale should be 2% 10 days, 30 days net; they provided that no bid for use both in foreign and domestic territory should offer any lower price on the lamps for foreign consumption than on those for domestic use (although the right to fix the price on lamps applied only to those sold for use in domestic territory). Under the sales rules no sales or quotations were to be submitted on lamps covered by attached schedules in connection with any other material or lamps not covered by such schedules where the award of such business was based upon the combined value of the scheduled lamps and other lamps and materials; no sample was to be supplied free of charge; no guarantee could be made on lamps except in accordance with the "standard specifications"; allowances for burned out lamps or bases were forbidden and also allowances or payments made to cover the cost of inspecting or testing lamps, except that factory facilities might be given without charge for the purpose of initial inspection or test, but not for life test. (These provisions were obviously intended to prevent indirect price cutting by the furnishing of services or other things of value to the purchaser.)

Under the price lists and discount schedules included in Schedule B there was a variation in prices and discounts depending upon the quantities purchased during a period of a year, and according to whether or not the purchase was in standard package quantities or in broken package quantities. The applicable discount varied from 10% to 37% in standard package quantities and 0% to 27% on broken package quantities depending upon whether the purchaser was in a bracket for $150, $300, $600, $1200, $2500, $5000, $10,000, $20,000, $40,000, $80,000, or $150,000 in total purchases during the period of a year. The license agreement placed certain restrictions upon the time within which changes might be made in the discount schedules.

The delivery and freight schedule set out in Schedule B provided that all lamps might be sold or billed to purchasers f. o. b. point of shipment, with freight allowed on shipments consisting of not less than one standard package to all points on or east of the Mississippi River, to all points in the states of Minnesota, Iowa and Missouri, and to all points on the Missouri River south of Sioux City, Iowa; on deliveries of less than standard package quantities, it was required that the goods should be sold only f. o. b. the manufacturer's place of business or that of his agent, and no allowance was to be made for either freight or express; as to all points outside the areas above described freight was to be added to the billing price of lamps in accordance with additional charges shown on the schedule, which were apparently calculated by the licensor on an average freight cost basis.

The license agreement obligated the licensee not to allow its agents any greater compensation than that allowed by the licensor to its agents; and the licensor expressly reserved the right to approve or disapprove any agent which the licensee might seek to appoint. The provision in terms was this: "It is understood that the Licensor proposes to appoint as agents, for the sale of a portion of its metallized filament, tungsten filament and tantalum filament lamps, persons and companies who will sell the Licensor's said lamps to consumers through their own salesmen. And this license is granted only upon and is subject to the condition that the Licensee shall not interfere with such portion of the Licensor's business in such lamps carried on in this manner, by offering to allow or allowing the Licensee's agents greater compensation than that allowed by the Licensor to its agents, as specified in said Schedule B, or by appointing as agents persons or companies of whom the Licensor affirmatively disapproves as being irresponsible representatives for handling metallized filament tungsten filament, and tantalum filament incandescent lamps covered by this license." (G. E. Record, supra, at pages 122, 123) (This is to be compared with the provisions in the USG license bulletins purposed to prevent rebating on the price of patented board by the splitting of salesmen's commissions with customers.)

The license agreement forbade the licensee's selling any parts of an incandescent lamp made under the license, as distinguished from a complete lamp, without the written consent of the licensor; the licensee was permitted to refill burned out lamps and to sell the same, but was required to guarantee that any such lamps sold by it would not be refilled.

It was provided in the license agree-

were two classes of provisions, one class providing how price should be arrived at, the other intended to protect the price fixed, *i.e.*, to prevent indirect price cutting. In both cases the provisions for arriving at price were drafted in view of the fact that the ultimate price at which a product is to be sold cannot be arrived at merely by naming an amount, but that other factors which have economic relationship to price —such as terms of payment, cost of delivery to various areas, including freight charges, quantity sold, type of product sold, and the like, must also be stipulated. It was recognized by the Court in the General Electric case that terms of payment and delivery affect price.[26] The provisions in the General Electric-Westinghouse license and

---

ment that if arbitrators should find that the licensee had sold at lower prices or on terms and conditions more favorable to the purchaser than those prescribed by the licensor, the damages for such violation of the license, in the absence of evidence to the contrary, should be an amount equal to the total value at the prices established under the agreement of the lamps involved in each transaction. A similar provision existed in respect of damages assessed against the licensor for any sales made by it at prices lower or on terms and conditions more favorable to the purchaser than those prescribed for the licensee.

The foregoing summary of the provisions of the General Electric-Westinghouse license agreement shows the restrictions placed upon the licensee by the license itself. As has been pointed out above in the text, the Government contended in the General Electric case that the license agreement itself required Westinghouse to adopt General Electric's del credere agency method of distribution and therefore to be bound also by the same restrictions therein which General Electric placed upon its own agents, and the Court held that, assuming this to be correct, "the result must be the same." (272 U.S. at page 489, 47 S.Ct. at page 196, 71 L. Ed. 362) Therefore the restrictions of the del credere agency contracts, instructions to agents and agents' compensation schedules, may be considered as having been held to be proper restrictions upon a licensee, although not contained in the provisions of the license agreement itself in the General Electric case. The restrictions are contained in Exhibit B, above referred to, and may be summarized as follows:

The General Electric del credere agency system divided the trade into three classes: (1) Large consumers readily reached by General Electric and sold directly by its own salaried employees with deliveries being made from its own factories and warehouses; (2) large consumers under contracts with General Electric, negotiated by agents, the de-

liveries being made from stock in the custody of the agents; (3) general consumers who were sold by agents under similar contracts. The agents under the second class were called B agents and those under the third class A agents. There were some 400 B agents of General Electric operating under two contracts, which specified in detail the manner in which they were to handle and distribute the lamps consigned to them. These agents performed the functions formerly performed by jobbers in the industry. The B agents were to recommend to General Electric efficient and reliable distributors to act as A agents. There were some 21,000 A agents—usually retail electrical supply dealers in small places. (At the time the stipulation of facts in the General Electric case was entered into Westinghouse Lamp Company employed approximately 140 B agents and approximately 6100 A agents throughout the United States.) The A agents were authorized to make sales only to consumers for immediate delivery and to purchasers under written contract with the manufacturer. Lamps were consigned to the A and B agents and were sold through them in accordance with minute instructions and detailed requirements. Rules for eligibility for appointment as B and A agents were established and standard forms of contracts to be entered into with different classes of agents were specified. The restrictions and requirements with respect to agents and purchasers were complex. The price schedules, discount schedules, agents' compensation schedules, forms of contracts for various types of purchasers and agents, and accompanying instructions in effect by January, 1925, cover 614 pages (pp. 180–794) of the printed record in the General Electric case.

[26] As pointed out earlier in this topic II, the Court in the General Electric case said, in respect of the Bement case: "A combination of manufacturers owning a patent to make float spring tool harrows, licensed others to make and sell the products under the patent, on condition that they would not during

in the licenses in the instant case in respect of indirect price cutting, *i.e.*, the price protective provisions, including those which relate to commission salesmen, are of similar character. This is commented upon further in footnote 25. If there is any difference between the provisions of the licenses in the General Electric case and in the instant case, it is in the greater stringency and complexity of those in the former.

■ The foregoing comparison of the patents involved in the General Electric case and in the instant case and of their relation to the respective industries, and the comparison of the amount of trade controlled by the parties to the license agreements in each of the two cases, and of the terms and conditions of the license agreements, and the conclusion reached above that no material distinction exists between the two cases, require that the question stated at the outset of this topic II be answered in the affirmative. That is to say, the license agreements described in the statement of facts at the outset of this opinion, examined in the light of the nature of the principal patents upon which they were founded, in the light of the fact that the defendants make and sell substantially all of the gypsum board in the "Eastern area," and in the light of the terms and conditions of the agreements, including those relating to price, are lawful. The decision in the General Electric case must be taken as sanctioning division of a patent monopoly by the granting of one or more licenses based on improvement patents, of control by a patentee through licenses of the price of either a major portion or all of a product made and sold in an industry, and of such stringent terms and conditions

of patent licenses, including both price fixing and price protective provisions, as are shown by the record in that case. Since the facts in the instant case are substantially parallel to those in the General Electric case in the respects mentioned, the license agreements in the instant case must be considered valid.

It is stated in the stipulation of facts in the record in the General Electric case that Westinghouse in negotiating its license dealt with General Electric "at arm's length," and it is suggested by the Government that on that account the two cases are distinguishable.[27] If by the suggested distinction the Government means to imply that there was coercion by USG in obtaining execution of the license agreements in the instant case, it is to be answered that there is no charge of coercion in the complaint and that the suggestion is therefore irrelevant to any issue defined by the pleadings. If by the suggestion is meant that the license agreements in the instant case were not executed in good faith, that is an issue which is discussed below.

It was said above that in addition to the primary propositions for which the General Electric case stands (that a patentee may divide his monopoly by licensing the right to make, use and vend the patented product, and that he may fix the terms and conditions, including the price, under which the patented product may be sold by the licensee, subject only to the limitation that such terms and conditions do not yield to the patentee more than the normal reward of a patent monopoly), the decision stands for certain further propositions, corollary to its primary holdings. These corollary propositions appear as follows:

The General Electric case demonstrably

---

the continuance of the license sell the products at a less price, *or on more favorable terms of payment and delivery to purchasers,* than were set forth in a schedule made part of the license. That was held to be a valid use of the patent rights of the owners of the patent. . . ." (Italics supplied) (272 U.S. at pages 490, 491, 47 S.Ct. at page 197, 71 L.Ed. 362.)

**27** " . . . The Westinghouse Electric & Manufacturing Company in negotiating and executing said license acted in entire good faith, and witnesses

called on its behalf would testify (and this shall be regarded as testimony given in this case) that in the negotiation of said contract it dealt with the General Electric Company at arm's length and secured the most favorable terms that it was able to negotiate after protracted discussions covering a period of many months, and believed and still believes that the license finally obtained was reasonable and fair and entirely lawful in every respect." (G.E. Record, supra, at page 105)

involves on its facts negotiation and discussion resulting in a "contract in restraint of trade," a "combination and conspiracy in restraint of trade," a "monopoly," "price stabilization," substantial elimination of manufacture and sale of inferior materials, *i.e.*, "standardization," and elimination of an element (jobbers) in the distributive system, *i.e.*, "control of distribution." All of this, except for the legitimatizing patents upon which the General Electric-Westinghouse license agreement was founded, except for the fact that the terms and conditions of the license did not, in the view of the Supreme Court, yield to General Electric more than the normal reward of its patent monopoly, and except for the fact that the price stabilization, standardization of materials, and control of distribution were but the normal and incidental fruits of a patent monopoly and licensing thereunder, would have been a violation of the Sherman Act. As a matter of course the complicated General Electric-Westinghouse license was not entered into without preliminary negotiation and discussion. This is shown in footnote 27, and further in the following from the stipulation of facts:

"At the time of the aforesaid decree the General Electric Company was the owner of the patent rights relating to the tungsten filament lamp, upon which applications had then been filed and under which the above mentioned Just & Hanaman patent No. 1018502 and Coolidge patent No. 1082933 were subsequently issued. Because of the superiority of the tungsten filament over the carbon filament, the exclusive right to make, use and vend lamps manufactured with tungsten filaments under the aforesaid patents, if valid and lawfully acquired by the General Electric Company, and of the scope indicated by their claims, vested in their owner, the General Electric Company, what has since become a practical monopoly of the manufacture and sale of incandescent electric lamps. *The Westinghouse Electric & Manufacturing Company because of this situation entered into negotiations with the General Electric Company,* for a license to manufacture under said patents, which negotiations resulted in the arrangement now in existence, as set forth in the above mentioned agreement, dated March 1, 1912, between the Westinghouse Electric & Manufacturing Company and the General Electric Company. . . ." [Italics supplied] [G. E. Record, supra, at page 104]

The record in the General Electric case also shows that General Electric, in entering into the license agreement with Westinghouse, discussed with Westinghouse the terms of the licenses with the other licensees. This appears from that portion of the record above quoted as demonstrating quantity and type limitations upon the other licensees. The license agreement between Westinghouse and General Electric was, of course, a "contract." In performing the obligations of the license agreement, Westinghouse and General Electric constituted a "combination and conspiracy" as did General Electric and each of the other licensees in performing the obligations of the several other licenses which, although they did not subject the other licensees to price control, did impose quantity and type limitations upon them. The General Electric-Westinghouse license controlled a sufficient amount of trade in electric lamps, 85%, to constitute a "monopoly" which, in the absence of a patent, would have been a violation of the Sherman Act. Since General Electric and Westinghouse were both to sell the patented product at the same price, there was "price stabilization" as between them, and hence in the electric lamp industry, since they controlled 85% of it; and the price was set, presumably, at a profitable level. The increase in tungsten filament lamps to 97% of total production, because of their superior quality, with the consequent substantial elimination of sale of lamps of the ordinary carbon filament type, accomplished "standardization" of the patented product. The arrangements for selling direct to consumers with consequent elimination of jobbers under the General Electric agency distribution plan adopted by Westinghouse constituted "control of distribution." [28] Finally, it is obvious in the General Elec-

---

[28] It has been pointed out earlier in this topic that the General Electric plan of distribution which, had it been a requirement of the General Electric-Westinghouse license, would not, the Court said, have changed the result in the case, "was of course devised for the purpose of enabling the company to deal directly with consumers and purchasers, and doubtless was intended to avoid selling the lamps owned by the company to jobbers or dealers, and prevent sale by these middle men to consumers at different and competing prices. . . ." (272 U.S. at page 483, 47 S.Ct. at page 194, 71 L.Ed. 362.)

tric case that the very purpose of the negotiation, discussion, execution of the license, and conducting of operations thereunder, was, on the part of the General Electric Company, that of exploiting its patent monopoly through collection of royalties, and at the same time, by means of price control, protecting its own profit in the making and selling of the tungsten filament lamps; and, on the part of Westinghouse, that of acquiring the right to make, use and sell the superior patented article and thereby making profit. And both must have expected, since both were to sell at the same price, that this "price stabilization" between them would cause stabilization in the industry; and both must have hoped and expected that their making and sale of the superior lamps would lessen the making and selling of inferior products by them and by others; and both clearly purposed the "control of distribution" through the elimination of jobbers. Yet the Supreme Court regarded none of this, in either purpose or accomplishment, as illegal. It looked upon the negotiation, discussion, license agreement and operations thereunder as the accomplishment of a lawful end by lawful means.

It follows from the foregoing that the terms "contract in restraint of trade," "combination and conspiracy," "monopoly," "price fixing," "price stabilization," "standardization," and "control of distribution" do not necessarily carry an illegal connotation. Confusion is avoided if this is borne in mind. Showing, without more, in a case brought under the Sherman Act, but involving a patent license, that there have been relationships, operations and accomplishments, which, grossly, are within the terms quoted, is not enough. The question in such a case is not merely whether there has been a "contract," a "combination," a "monopoly," "price fixing," "price stabilization," "standardization," "control of distribution," and a purpose to accomplish and a partnership in accomplishing such *actual* restraints of trade—for the patent laws, within their limits, permit all of the foregoing; the question in such a case is whether the purposes and accomplishments of the parties to the license contract went beyond the lawful limits of a patent monopoly and in-

to the field of purposes and acts denounced by the Sherman Act. Were the "restraints of trade" *illegal, i.e.,* of Sherman Act quality and extent, or were they such as the patent laws permit—is the question.

The General Electric case illustrates that the law, whether in the form of a statute, or of principles arising out of judicial application of a statute (in this instance the statute authorizing the granting of patents and the principles arising out of judicial application thereof to patent licensing arrangements and operations) cannot legitimatize such arrangements and operations and at the same time stigmatize as unlawful the purpose to bring them about, the necessary means of bringing them about and carrying them on, or the consequences that normally flow from them. The General Electric case establishes that a patent license agreement granting the right to make, use and vend a patented product, under terms and conditions, including prices, fixed by the licensor, is lawful. Such a license agreement ordinarily, and, when the prices are (as in the General Electric case) a part of the license contract, necessarily, involves negotiation and discussion between the licensor and the licensee and agreement upon the terms and conditions, a purpose to execute and carry out the agreement, combined action in signing the agreement and in performing the obligations thereof, with knowledge that it will result in a stabilized and presumably profitable price for the patented product as between the parties and in the industry (since the parties are, by virtue of the patent, the only ones having a right to make, use and sell the superior patented product) and with knowledge that it will result in a monopoly (*i.e.,* a divided patent monopoly), in probable discontinuance of manufacture and sale by the licensee of inferior materials (the licensee's incentive to take a license is the right to make the superior product), and in control of distribution. What a lawful patent license agreement normally involves cannot be unlawful. Additionally, since a patent owner may lawfully divide his patent monopoly with a plurality of licensees, there will in the usual course be with each of such licensees the same negotiation and dis-

cussion, agreement upon terms, purpose to execute and carry out a license contract and to accomplish its normal results, and combined action in so doing, as in the case of a single licensee. And each licensee will be informed of and discuss with the licensor the terms and conditions of the proposed licenses; otherwise no more than a single license could be executed. A patent owner would not be able to license competing manufacturers upon different price terms; no one such would be willing to suffer competitive disadvantages; no one such would be willing to sign in the dark as to the terms to be extended to the others; ordinarily, moreover, there will be discussion at large, i.e., within the trade, of the advantages and disadvantages of the licenses proposed by the patent owner. Each of a plurality of licensees will, moreover, have the same purpose to take a license and to secure its resulting advantages. The licensor and each licensee of such a plurality constitute a "combination" to effectuate the purposes of their license. Since a plurality of licenses is lawful, all of this must be lawful. Further, if in practical effect the licensor and the plurality of licensees are a "combination" to the same end, such a "combination" is not stigmatized by the law—provided in purpose and effect it does not secure to the patent owner more than the normal reward of a patent monopoly, nor to any of the licensees with whom that monopoly is divided more than the advantages which naturally result to a licensee, as well as to a licensor, from patent licensing. All of this necessarily follows from the General Electric case. Compare the words of the court quoted from the Motion Picture Patents case, supra.

In the course of the oral arguments upon the motions now under consideration in the instant case, the presiding judge put to the Government the following questions:

"Justice Stephens: Since your argument is being interrupted by these questions and since you are going to discuss the General Electric case in greater detail, I should like to put to you . . . some problems which arise in my mind on what seems to be your opinion, from the briefs and your statement this morning, with respect to the General Electric case, not with the expectation you will answer them now but so that you can think them over and answer them later.

"I have read the General Electric case very carefully and given considerable thought to your position as announced in your briefs that it really is not a case which controls the instant case. My thinking takes me back first, on the subject of the General Electric case, to what is the nature of a patent or of a so-called patent monopoly. It is not, as I understand it, quite like a monopoly such as the Government gives to one to whom it grants Blackacre—which the Government, as the representative of the people, originally owned entire and now passes over upon some consideration to a grantee in perpetuity or in fee simple. It is not that kind of monopoly because the Government never did have the process or product or design or machine which becomes the subject of a patent. The invention was originally in the mind of the inventor. What the Government gives him, what we call a patent monopoly, is an exclusive right to make, use and vend over a period of years and the theory of that is, as I have always understood it, that that will be an inducement to him to disclose the results of his inventive activity to the public for the benefit of the public and to the development of industry.

"As I understand the theory of the General Electric case, since a patentee does have an exclusive right to make, use and vend over a period of time, he may make a choice between keeping that himself, keeping his patent monopoly exclusively in him over the period of the patent and licensing the right to make, use and vend to someone else and he may, under the theory of the General Electric case, fix reasonable terms and conditions, including prices, on the first sale by his licensee, in protection of his patent monopoly.

"Let's assume for the moment that the General Electric case means that he can only have one licensee. He cannot enter into an agreement with that licensee without discussion of terms and conditions and prices; so that far, at least, the discussion cannot be illegal. The getting together of the parties cannot be said to be the kind of a conspiracy which is illegal under the Sherman Act because the Sherman Act and the patent laws stand together.

"I have difficulty in seeing, taking the next step, how it can be said that the General Electric case confines a patentee to licensing one licensee—because what difference can it make, if he has a right to retain the whole patent monopoly in himself if he wishes to, whether he divides it with one or divides it with ten or with a hundred? It is still a patent monopoly. The public is excluded except to the extent that he gives it the benefit of the invention by using it himself or by dividing it with licensees. If it then follows from the General Electric case that a patentee can have more than one licensee, again how can it be illegal for the group of licensees or the several licensees to discuss either with him or with each other the terms of the license arrangments? In short, how can the law both give and take away with the same hand? It gives the right to enter into either one or a group of patent-license agreements. Does it not necessarily also give the right to do the things that are normally necessary to constitute such agreements—talk about them and discuss the terms? Must a patentee go by stealth and by night to each licensee separately to make out the license agreement and avoid any discussion with the group?

"Moreover, if the suggestions I have made concerning the General Electric case are sound, if it is lawful to enter into a license agreement containing price-fixing terms and conditions in reasonable protection of the patent monopoly with either one or a series or a group of licensees, how can it be illegal to accomplish the inevitable economic consequences of that, which you phrase as blanketing an industry or stabilizing prices, or even producing uniformity in products because the patented product is more likely to sell because of its merit; and if it is not illegal to accomplish the normal economic consequences of licensing, how can it be illegal to talk about them and arrange for them in entering into license agreements?" [Tr. 7259-7262]

These questions were not satisfactorily answered by the Government either in the course of the further oral argument or in the written briefs submitted on the motions.

---

The principles and propositions stated and the conclusions reached in this topic II leave for determination two issues of fact. There is no dispute about the nature of the principal patents upon which the license agreements were founded, or about the extent of manufacture and sale by the defendants of gypsum board in the "Eastern area," or about the signing of the agreements, or about the terms and conditions thereof, including those for the establishment and protection of minimum prices on patented board made and sold by the defendants. It has been determined that the license agreements, looked at in the light of the nature of the patents, of the fact that the defendants make and sell substantially all of the gypsum board in the "Eastern area," and in the light of the terms and conditions of the agreements, are lawful. But it has been assumed in this topic that the license agreements are bona fide agreements; whereas it is charged by the Government that they are not such but are sham and were entered into for illegal purposes. It has also been assumed in this topic that the agreements were carried out according to their terms, which have been held valid; whereas it is charged that the operations of the defendants actually went beyond the proper limits of a patent monopoly and licensing thereunder.

These two questions of fact are therefore left for decision: One, were the license agreements not entered into as bona fide agreements, but merely to give color of legality to a combination to restrain trade in violation of the Sherman Act; the other, were the actual operations of the defendants carried beyond the proper limits of a patent monopoly and licensing thereunder, i.e., beyond the activities contemplated by the agreements as written and into the field denounced by the Sherman Act. But before determination of these two issues of fact can be made, a question relating to the burden of proof must be answered, comment must be made upon certain pertinent principles of proof, and the rule concerning the admissibility of declarations of alleged co-conspirators must be stated. And, preliminary to consideration of the two issues of fact, there must be determined, under the motions to strike declarations admitted in evidence subject to connection, whether there is evidence outside the declarations of the existence of the conspiracy charged and of the defendants' participation therein.

### III

THE BURDEN OF PROOF; PRINCIPLES OF PROOF; THE RULE CONCERNING ADMISSIBILITY OF DECLARATIONS OF ALLEGED CO-CONSPIRATORS

*The burden of proof:* As has been stated at the outset of this opinion, the Government's complaint in paragraph 44 charges, in the language of the statute, violations of Sections 1, 2 and 3 of the Sherman Act; and in paragraph 45 these charges are amplified by allegations that the defendants have combined to fix arbitrary and non-competitive prices for the sale of gypsum products both patented and unpatented, to standardize the products which they manufactured, to control distribution of such products, and to require manufacturing distributors, upon resale of products purchased from the defendants, to conform to arbitrary and non-competitive prices. The complaint then alleges in paragraph 46 that the combination was entered into and carried out by the defendants in part under the guise of license agreements purporting to relate to the use of patents owned by the defendant USG in

the manufacture of gypsum board; that to give color of legality to the combination, the defendant companies and other companies agreed among themselves to enter into, and did enter into, these license agreements; that such agreements are not bona fide patent license agreements reasonably designed to secure to USG the pecuniary reward for valid patent monopolies, but were entered into and executed for the illegal purposes described in paragraphs 44 and 45 of the complaint. Paragraphs 44, 45 and 46 of the complaint are set out verbatim in the description of the charges at the outset of this opinion.

The defendants USG, Avery and Knode, in paragraph 35 of their answer, respond to paragraph 46 of the complaint by denying each and all of the averments thereof. Then, "further answering," they aver that USG developed improvements in the manufacture of gypsum products and that it owns numerous patents covering its inventions; that it acquired a legal monopoly in the manufacture, use and sale of products embodying the inventions of its patents,

and that it determined to share that monopoly and to grant licenses to the end that the gypsum industry and the public might benefit; and that as a condition in said licenses, USG reserved the right to establish minimum prices. The right so reserved to USG was, so it is further averred, designed to and did protect its patent rights and was a lawful restriction under • the patent laws and the decisions of the Supreme Court; the license agreements, it is alleged, involved basic patents and were in law and in fact bona fide agreements reasonably designed to secure to USG the pecuniary reward for its valid patent monopolies to which it was entitled. The full text of this paragraph 35 of the answer of USG, Avery and Knode is set forth in the margin.[29] The answers of National and Baker, of Ebsary and Fred Ebsary, and of Newark and Tomkins deny the allegations of paragraph 46 of the complaint. The defendants Certain-teed and Hartley deny the allegations of paragraph 46, except that these defendants admit that the licenses referred to in paragraphs 76, 85,

[29] "35. Deny each and all of the averments contained in Paragraph 46 of the Complaint and, further answering, these defendants aver that through extensive research work carried on by the expenditure each year of substantial sums of money, the defendant, United States Gypsum Company, developed extensive improvements in the art of manufacturing gypsum products and in the character and quality of such products and acquired and now owns numerous United States Letters Patent covering its inventions and improvements embodied in said gypsum products and in their manufacture, particularly with regard to gypsum board. Further answering, these defendants aver that, in accordance with the patent laws of the United States, the defendant, United States Gypsum Company, acquired a legal monopoly in the manufacture, sale and use of such gypsum products embodying the inventions and improvements set forth and claimed in its said patents and that, after due deliberation, said defendant determined to share its said monopoly with other manufacturers of gypsum board through the granting of licenses to manufacture and sell gypsum board embodying the inventions and improvements set forth and claimed in said defendant's patents, to the end that the gypsum industry and the public generally might benefit through the production and enjoyment of a superior product they could not otherwise have produced or had, and, as a condition in said licenses and for the reasonable and appropriate protection of the patent rights which it had acquired, the defendant, United States Gypsum Company, reserved the right to establish the minimum prices at which its licensees might sell the patented products so manufactured by them, pursuant to the terms of the license agreement. These defendants further aver that the right so reserved to defendant, United States Gypsum Company, was designed to and did protect said defendant's patent rights and was an entirely proper and legal restriction within the purview of the patent laws and the decisions of the Supreme Court of the United States; that the said license agreements involved basic patents in the manufacture of gypsum board and were, in law and in fact, bona fide license agreements, reasonably designed to secure to the defendant, United States Gypsum Company, the pecuniary reward for its valid patent monopolies to which it was entitled."

113 and 117 of the complaint were executed between USG and Certain-teed;[30] they deny that the license agreements were made for any purpose described in paragraphs 44, 45 and 46 of the complaint, and aver that each agreement was voluntarily made for the lawful purpose of enabling Certain-teed to make, sell and distribute gypsum products covered by USG patents. The defendants Celotex and Dahlberg deny the allegations of paragraph 46 of the complaint; further answering, these defendants aver that Celotex was organized in 1935 and did not until 1937 engage in the gypsum business directly or indirectly, that in 1937 and 1938 it acquired a minority stock interest in Certain-teed and thereafter began selling gypsum products manufactured in plants of Certain-teed, that in 1939 Celotex acquired the assets of American, including the license agreement between USG and American, and that upon advice of counsel Celotex assumed the obligations of that license agreement and has ever since observed its terms. Texas denies the allegations of paragraph 46 of the complaint; further answering, Texas alleges that it made license agreements with USG in good faith and in the belief that USG had basic patents, that all of the agreements were made in due course of business and for legal purposes, and in order to permit Texas to make gypsum products, and that, relying upon the validity of the patents and the legality of the agreements, Texas expended large sums in plant equipment.

It is the contention of the Government that in this state of the pleadings the burden is upon the defendants, by way of confession and avoidance, to justify under the patent licenses the restraints of trade described in the complaint. The Government relies, in this contention, so far as the effect of the pleadings is concerned, upon the Motion Picture Patents case, stated in another connection in topic II of this opinion; and, so far as the bearing of the substantive law is concerned, upon the Masonite case, also referred to in topic II,

United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, rehearing denied 1940, 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421, and United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024. The defendants assert that the burden of proving lack of bona fides in the license agreements is upon the Government.

The foregoing is, however, for the purpose of consideration of the contentions concerning burden of proof, an insufficient description of the pleadings of the Government in respect of the patent license agreements. Not only has the Government in paragraph 46 of the complaint set up the execution of such agreements and charged them not to be bona fide, but also in subsequent paragraphs of the complaint it has in detail alleged the circumstances leading up to the execution of the license agreements, and has set forth in detail the manner in which it claims that they were carried beyond the normal limits of a patent monopoly. These allegations have been outlined at the outset of this opinion. Particular reference may here be made, however, to the following paragraphs of the complaint: Paragraph 77 charges that at the time of the execution of the May 1929 licenses USG and its licensees, among other things, mutually agreed that they would immediately discontinue the manufacture of unpatented open-edge board and dispose of inventories of the same at prices to be fixed by USG, agreed that USG would immediately furnish and stabilize prices for board, agreed that as prices for board were raised all companies would increase their prices for plaster and miscellaneous gypsum products, and agreed that the prices for board manufactured by the licensees would be controlled, through the use of other patents, by USG after the expiration of the Utzman patent in August 1929. Paragraph 86 alleges that for many years prior to 1929 the licensees, except Ebsary and Kelley, had been using adhesives in the manufacture of board to increase adhesion between the core and

---

30 These are the paragraphs of the complaint which allege the execution by USG and Certain-teed of the May 1929, November 1929, metallized board, and perforated lath license agreements.

liners, and that the licensees, in addition to the agreements contained in the licenses of November 1929, mutually agreed among themselves and with USG to consider such use of adhesives as falling within the scope of the Hite and Haggerty patents for the purpose of permitting price control by USG during the life of said patents; and that Ebsary and Kelley agreed to commence using adhesives for the same purpose. Paragraph 93 alleges that USG and its licensees have by concerted action sought to standardize the manufacture of gypsum board and have refrained from manufacturing and marketing open-edge board and other board not within the agreed upon scope of the patents involved in the license agreements, and that National was induced, by USG and the other licensees, in 1934 and 1935, to refrain from marketing a new light weight board until the other licensees were equipped to make and market a similar board. Paragraph 95 alleges that USG and its licensees, for the purpose of eliminating distribution of gypsum products through jobbers, agreed among themselves to sell gypsum board to jobbers at no less than the minimum prices set by USG for sale of board to dealers and to sell plaster and miscellaneous gypsum products to jobbers at no less than the prevailing minimum prices to dealers for such products, and that this agreement was carried into effect. Paragraphs 96–102 charge that the licenses were used to fix the price of unpatented board in that prices were fixed on unpatented open-edge board, on closed-edge board manufactured and sold during the period from August 6 to November 5, 1929, when USG owned no patents covering such board, that prices were fixed under the Haggerty and Hite starch patents from November 1929 to October 1935, although none of the licensees, except Universal, was manufacturing board under those patents, and that prices were fixed after October 1935 under the Roos. foam patents notwithstanding that a substantial part of the board produced by various of the licensees was not covered by the patents issued upon the foam process. Paragraph 103 asserts that beginning in May 1929 USG and its licensees concertedly raised and stabilized the prices of

plaster and miscellaneous gypsum products and agreed to sell, and have sold, such products on the basis of various of the terms and conditions prescribed by USG for the sale of gypsum board. Paragraph 108 alleges that since 1929 USG and its licensees have by concerted action induced and coerced manufacturing distributors purchasing gypsum board from them to resell such board to dealers and consumers at bulletin prices determined and fixed by USG for sales of board by its licensees to such trade. All of these paragraphs of the complaint are in aid of the allegations of paragraph 46 as well as of paragraphs 44 and 45.

In this condition of the pleadings, it would be extraordinary to place the burden of proof in respect of the bona fides of, and the propriety of operations under, the patent license agreements upon the defendants, in the absence of some clear requirement of adjective or substantive law. To place the burden as urged by the Government would be, in effect, to strip the Government's complaint of all of its allegations in respect of the patent license agreements, to eliminate from the complaint paragraph 46, and the other paragraphs which supplement the same, alleging the execution and the manner of applying the license agreements. All of these allegations would thus be treated as surplusage and the Government's case would be left resting in the large upon the contents of paragraphs 44 and 45. Where the Government has pitched its case as carefully and elaborately as it has upon violation of the Sherman Act through the execution of patent license agreements not bona fide, and not designed to secure to USG the pecuniary reward for valid patent monoplies, but executed only for illegal purposes, and where the Government has set forth in such detail as it has the manner of accomplishment, through misuse of patent license agreements, of these illegal purposes, it ought to be required to prove the case it has thus alleged unless, as said, there is some clear rule of adjective or substantive law which relieves it of this burden.

None of the cases relied upon by the Government, Motion Picture Patents, Masonite, Socony-Vacuum and Bausch &

Lomb, supports its contention concerning the burden of proof on the issue in question. In the Motion Picture Patents case the court introduced its discussion of the effect of the patents there involved by saying: "The next branch of the defense which presents itself for analysis and discussion is that based upon the patent rights of the Motion Picture Patents Company. The plea is, in legal effect and in practical acknowledgment, one in confession and avoidance, for there is, as already stated, a substantial (although not formal) admission that, with this patent right ownership out of the case, plaintiff should have the relief prayed." (225 F. at page 803) But the pleadings are not set out in the opinion of the court; therefore, it cannot be determined whether or not the complaint, as in the instant case, charged that the restraints of trade alleged were accomplished through the misuse of patent license agreements. For all that appears on the face of the opinion, there may have been no mention of patents in the complaint; the defendants may without contest have assumed the burden of justifying their acts under patents. It does not appear that any question was raised as to the burden of proof in respect of patent rights. The case is, therefore, inconclusive. There is, moreover, conclusive authority to the contrary: Where an indictment under the Sherman Act charges a conspiracy in restraint of trade, and monopolization, by a company, its officers and agents, and alleges patents covering products manufactured and sold, the indictment must also negative that the trade and commerce was covered by the patents. Patterson v. United States, 6 Cir., 1915, 222 F. 599, certiorari denied 1915, 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499. Demurrers to three counts of the indictment in that case were overruled by the trial judge. On appeal after trial and conviction the Circuit Court of Appeals found certain errors in exclusion of evidence and in instructions to the jury in respect of the first count, and held that demurrers should have been sustained as to the second and third counts. With respect to the third count, the court said:

". . . The indictment, having thus charged that the National [Cash Register] Company had patents covering the cash registers made and sold by it, should have negatived that the trade and commerce which it so secured and held onto was covered by those patents. In the first count it is alleged that defendants' conduct therein complained of was not 'justified or warranted by any letters patent'; but it was not meant thereby to charge that the trade and commerce affected by the conspiracy complained of therein was not covered by the National Company's patents, for it is the position of the government that the defendants were not justified or warranted by those patents in protecting the rights so secured in that way. It is charged in the first count that at the beginning of the 20 years the National Company did 80 per cent. of the manufacturing of cash registers. This of itself was a practical monopoly. It is not alleged that it had been secured by wrongful acts. Presumably it was entitled to it under its patents. It is true that it is alleged that long before the 3 years preceding the finding of the indictment most of the basic patents and many of the improvement patents had expired. But this concedes that some of the basic patents were then still unexpired at the beginning of the 3 years, and it is consistent with the fact that such was the case as to a great number of improvement patents. Everything, therefore, which the count alleges, may be true, and yet the National Company have been entitled to hold onto the business which it had so secured, in which case its conduct in so doing could not have been monopolizing." [222 F. at page 625]

It would follow from this ruling that the burden of proof, upon an allegation negativing that the trade and commerce charged to have been restrained was covered by the patents, must have been upon the Government, since it is elementary that a pleader must prove those allegations which are essential to his complaint. In Dickson v. Uhlmann Grain Co., 1933, 288 U.S. 188, 53 S.Ct. 362, 77 L.Ed. 691, 83 A.L.R. 492, the Grain Company, a broker, sued Dickson, a customer, for commissions and advances on contracts for purchases and sales of grain. Dickson answered that the contracts did not contemplate that any grain should actually be bought and sold or delivered in his behalf and were in consequence in violation of the Missouri Bucket Shop Law, Mo.R.S.A. § 4706 et seq., having been executed in that state. This defense, like the assertion of the Government concerning the license agreements in the instant case, was, in effect, an allegation that the contracts were fictitious, *i.e.*, not bona fide contracts for purchases and sales. It was contended by the Grain Company that the burden was upon Dickson, who made this allegation, to prove it. The Court so held.

446

So far as the substantive law is concerned, the contention of the Government is that an agreement to fix prices on products in interstate commerce is *per se* a violation of the Sherman Act; and the Government appears to urge therefore that a complaint charging price fixing, as in paragraph 45 of the complaint in the instant case, states a cause of action; hence it is sufficient for the Government to prove the allegations of that cause, leaving the burden of justification under patents to the defendants. It is true that it is held in United States v. Masonite Corp., United States v. Socony-Vacuum Oil Co., and United States v. Bausch & Lomb Optical Co., cited by the Government, that price fixing, reasonable or unreasonable, is unlawful *per se*. But in the Masonite case, although the "hardwood" involved was covered by patents owned by Masonite, the options of the other defendants to take patent licenses from Masonite were not exercised; the case therefore does not involve price fixing alleged to have resulted from the misuse of patent license agreements. Neither United States v. Socony-Vacuum Oil Co. nor United States v. Bausch & Lomb Optical Co. involved patents at all. The Bement and General Electric cases, as has been demonstrated in topic II, hold that price fixing under patent license agreements is not an illegal restraint of trade, but a valid exercise of a patent monopoly, so long as the terms and conditions of the agreements and the practice thereunder are limited to reasonably securing to the patentee the reward to which by virtue of the grant of the patent he is entitled. From these cases it is to be inferred that a complaint under the Sherman Act, alleging price fixing under patent license agreements, without more, would not state a cause of action. It would follow that proof of such allegations alone would not carry a plaintiff's case beyond a motion to dismiss. In view of the holding in the Bement and General Electric cases, it must be alleged, and therefore shown, in order to make out a case of violation of the Sherman Act, either that the patent license agreements were not bona fide, or that even if not sham agreements as executed, the operations under them were carried beyond the proper limits of a patent monopoly. The Bement and General Electric cases were decided upon the assumption that the license agreements were bona fide. The contention in those cases was that even under bona fide patent license contracts price fixing is not lawful, and the Court rejected that view. But obviously a case of unlawful price fixing would be made out under the Sherman Act if it were alleged and shown that the patent license agreements providing for price fixing were not bona fide, but were entered into only to give color of legality to the conduct of the parties. Patents would not sustain price fixing if not honestly used. Equity would regard the substance, not the form. It is clear that it is upon this theory that the Government's complaint was drawn. Having pitched its battle upon this ground, the Government ought to be required to fight it there. There is no clear requirement of law, in any of the cases cited by the Government, placing upon the defendants the burden of proving bona fides in execution and practice under the patent license agreements. The cases which directly pass upon such or similar questions are, as above demonstrated, to the contrary.

Authoritative texts lend no support to the contentions of the Government concerning burden of proof on the issue of bona fides in the license agreements. Stephen, Digest of the Law of Evidence, 12th Ed. 1936, Art. 100, under the sub-topic "He who asserts must prove," states that "Whoever in the course of a judicial proceeding first asserts that a fact exists or *does not exist,* must prove the existence or *non-existence,* of such fact." (Italics supplied) In Article 104, under the sub-topic "Burden of proof as to particular fact," it is said: "The burden of proof as to any particular fact lies on that person who wishes the Court to believe in its existence, unless it is provided by any law that the burden of proving the fact shall lie on any particular person; but the burden may in the course of a case be shifted from one side to the other, and in considering the amount of evidence necessary to shift the burden of proof the Court has regard to the opportunities of knowledge with re-

spect to the fact to be proved which may be possessed by the parties respectively." In 9 Wigmore, Evidence, 3d Ed. 1940, §§ 2485-6, the author points out that the determination of the propositions of persuasion which are assigned to a particular party in litigation as a prerequisite to the action of a court is made "first and broadly, by the *substantive law,* which fixes the groups of data that enter into legal relations and constitute rights and duties, and, secondly and more in detail, by the *laws of pleading and procedure,* which further group and subdivide these larger groups of data, and assign one or another subgroup to this or that party as prerequisites of the tribunal's action in his favor." Of course, as further pointed out by the author, "the groupings defined by the substantive law and the further subdivision by the law of pleading do not necessarily end the process of apportionment by law. It arises again *after trial begun* and during the stage of adducing evidence. Even within a single pleading there are instances in which the burden of proof (in the sense of a risk of non-persuasion) may be taken from the pleader desiring action and placed upon the opponent." Wigmore further points out that "The characteristic . . . of this burden of proof (in the sense of a risk of non-persuasion) in legal controversies is that the law divides the process into stages, and apportions definitely to each party the specific facts which will in turn fall to him as the prerequisites of obtaining action in his favor by the tribunal." There is no single principle or rule, according to Wigmore, which will solve all cases and afford a general test for ascertaining the incidence of the risk of non-persuasion:

"It is often said that the burden is upon the *party having in form the affirmative allegation. But this is not an invariable test, nor even always a significant circumstance; the burden is often on one who has a negative assertion to prove;* a common instance is that of a promisee alleging non-performance of a contract. [Italics supplied]

"It is sometimes said that it is upon the party *to whose case the fact is essential.* This is correct enough, but it merely advances the inquiry one step; we must then ask whether there is any general principle which determines to what party's case a fact is essential.

"Still another consideration has often been advanced as a special test for solving a limited class of cases, *i. e.* the burden of proving a fact is said to be put on the *party who presumably*

*has peculiar means of knowledge* enabling him to prove its falsity if it is false. This principle has received frequent application in modern statutes making it an offense to pursue a certain occupation without a State *license* or forbidding a certain act unless in personal circumstances justifying an *exception.*

"But this consideration furnishes no universal working rule; if it did, then the plaintiff in an action for defamation charging him to be living in adultery should be required to prove that he is lawfully married. This consideration, after all, merely takes its place among other considerations of fairness and experience as a most important one to be kept in mind in apportioning the burden of proof in a specific case.

"The truth is that there is not and cannot be any one general solvent for all cases. It is merely a question of policy and fairness based on experience in the different situations. Thus, in most actions of *tort* there are many possible justifying circumstances,—self-defence, leave and license, 'volenti non fit injuria,' and the like; but it would be both unfair and contrary to experience to assume that one of them was probably present, and to require the plaintiff to disprove the existence of each one of them; so that the plaintiff is put to prove merely the nature of his harm, and the defendant's share in causing it; and the other circumstances, which would if they existed leave him without a claim, are put upon the defendant to prove. Nevertheless, in malicious prosecution, on the one hand, the facts as to the defendant's good faith and probable cause, which might otherwise have been set down for the defendant to show in excuse (as the analogous facts in an action for defamation are reserved for a plea of privilege), are here put upon the plaintiff, who is required to prove their non-existence; because as a matter of experience and fairness this seems to be the wiser apportionment. So, on the other hand, in an action for defamation ('false words,' in the old nomenclature), it might have been supposed on other analogies that to the plaintiff it would fall to prove the falsity of the defendant's utterance; yet as a matter of fairness, it has in fact been put upon the defendant to prove the truth of his utterance. . . .

"There is then, no one principle, or set of harmonious principles, which afford a sure and universal test for the solution of a given class of cases. The logic of the situation does not demand such a test; it would be useless to attempt to discover or to invent one; and the state of the law does not justify us in saying that it has accepted any. There are merely specific rules for specific classes of cases, resting for their ultimate basis upon broad reasons of experience and fairness." [9 Wigmore, Evidence, § 2486]

In 1 Jones, Evidence in Civil Cases, 4th Ed. 1938, § 180, it is stated:

". . . Some early text writers declared the burden of proof to be on the party who asserts the affirmative of the issue or question in dispute. '*Ei incumbit probatio qui dicit, non qui negat.*' (The burden of proof lies upon him who affirms, not him who denies.) However, later writers have questioned the accuracy of the rule, urging that the burden of proof does not depend upon the form of the proposition, but that the burden of proving any given claim

or defense rests upon him who asserts it. To some extent, recognition is seemingly given to the former test in a few of the recent cases.

"The authorities hold that whoever asserts a claim or defense which is negative in form or depends upon a negative has the burden of establishing the truth of the allegation. But this seems to be only another way of saying that he who affirms must prove; and in cases involving negative propositions the courts seem not to have regarded the form of the issue as material."[31]

The allegations of paragraph 46 of the Government's complaint concerning bona fides in the execution and use of the license agreements are in the form of a negative. This, as noted, will not necessarily relieve the pleader from the burden of proof. The Government does not specifically urge that the facts relating to the issue of bona fides are so peculiarly within the knowledge of the defendants as to require, as a matter of convenience and fairness, that they be produced by them. The Government could hardly urge this in the instant case, in view of the fact that it, as pointed out in topic I of this opinion, fully availed itself of Rules 43(b) and 26 to 37 of the Federal Rules of Civil Procedure. As said, most of the Government's evidence came either from the lips of officers or employees of the defendants, or from documents obtained from their files. The officers and employees who testified gave no indication of reluctance to disclose any matters relevant under the issues.

In the course of its contentions with respect to burden of proof, the Government does assert that the burden is upon the defendants to show that in fact the board made by them and controlled by the license agreements was covered by the patents This, however, is but a subsidiary aspect of the issue of bona fides advanced in paragraph 46, and the Government is not confronted with any undue obstacle, and has not claimed to be, in obtaining evidence on this subject from the defendants' files or officers or employees.

So far as the affirmative allegations of the answers of the defendants USG, Avery and Knode, Certain-teed and Hartley, Celotex and Dahlberg, and Texas are concerned, if the burden of proof on the issue of the bona fides of the patents is properly on the Government, as is herein held, these allegations may be treated as surplusage, or as denials in affirmative form, or as assertions in aid of the denials, which were expressed in the answers of each of these defendants, of the allegations of paragraph 46. "An allegation of fact that is material only as an indirect negative of something to be proved by the other party does not shift the burden of proof. Starratt v. Mullen, 148 Massachusetts, 570 [20 N.E. 178, 2 L.R.A. 697]." Per Mr. Justice Holmes in Javierre v. Central Altagracia, 1910, 217 U.S. 502, 508, 30 S.Ct. 598, 599, 54 L.Ed. 859.[32]

The basis for injunctive relief under Section 4 of the Sherman Act must

---

[31] Dickson v. Uhlmann Grain Co., discussed above, is here cited.

[32] In aid of a more generalized argument on burden of proof the Government cites United States v. Eastman Kodak Co., D.C.W.D.N.Y.1915, 226 F. 62, appeal dismissed 1921, 255 U.S. 578, 41 S. Ct. 321, 65 L.Ed. 795, and United States v. United States Steel Corp., D.C.D.N. J.1915, 223 F. 55, affirmed 1920, 251 U. S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L. R. 1121. In the first of those cases it was undisputed that the Eastman Kodak Company controlled from 75 to 80% of the entire interstate trade in cameras, film, plates and photographic paper, and had accordingly secured a monopoly. District Judge Hazel held that under these circumstances the burden rested upon the defendants to prove that this was accomplished by lawful methods— normal processes of growth, mere ac-

quisition of property, or superior merit of products. In United States v. United States Steel Corp., Circuit Judge Buffington, speaking for the District Court, ruled that the vast size of the Steel Corporation, the influence and control incident to such size, and the seeming power of the Corporation to crush and its ability to absorb business through its systemized organization, were all factors so associated with monopoly to restrain trade and crush out competition "that we may say that, standing alone as a mere isolated fact, this great company gives one such an impression of monopoly that we feel we may in this inquiry place the burden upon it and its formers to satisfy us by affirmative proof that monopoly was not the purpose for which it was formed, but that it was the normal, regular, and natural outcome of the improvement in steel making, and its

be definitely and satisfactorily proved by the Government. United States v. Aluminum Co. of America, D.C.S.D.N.Y.1941, 44 F.Supp. 97, 215, reversed on other grounds 2 Cir., 1945, 148 F.2d 416. It has been repeatedly held in suits brought under this statute that there must be a definite factual showing of illegality in the conspiracy, combination, or monopoly charged. Appalachian Coals, Inc. v. United States, 1933, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; Standard Oil Co. v. United States, 1931, 283 U.S. 163, 179, 51 S.Ct. 421, 75 L.Ed. 926; Board of Trade of City of Chicago v. United States, 1918, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683, Ann. Cas.1918D, 1207. We hold that this properly includes, in the instant case, the duty of proof, by the Government, of the allegations of paragraph 46 of the complaint as well as of all other allegations of the complaint which are in aid of said paragraph.

■ *Principles of proof:* In determining questions of fact a trier of facts (whether jury, court or commission) properly takes two steps: One, determination, from consideration of the evidence, of the underlying or subsidiary (sometimes referred to as the basic) facts; the other, determination from such facts of the question whether the ultimate facts alleged have been established. And, under the system of law guaranteed by the Constitution, the subsidiary facts must be reached from the evidence and the ultimate facts from the subsidiary facts, not arbitrarily or by assumption or conjecture, or by a process contrary to reason, but according to reason. Inferences must be reasoned inferences, otherwise a case is not decided according to law. Certain principles have been recognized by the courts with reference to the dependability of inferences. They safeguard the integrity of ultimate facts arrived at by inference. These principles, authoritative guides to every trier of fact, whether jury, court or commission, are the following:

■ (1) An inference to be reasonable must be warranted from all the evidence, otherwise a fact reasonably inferable from a single fact or group of facts might be inconsistent with the totality of proven or conceded subsidiary facts. As said in National Labor Relations Board v. Union Pacific Stages, 9 Cir., 1938, 99 F.2d 153, 177, where the court interpreted the meaning of Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e), providing that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive": "But the courts have not construed this language as compelling the acceptance of findings arrived at by accepting part of the evidence and totally disregarding other convincing evidence." In short, a trier of fact may not ignore a part of the evidence. In National Labor Relations Board v. Thompson Products, 6 Cir., 1938, 97 F.2d 13, 15, the court said in respect of Section 10(e) of the Act: "It means that the one weighing the evidence takes into consideration all the facts presented to him and all reasonable inferences,

concentrated powers were only such as were deemed to be necessary to successful producing and marketing its product." (223 F. at page 121) But when the Steel Corporation case reached the United States Supreme Court, that tribunal ruled that "we must adhere to the law and the law does not make mere size an offense or the existence of unexerted power an offense." (251 U.S. at page 451, 40 S.Ct. at page 299, 64 L. Ed. 343, 8 A.L.R. 1121) In United States v. International Harvester Co., 1927, 274 U.S. 693, 708, 47 S.Ct. 748, 753, 71 L.Ed. 1302, the Supreme Court ruled that "The law, however, does not make the mere size of a corporation, however impressive, or the existence of unexerted power on its part, an offense, when unaccompanied by unlawful conduct in the exercise of its powers. United ed States v. United States Steel Corporation, 251 U.S. 417, 451 [40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121]." Again in United States v. Swift & Co., 1932, 286 U.S. 106, 116, 52 S.Ct. 460, 463, 76 L.Ed. 999, the Court said "Mere size, according to the holding of this court, is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly (United States v. United States Steel Corp., 251 U.S. 417 [40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121]; United States v. International Harvester Co., 274 U.S. 693, 708 [47 S.Ct. 748, 71 L.Ed. 1302]), but size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past."

deductions and conclusions to be drawn therefrom and, considering them in their entirety and relation to each other, arrives at a fixed conviction. . . . Testimony is the raw material out of which we construct truth and, unless all of it is weighed in its totality, errors will result and great injustices be wrought."

■ (2) If two equally probable but inconsistent inferences may be drawn from the same facts, a finding of fact cannot reasonably be based upon either of them; in such a situation the evidence is equivocal. Pennsylvania R. Co. v. Chamberlain, cited in topic I of this opinion. In that case the Court said: "We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover. [Citing authorities]" (288 U.S. at page 339, 53 S.Ct. at page 393, 77 L.Ed. 819) Cf. Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 1939, 106 F.2d 100.

■ (3) Where two different inferences may be drawn from undisputed facts, that which is the more probable is the one which must be drawn. National Labor Relations Board v. Sands Mfg. Co., 1939, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 1938, 93 F. 2d 985.

■ (4) A fact may not be inferred from a proven fact or facts where unimpeached and uncontradicted testimony consistent with such proven fact or facts but inconsistent with the fact sought to be inferred, is in the record. Pennsylvania R. Co. v. Chamberlain; Cupples Co. Manufacturers v. National Labor Relations Board; Foote Bros. Gear & Mach. Corp. v. National Labor Relations Board, 7 Cir., 1940, 114 F.2d 611, reversed per curiam on other grounds 1940, 311 U.S. 620, 61 S.Ct. 318, 85 L.Ed. 394. This proposition was phrased as follows in the Pennsylvania Railroad case: "And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist. . . . A rebuttable inference of fact, as said by the court in the Wabash Railroad case [Wabash R. Co. v. De Tar, 8 Cir., 1905, 141 F. 932, 935], 'must necessarily yield to credible evidence of the actual occurrence.' And, as stated by the court in George v. Missouri Pac. R. Co. . . . [1923, 213 Mo.App. 668, 674, 251 S.W. 729, 732], 'It is well settled that where plaintiff's case is based upon an inference or inferences, . . . the case must fail upon proof of undisputed facts inconsistent with such inferences.' " (288 U.S. at page 340, 341, 53 S.Ct. at page 394, 77 L.Ed. 819) In the Cupples Co. Manufacturers case the court stated: "evidence which merely furnishes grounds for suspicion and conjecture proves nothing, and . . . the Board, like a jury, may not disregard the uncontradicted testimony of unimpeached and credible witnesses." (106 F.2d at page 105) In the Foote Bros. Gear & Mach. Corp. case the court said: "In reaching our conclusion we wish to make it clear that . . . (c) A statement which alone may afford substantial support for a fact finding may lose its weight entirely in the face of uncontradicted facts inconsistent with it." (114 F.2d at page 622).

■ In short the rules of logic and reasoning which are necessary to the accomplishment of the type of adjudication guaranteed under our system of law must be applied by every trier of fact in reaching findings. Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. A. S. Abell Co., 4 Cir., 1938, 97 F.2d 951; National Labor Relations Board v. Bell Oil & Gas Co., 5 Cir., 1938, 98 F.2d 406, rehearing denied 5 Cir., 1938, 98 F.2d 870; Cupples Co. Manufacturers v. National Labor Relations

Board, supra; Magnolia Petroleum Co. v. National Labor Relations Board, 5 Cir., 1940, 112 F.2d 545.

■■■ By substantial evidence is meant more than a mere scintilla; it must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. National Labor Relations Board v. Columbian Enameling & Stamping Co., 1939, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660; Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; Gunning v. Cooley, 1930, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 1938, 93 F.2d 985, 989. In the Federal courts substantial evidence rather than a mere scintilla is necessary to support a judgment. Pennsylvania R. Co. v. Chamberlain, supra; Jackson v. Capital Transit Co. and Hopkins v. Baltimore & Ohio R. Co., both cited in topic I of this opinion.

The evidence offered by the Government in the instant case is mostly circumstantial and the subsidiary facts in the case are largely not in dispute; it is in respect of the meaning of these facts, of the inferences to be drawn from them, that the parties are in contest. Hence the principles above stated are to be borne in mind in considering and determining the issues of fact in the case.

■■■ Certain other principles relating to proof of such charges as are involved in the instant case should be stated: A conspiracy is a partnership in the accomplishment of an unlawful thing, or of a lawful thing by unlawful means. Duplex Printing Press Co. v. Deering, 1921, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; United States v. Kissel, 1910, 218 U.S. 601, 608, 31 S.Ct. 124, 54 L.Ed. 1168; Patterson v. United States, 6 Cir., 1915, 222 F. 599, 630, 631, certiorari denied 1915, 283 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499. Under the Sherman Act a conspiracy need not involve an overt act, although the commission of such an act or acts may tend to characterize a conspiracy in respect of time and place. The "Sherman Act punishes the conspiracies at which it is aimed on the common law footing—that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability." Nash v. United States, 1913, 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232. Cf. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 224–246, 60 S. Ct. 811, 84 L.Ed. 1129, rehearing denied 1940, 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421. A conspiracy may be proved by circumstantial evidence. Eastern States Retail Lumber Dealers' Ass'n v. United States, 1914, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Baush Machine Tool Co. v. Aluminum Co. of America, 2 Cir., 1934, 72 F.2d 236, 241, certiorari denied 1934, 293 U.S. 589, 55 S.Ct. 104, 79 L.Ed. 683. As stated in the latter case "Conspiracies are seldom capable of proof by direct testimony and may be inferred from the things actually done and from the circumstances." Evidence as to conspiracy is, of course, to be considered as a whole—not piecemeal. Although separate acts of alleged conspirators may, when viewed alone, seem innocent, they may, when looked at as parts of a general scheme, take on an illegal aspect. United States v. Reading Co., 1912, 226 U.S. 324, 357, 33 S.Ct. 90, 57 L.Ed. 243, modification, not affecting this holding, 1913, 228 U.S. 158, 33 S.Ct. 509, 57 L.Ed. 779; United States v. Patten, 1913, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325.

■■■ *The rule concerning admissibility of declarations of alleged co-conspirators:* Much of the testimony introduced by the Government in this case, and most of the exhibits, consist of declarations of alleged co-conspirators. It is necessary therefore to bear in mind the rules concerning admissibility of such declarations. Ordinarily the law holds a person liable only by reason of his own acts or utterances. But where two or more persons act in concert, with a common purpose, the acts and declarations of one during the existence, and in pursuance, of the conspiracy, are held in law to be the acts and utterances of the others. As said in Connecticut Mutual Life Ins. Co. v. Hillmon,

1903, 188 U.S. 208, 218, 23 S.Ct. 294, 298, 47 L.Ed. 446, "every act and declaration of each member of the conspiracy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is therefore original evidence against each of them." But upon the application of this rule there are definite limitations which flow from its foundation, to wit, one person may be held liable for the acts and utterances of another *if the two are acting in concert and to a common purpose*. In order to render admissible as against one member of an alleged conspiracy the acts or declarations of another, the *existence of the conspiracy charged and the connection of the conspirators with it must be shown independently*. It is also necessary that the acts and declarations shall have some relation to the execution of the common purpose; declarations must be more than mere narratives. In Winchester & Partridge Mfg. Co. v. Creary, 1885, 116 U.S. 161, 166, 6 S.Ct. 369, 371, 29 L.Ed. 591, a common purpose to defraud other creditors of a vendor by a sale of property was charged against the vendor and a vendee-creditor. The jury was permitted to consider, as against the vendee, declarations of the vendor, made after the sale, as to its true character. The Supreme Court held this error, saying: "it is sufficient to say that such declarations are not admissible against the vendee, unless the alleged common purpose to defraud is first established by independent evidence, and unless they have such relation to the execution of that purpose that they fairly constitute a part of the *res gestae*." In Thomas v. United States, 10 Cir., 1932, 57 F.2d 1039, 1041, 1042, the limitations were described thus:

"To render evidence of the acts or declarations of an alleged conspirator admissible against an alleged co-conspirator, the existence of the conspiracy must be shown and the connection of the latter therewith established. Pope v. United States (C.C.A.3) 289 F. 312, 315; Kelton v. United States (C.C.A.3) 294 F. 491, 495; Isenhouer v. United States (C.C.A.8) 256 F. 842; United States v. Goldberg, 7 Biss. 175, Fed.Cas. No.15,223; United States v. McKee, 3 Dill. 551, Fed.Cas.No.15,686; Burns v. United States (C. C.A.8) 279 F. 982, 986; Dolan v. United States (C.C.A.9) 123 F. 52; Stager v. United States (C.C.A.) 233 F. 510.

"Declarations made by one conspirator to another are not competent evidence to establish the connection of a third person with the conspiracy. Kuhn v. United States (C.C.A.9) 26 F.(2d) 463; United States v. McKee, supra.

"The existence of the conspiracy charged cannot be established against an alleged conspirator by evidence of the acts or declarations of his alleged co-conspirator done or made in his absence. Hauger v. United States (C.C.A.4) 173 F. 54, 57; United States v. Richards (D.C.Neb.) 149 F. 443; United States v. Goldberg, supra; United States v. McKee, supra."

In Stager v. United States, 2 Cir., 1916, 233 F. 510, 513, the court said:

". . . When a conspiracy is once established acts and admissions of any one of the conspirators in pursuance of the conspiracy, and while it continues, are admissible against the others, upon the theory that the conspirators are agents for one another in the common enterprise. Connecticut Mutual Life Insurance Co. v. Hillmon, 188 U.S. at page 218, 23 S.Ct. 294, 47 L. Ed. 446. But the preliminary question whether sufficient evidence of a conspiracy has been adduced must always be answered by the court in the affirmative or the general rule of evidence excluding hearsay will render an admission of one of the conspirators inadmissible against the others. . . ."

In Mayola v. United States, 9 Cir., 1934, 71 F.2d 65, 67, the court ruled that the declarations of one co-conspirator to another are not competent to establish the connection of a third person with the conspiracy. It quoted from Nibbelink v. United States, 6 Cir., 1933, 66 F.2d 178, 179, as follows: " '* * * Before the declarations of coconspirators can be received in evidence against one charged with participating in the conspiracy, it must be shown by independent evidence that the conspiracy existed and that the accused was a party to it at the time the declarations were made.' " To the same effect see United States v. Renda, 2 Cir., 1932, 56 F. 2d 601. In Logan v. United States, 1892, 144 U.S. 263, 309, 12 S.Ct. 617, 632, 36 L.Ed. 429, the Supreme Court expressly ruled against the use of declarations concerning past events, saying that "the defendants on trial could not be affected by the admissions made by others of the alleged conspirators after the conspiracy had ended" since such declarations "were not in execution or furtherance of the conspiracy, but were mere narratives of a past fact." See also Harrington v. United States, 8 Cir., 1920, 267 F. 97; Oras v. United States, 9 Cir., 1933, 67 F.2d 463.

■ Declarations are, strictly, hearsay, being made out of court and without the sanction of an oath, but are received in evidence as in the nature of admissions of a party. They may, of course, in some instances be verbal parts of an act which is itself material and relevant in a case, and in such event admissible as original evidence. Hughes, Evidence (1907) Ch. XVII, § 6. "If a declaration has its force by itself, as an abstract statement, detached from any particular fact in question, depending for its effect on the credit of the person making it, it is not admissible in evidence. . . . But when the act of a party may be given in evidence, his declarations made at the time, and calculated to elucidate and explain the character and quality of the act, and so connected with it as to constitute one transaction, and so as to derive credit from the act itself, are admissible in evidence. . . Such a declaration derives credit and importance as forming a part of the transaction itself." The quotation is from Justice Fletcher, in Lund v. Inhabitants of Tyngsborough, 1851, 9 Cush., Mass., 36, 42. But the acts and explanatory declarations of one alleged co-conspirator would be admissible as against others only subject to the limitations above expressed.

■ State v. Trocchio, 1922, 121 Me. 368, 117 A. 460, is urged by the Government as rejecting the limitation that declarations of one alleged co-conspirator are not admissible against others until there has been independently proved the existence of the conspiracy and the participation of the others therein. In that case, involving a conspiracy to kill, exceptions were taken to the admission as against one defendant (Philomena Trocchio) of letters and confessions of others. The court said:

". . . The defendant, Philomena, however, strongly protests that the letters and confessions were not admissible as tending to prove participation in the conspiracy on her part, inasmuch as a conspiracy must first be established before the acts or words of alleged co-conspirators can become admissible.

"We do not understand the rule of the admission of testimony, in proof of a conspiracy, to be as limited as above stated and claimed. We think the true rule, as shown by ample author-

ity is, that the acts and words of all parties alleged to be participants in the conspiracy, as well as all other testimony, are admissible in the discretion of the court, for the purpose of proving the fact of a conspiracy, but are not to be taken into consideration against any one of the parties concerned, until, from the evidence thus admitted, the fact of a conspiracy is proved; after which the acts and words of each co-conspirator, whenever done or whenever said, in furtherance of the common purpose are admissible against all the alleged conspirators, upon the ground that the act of one is the act of all." [121 Me. at page 375, 117 A. at page 462]

Reading of the entire opinion in that case, however, indicates that what was really in the mind of the court in its ruling was the order of evidence. The court states, for example, that it is claimed by the defendant Philomena Trocchio that none of the evidence disclosed by the letters between her daughter Elizabeth and Nick Vetrano (the other defendant), or their confessions, were admissible against her until a conspiracy in which she was a participant was proved. In respect of this the court said: "Such is the general rule, but the exceptions are so numerous that in nearly all the jurisdictions of this country *the order of introducing all testimony* upon conspiracy charges, is left to the discretion of the presiding Justice." (Italics supplied) (121 Me. at page 378, 117 A. at pages 463, 464) Spies v. People, 1887, 122 Ill. 1, 238, 239, 12 N.E. 865, 980, 17 N.E. 898, 3 Am. St.Rep. 320, petition for writ of error dismissed 1887, 123 U.S. 131, 8 S.Ct. 22, 31 L. Ed. 80, cited by the Government also relates to the order in which evidence is received, within the discretion of a trial court, in a conspiracy case. It is, of course, true that a trial judge may in his discretion receive evidence concerning declarations of alleged co-conspirators prior to proof of the existence of the conspiracy and of the participation of the other defendants therein, subject to a promise, by the party offering the declarations, of ultimate independent proof of the conspiracy and the connection of the defendants therewith. Such order of proof was permitted in the instant case.

The Government asserts that the law requires slight evidence only of connection of an alleged conspirator with the conspiracy, citing Galatas v. United States, 8 Cir., 1935,

80 F.2d 15, certiorari denied 1936, 297 U.S. 711, 56 S.Ct. 574, 80 L.Ed. 998; Van Riper v. United States, 2 Cir., 1926, 13 F.2d 961, 967, certiorari denied sub nom. Ackerson v. United States, 1926, 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848; Roberts v. United States, 9 Cir., 1918, 248 F. 873, 880, certiorari denied 1918, 247 U.S. 522, 38 S.Ct. 583, 62 L.Ed. 1247; and Gernert v. United States, 9 Cir., 1917, 240 F. 403. In the Gernert case the evidence was not slight. In the Van Riper case it is held that there is no requirement that each of several co-conspirators be shown to have had an *equal* part in forming and carrying out the conspiracy. It is added that if it be shown that he subsequently adopted the conspiracy with knowledge of its design and purpose, declarations may be admissible against a conspirator even though he had nothing to do with the conspiracy at its inception. This is the ruling in the Roberts case, the court there making the qualification, however, that the adoption of the conspiracy must be in its original design and purpose. In Galatas v. United States, it is said that where a conspiracy is established "but slight evidence connecting a defendant therewith may still be substantial, and if so, sufficient." (80 F.2d at page 224) But none of these cases indicates that the "slight evidence" which may be sufficient to connect a defendant with a conspiracy, or to show that he adopted it, can be insubstantial. Wilson v. United States, 2 Cir., 1911, 190 F. 427, 438, affirmed 1911, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558, is cited as holding that a party may be connected with a conspiracy by evidence which if standing alone would be insufficient to establish the existence of the conspiracy. But the case does not hold that the connecting evidence may itself be insubstantial.[33]

The Government also relies upon Cummings v. United States, 9 Cir., 1926, 15 F.2d 168. That case involved a conspiracy to violate the National Prohibition Act, 27 U.S.C.A. § 1 et seq. The defendants relied upon the proposition that the formation of a conspiracy could not be established "by declarations of the defendants." The court said that it was true that a declaration by a single defendant would not be competent as against the others or sufficient in itself to prove the conspiracy, but that if the defendants "each and all, though separately, admitted or declared the existence of the alleged conspiracy, such declarations would be competent, and, taken together with the conduct of the parties and other circumstances, might very well constitute the most convincing evidence." (15 F.2d at page 169) This case is cited in Hoeppel v. United States, 1936, 66 App.D.C. 71, 76, 85 F.2d 237, 242, certiorari denied 1936, 299 U.S. 557, 57 S.Ct. 19, 81 L.Ed. 410, rehearing denied 1936, 299 U.S. 622, 57 S.Ct. 188, 81 L.Ed. 458. But neither the latter case nor Cummings v. United States alters the general rule with respect to the admissibility of declarations. In the Cummings case, a criminal case, the declarations were apparently separate *confessions,* not merely admissions of a party in the usual sense of those words in civil cases.

---

[33] The Van Riper case, above cited, contains a good statement of the rule concerning the admissibility of declarations in conspiracy cases: "Such declarations are admitted upon no doctrine of the law of evidence, but of the substantive law of crime. When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made 'a partnership in crime.' What one does pursuant to their common purpose, all do, and, as declarations may be such acts, they are competent against all. Hitchman C. & C. Co. v. Mitchell, 245 U.S. 229, 249, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann. Cas.1918B, 461; Connecticut Mut. L. Ins. Co. v. Hillmon, 188 U.S. 208, 23 S. Ct. 294, 47 L.Ed. 446. For this reason, merely narrative declarations are not competent. But it is also a part of the law of joint crimes that, when a party joins an existing group already so engaged, he assumes responsibility for all that has been done theretofore. Anonymous, 6 Mod. 43; People v. Mather, 4 Wend. (N.Y.) 229, 258, 259, 260, 21 Am.Dec. 122; Com. v. Rogers, 181 Mass. 184, 194, 63 N.E. 421; 1 Russell on Crimes (8th Ed.) 190; 1 Bishop, New Criminal Law, § 642. For this reason all that was done before he entered may be used against him, but obviously not what was done after he left, Logan v. United States, 144 U.S. 263, 309, 12 S. Ct. 617, 36 L.Ed. 429; Brown v. United States, 150 U.S. 93, 14 S.Ct. 37, 37 L. Ed. 1010." (13 F.2d at page 967)

The Government cites Hitchman Coal & Coke Co. v. Mitchell, 1917, 245 U.S. 229, 249, 38 S.Ct. 65, 72, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461, wherein the Court says: "In order that the declarations and conduct of third parties may be admissible in such a [conspiracy] case, it is necessary to show by independent evidence that there was a combination between them and defendants, but it is not necessary to show by independent evidence that the combination was criminal or otherwise unlawful. The element of illegality may be shown by the declarations themselves." Cited also are Van Riper v. United States, supra; Boyle v. United States, 7 Cir., 1919, 259 F. 803, 808; United States v. American Column & Lumber Co., D.C.W.D.Tenn.1920, 263 F. 147, 152, affirmed 1921, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093; but none of these cases discusses this aspect of the declarations rule. There is, moreover, a limitation upon the independent evidence requirement which the statement in the Hitchman case is not to be read as negating. The independent evidence which must be introduced by the Government before declarations of one co-conspirator can be used to bind another must prove *the very combination charged*. Declarations cannot be used to prove the common purpose, or to enlarge the scope of any common purpose which has been proved. Without this limitation, one person might be bound by the declarations of another disclosing an illegal undertaking quite different from an innocent transaction in which the two had been jointly engaged. This limitation is recognized in United States v. Food and Grocery Bureau, D.C. S.D.Cal.1942, 43 F.Supp. 966. That was a criminal prosecution for violation of Section 1 of the Sherman Act against the Food and Grocery Bureau and others, charging a conspiracy to stabilize retail prices of food and grocery products. The testimony for the Government showed that what started as an effort on the part of persons engaged in the food and grocery business to secure the enforcement of the Unfair Trade Practices Act of California gradually developed into a price fixing and stabilization scheme. Thus, the starting point of the conspiracy dealt with a legal venture, *i.e.*, the association of various persons to assist in the enforcement of a law. Evidence consisting of declarations showed that the association departed from the original object and started illegally to fix prices. At the conclusion of the Government's case it moved to apply to all of the defendants evidence which had been received subject to later connection as to certain defendants. In denying this motion in respect of several defendants who were not shown, by independent proof, to have been parties to the unlawful part of the plan, the court said:

"*But unless the passage from the legal to this illegal object is brought home individually to the various defendants, mere membership in the Bureau, mere contributions toward its support, or the collection of the tax on milk by wholesalers from retailers for the use of the Bureau, are not sufficient to charge the individual members—be they persons or groups—with these acts.*

"Nor, assuming that the Secretary of the Bureau, the Bureau as a corporate entity, and the directors, who participated in its deliberations, knew of the activities, can this illegal object be charged to the organizations of which some of the directors were also members, unless it appear that the organization, *as such*, knew and sanctioned the acts of their representatives. Any other attitude would result in grave injustice. *Some of the defendant organizations are cooperatives—groups consisting of hundreds of petty tradesmen. It would be wholly unfair to charge this group with the actions of some of their officers in attempting to bind them to an illegal act, unless it be shown that the matter was brought up and explained at some meeting and that the nature of the activity was clearly understood by the membership. Our law abhors crime by association. To say that a hundred grocers, bound together in a cooperative, should be found guilty of the violation of a statute of the United States because one or two of their officers or directors were also on the Board of the Bureau, would be applying to criminal law the civil law of agency. This cannot and should not be done.*

&ast; &ast; &ast;

"I am of the view that the evidence does not show that any of these individual or group defendants, as to whom the motion is denied, *engaged in any scheme of price-fixing or joined others in carrying out an intention to fix retail prices in obstruction of interstate commerce.*

"To amplify this further would require a repetition or application to each of these defendants of the legal norms discussed. This is unnecessary. I believe that the application of the principles to each of them is obvious. Either their part was insignificant, or there is no evidence of any knowledge on their part that anyone was doing aught but engage in a legal activity. There is no evidence that they participated in any act of an illegal nature, such as coercion, threats, intimidation, and the like, in carrying out the objects for which they may have as-

sociated themselves with the Food and Grocery Bureau, at its inception. *You cannot ground a conspiracy upon the doing of a lawful act, unless the means are unlawful.* The effort to support the Unfair Practices Act was not accomplished by any unlawful means, so far as these particular defendants are concerned." [Italics supplied] [43 F.Supp. at page 973]

An effort to bind one party by the declarations of another merely because they had a contract which itself did not involve any common or joint undertaking was rejected in Winchester & Partridge Mfg. Co. v. Creary, supra.

## IV

### EVIDENCE OF CONSPIRACY OUTSIDE THE DECLARATIONS

▋ Under the limitation stated in topic III, unless there is evidence, outside the declarations, of the conspiracy charged, the declarations are binding only upon the declarant, not upon other members of the alleged conspiracy. The conspiracy charged in the complaint is a conspiracy to accomplish the restraints of trade alleged in paragraph 45 (*viz.*, the fixing of prices on gypsum board made and sold by the defendants, improper standardization of board, fixing of prices on unpatented materials, improper control of distribution of gypsum products, and fixing of the prices at which manufacturing distributors would resell gypsum board) by the execution, as alleged in paragraph 46, of patent license agreements which are not bona fide agreements intended to secure to USG the pecuniary reward of its patent monopoly, but which were entered into only to give color of legality to a combination to restrain trade as alleged.

The Government asserts that the conspiracy is proved by evidence, outside the declarations, to the effect that: (1) In 1927–1929 there was a price war in the gypsum industry; due to litigation and competition from open-edge board prices in some localities were as low as cost, and for some manufacturers business was no longer profitable. (2) On May 21, 22 and 23, 1929, Avery, Henning and MacLeish (counsel), of USG; Reeb, of Niagara; Baker, of National; Kelley, of Kelley; Neale and Channing, of Atlantic; C. O. Brown and Whittemore, of Certain-teed; Holland, of Universal; and Ebsary, Lenci and Rippey (counsel), of Ebsary, met by previous arrangement in Chicago in relation to the possible settlement of the USG patent litigation and the issuance of licenses by USG.[34] Avery and MacLeish

---

[34] Following is a list of the full names and the business or professional identity of all of the persons referred to in this opinion. Hereafter in the text for convenience surnames only will be used except where two persons have the same surnames, in which event given names or initials will be used for differentiation. In the following list the letter (W) after a name indicates that such person was a witness.

| | |
|---|---|
| Avery, Sewell L. | USG, Chairman of Board since 1936; President 1905–1936. |
| Baker, Melvin H. | National, President. |
| Bayer, Erick Christian | Foreign Patentee. |
| Black, Arthur R. (W) | Celotex, Supervisor of Sales since 1939; Sales Manager of American 1907–1939. |
| Blagden, Augustus G. (W) | Beaver, President 1923–1928. |
| Brown, Claude Oliver (W) | Certain-teed, Vice-president 1929–1937; General Sales Manager 1925–1929. |
| Brown, George M. (W) | Certain-teed, Chairman of Board 1936–1937; President 1904–1935. |
| Channing, M. M. | Atlantic, Counsel. |
| Chism, H. E. (W) | Texas, General Manager since 1932; Assistant to the General Manager 1922–1932. |
| Coffin, W. E. | Certain-teed. |
| Dahlberg, Bror G. (W) | Certain-teed, Chairman of Board since 1933. Celotex, President since 1921. |
| Diegel, Ed. H. | Ebsary, General Sales Manager. |
| Ebsary, Frederick G. | Ebsary, President. |
| Fuller, Willard P. | Atlantic, President. |
| Gloyd, Samuel M. | Texas. |
| Griswold, Frank J. (W) | American, Vice-president and General Manager. |

stated to the others present that the General Electric decision sanctioned the granting of patent licenses containing provision for sale of the patented product at minimum prices to be fixed by the licensor, and explained the terms of the proposed licenses. Certain-teed, Ebsary and Niagara at this time signed their May 1929 licenses under the Utzman and other patents. National had signed its license on May 16. The first price bulletin under these licenses was then issued. Thereafter Avery explained the advantages of the Roos foam invention and suggested the taking of additional licenses under the patent for this. There were further representations during the summer of 1929 as to the advantages of the Roos foam invention, and of the Haggerty and Hite starch patents which were owned by Universal but were to be sold to USG. As evidence, outside the declarations, of the conspiracy charged, the Government relies also upon (3) the fact of execution of the 1926–1927, May 1929, November 1929, metallized board and perforated lath license agreements; and upon (4) the terms and provisions of these licenses. These terms are outlined in the statement of facts at the outset of this opinion and need not be repeated here.

These items do not prove the conspiracy charged because they do not show that the licenses were not bona fide or that they were executed to accomplish restraints outside the proper limits of a patent monopoly. The low prices in 1927-1929 may have been an inducement to the execution of licenses under which prices on patented board would be fixed by the licensor at presumably profitable levels, since the licensor was also a manufacturer; *non constat* that it was an inducement to execute non-bona

| | |
|---|---|
| Haggerty, J. F. | National, President. |
| Hansen, Emil (W) | Paragon Plaster Co., President and Treasurer. |
| Hartley, Henry J. | Certain-teed, President. |
| Henley, Warren | Certain-teed, Merchandise Manager. |
| Henning, C. F. | USG, Vice-president in charge of sales. |
| Higgins, Charles A. (W) | Quality Materials Co. since 1937; Central Sales Manager of National 1929–1937. |
| Hite, C. | Universal, Research. |
| Holland, Eugene (W) | Universal, President and General Manager and Co-Receiver. |
| Ingberg, S. H. (W) | Bureau of Standards. |
| Kelley, Stephen J. | Kelley, President. |
| Kellogg, Willard H., Jr. (W) | Connecticut Adamant Plaster Co., Secretary and Treasurer. |
| Kling, John A. | American, Chairman of Board. |
| Knode, Oliver M. | USG, President. |
| Lenci, George N. (W) | Ebsary, Vice-president. |
| MacLeish, John E. | USG, Counsel. |
| McCormack, Harry G. (W) | American Cyanamid Corp. since 1928; prior thereto, Assistant Sales Manager of Structural Gypsum Corp., and prior thereto with USG, National and American. |
| McCrady, J. H. | American, President. |
| Miller, Frank M. | Board Survey, Executive Secretary. |
| Neale, Laurence I. (W) | Atlantic, Vice-president. |
| Nelson, Robert M. (W) | Certain-teed, Vice-president and Treasurer. |
| Reeb, M. A. | Niagara, President. |
| Rippey, Harlan W. | Ebsary, Counsel. |
| Roos, Carlisle K. | USG, Director of Research. |
| Spease, J. R. (W) | Fairmont Wall Plaster Co. |
| Spencer, H. Dorsey (W) | Certain-teed, Counsel. |
| Stromquist, Walter G. (W) | Universal, Eastern Sales Manager. |
| Tomkins, Frederick (W) | Newark, President. Calvin Tomkins Co., Vice-president. President of Kelley 1937–1939. |
| Utzman, Clarence W. | USG, Inventor-Employee, Research. |
| Van Hagan, H. H. | Certain-teed, Production Department. |
| Whittemore, Audenreid (W) | Certain-teed, Executive Vice-president. |
| Williams, C. E. | National. |

fide licenses with intent to accomplish unlawful restraints of trade. The meeting, representations and negotiations mentioned prove nothing as to the alleged non-bona fide character of the licenses or as to the alleged illegal objectives thereof; nor does the fact of execution of the licenses, unless it be assumed, contrary to the holding in topic II, that a plurality of patent licenses is unlawful. The provisions of the licenses evidence nothing as to alleged non-bona fides of the licenses or as to their asserted illegality of purpose. As is shown in topic II similar provisions were approved in the General Electric case. That the fixing by USG of the minimum prices to be charged in sales of patented board by the licensees was provided for in the licenses is no evidence of wrongful purpose unless it is otherwise shown that the licenses were sham. The Government emphasizes the provisions for recognition of the validity of USG's patents, for the marking of seconds, for the payment of royalty on all board sold whether patented or not, and the "most favored nation" clause. Recognition of the validity of the patents is no evidence that the licenses were not executed bona fide; indeed, without more, it is evidence that they were. The provisions for marking seconds and for royalty are no evidence that the licenses were sham or that they were executed for the accomplishment of illegal objectives; the one was to avoid confusion between first grade and defective board; the other was a means of measuring the amount to be paid for the right of the licensees to use the patents. The "most favored nation" clause is no evidence that the licenses were not executed in good faith. Given a right to execute a plurality of licenses, a patentee may properly draft them with uniform terms and with such a provision against future discrimination by the licensor between the licensees.

The Government contends further that the actual operations of the defendants after the licenses were signed were carried beyond the proper limits of the patent monopoly, and that this shows that the licenses were executed with a wrongful intent—since it may be taken for granted that the manufacturing and sales activities were designed. But there is no evidence to support this contention. It is demonstrated in topic VI of this opinion that the evidence fails to establish that there was resale price fixing, improper control of distribution, fixing of prices on unpatented products, or improper standardization of gypsum board. The discussion of those topics will not be duplicated here. That USG did fix, by the issuance from time to time of bulletins, the minimum prices at which patented board should be sold, and that in the large the licensees conformed to these prices, is not in dispute. But to infer from this that the licenses were executed with a wrongful purpose is either to assume, rather than to prove, that they were sham, or to reason from a false premise, that is to say, from a premise that the fixing by a licensor under bona fide licenses of the minimum price on sales of the patented product is illegal. The General Electric decision holds that this is not illegal.

In considering the question whether there is evidence, outside the declarations, of the conspiracy charged, the court has taken into account the contention of the Government that the declarations may themselves be considered, as admissions, under the theory of Cummings v. United States, referred to in topic III. But, as pointed out there, the so-called separate "admissions" in that case were really confessions which admitted and declared the existence of the conspiracy. None of the declarations in the instant case constitutes a confession of the conspiracy charged.

It is concluded that there is no evidence, outside the declarations, of the conspiracy charged. The court now proceeds to consider, on the merits, the two principal questions of fact in the case, and in examining the evidence will regard the declarations as binding only upon the declarant.

V

THE BONA FIDES OF THE PATENT LICENSE AGREEMENTS

The first of the two questions of fact in the case is, as stated at the close of topic II: Were the license agreements entered into by the defendants not as bona fide

patent license agreements but to give color of legality to a combination to restrain trade in violation of the Sherman Act? The execution of the license agreements, their terms, and the litigation out of which, in the large, they grew, have been described at the outset of this opinion. But further facts connected with the execution and operation of the contracts must be alluded to in order that the conflicting contentions of the parties in respect of the questions of fact may be understood and resolved. It is to be borne in mind that although there are conflicting contentions, this is not a case of conflicting evidence in the usual sense of those words. All of the evidence before the court was introduced by the Government, none by the defendants. There was, of course, cross-examination by the defendants, and items of evidence thus elicited are in some part relied upon by the defendants; but those items are out of the mouths of the Government's witnesses, and their credibility is not assailed by either the Government or the defendants, except in the instance of one witness the dependability of whose testimony, in connection with the second issue of fact, is questioned by the defendants. Since many of the witnesses were officers of the defendant companies, the Government was free, under Rule 43(b) of the Federal Rules of Civil Procedure, to interrogate them by leading questions, and it did so. Under the same rule the Government was free to contradict or impeach such witnesses. This it did not do. The conflicting contentions of the parties on the issues of fact in the case are not as to what the evidence is, or as to what are the basic facts shown by the evidence; the dispute is as to the inferences to be drawn from the basic facts and, therefore, as to what the ultimate facts are. Cf. Saginaw Broadcasting Co. v. Federal Communications Commission, 1938, 68 App.D.C. 282, 287, 96 F.2d 554, 559, certiorari denied sub. nom. Gross v. Saginaw Broadcasting Co., 1938, 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391.[35] Accordingly the principles set forth in topic III in respect of the drawing of inferences are to be regarded.

It is to be noted that the first question of fact—were the license agreements entered into by the defendants not as bona fide license agreements but to give color of legality to a combination to restrain trade in violation of the Sherman Act—has two aspects: One, were the agreements executed as bona fide agreements, intended to bind each party to the promises made therein, or were they intended by the parties only as sham agreements to disguise illegal purposes; the other, were the agreements executed with intent to gain more than appears on their face—to gain objectives beyond the proper limits of a patent monopoly? Each of these two aspects of the question merges into the other. If the license agreements were intended not as binding, but only as sham, agreements, then in equity they would be contracts in form only, not in substance, and the parties to them would be without patent protection so far as price fixing is concerned, i.e., USG would have no warrant to fix prices on sales of board by the licensees, or they to abide by prices so fixed; and if the agreements, even though executed as binding instruments and in that sense bona fide, were intended to gain more than appears on their face, to gain objectives beyond the proper limits of a patent monopoly, then they would, in a broad sense, not be bona fide; and if so intended, even if not so applied, the agreements would be illegal—because a Sherman Act conspiracy need not involve an overt act. Although the two aspects of the first question of fact do, as said, merge into each other, they will, for convenience, be discussed separately.

■ *Were the license agreements executed as bona fide agreements intended to*

[35] In that case it is pointed out that the process which a court or a commission properly follows in reaching a decision on the facts includes four parts: (1) Evidence must be taken and weighed both as to its accuracy and as to its credibility; (2) from consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of an applicable statute or principle of law, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow on the application of the statutory or judicially enunciated criterion.

*bind each party, or were they intended only as sham agreements to disguise illegal purposes?* The evidence introduced by the Government fails to prove that the agreements were intended only as sham agreements to disguise illegal purposes; on the contrary it shows that they were executed bona fide.

All of the license agreements, except that of July 29, 1926, between USG and Beaver, and that of September 17, 1926, between USG and Universal, were executed after the decision in the General Electric case on November 23, 1926; and Bement v. National Harrow Company had long been decided ·(May 19, 1902) before the Beaver and Universal agreements were signed. The terms and conditions of the licenses in the instant case are similar to those in the General Electric-Westinghouse license. This has been shown in topic II of this opinion. It thus appears that the license agreements in the instant case, except those executed in 1926 by Universal and Beaver, were patterned upon the General Electric decision and the license agreements which in that case were sanctioned by the Supreme Court; and the Universal and Beaver licenses were apparently executed upon the faith of the Bement decision. Both that case and the General Electric decision, as pointed out in topic II, sanction price fixing by a patentee on a product manufactured and sold under patent licenses granted by him. The licensees in the instant case had been advised that license agreements giving price control to the licensor were proper and that they had a right to enter into them under the patent laws. Griswold of American testified in this respect that in 1926 he understood that the law granted to USG the right to fix prices under its (Utzman) patent. Specifically, he said that his attorneys had advised him that he had a right to enter into a license agreement under the patent laws, and that if Avery saw his way clear to grant a license, he had a right to do so and to tell his licensees the price at which they should sell the patented product. Griswold said that there was no secret about that—that everybody seemed to know it at that time. He testified similarly in reference to the Birdsey partially closed-edge patent. Lenci of Ebsary testified that at the Palmer House in Chicago in May, 1929, when representatives of his company, National, Certain-teed and Niagara signed the May 1929 agreements, Avery stated that under the General Electric decision USG had a right to offer the licenses; and Lenci said further that Rippey, counsel for Ebsary, advised that it was lawful under the General Electric decision to take out a license under which USG would fix the prices of the patented product. It is implied in the testimony of George M. Brown of Certain-teed that he understood that price fixing by a patent licensor was lawful. It may properly be inferred that Holland was of the view that the USG license to Universal was lawful, since the sale transaction of the Haggerty and Hite patents by Universal to USG, ·of which the license was a part, was approved by the seven United States District Courts in which the Universal receiverships were pending. All of this evidences good faith in the execution of the licenses.

All of the license agreements subjected the licensees to the payment of substantial royalties; and many of them were entered into, as appears from the statement of facts at the outset of this opinion, in settlement. of infringement litigation and in consideration of the payment of substantial damages. This affirmatively evidences good faith and negatives sham and subterfuge. It is not reasonably to be thought that licensees would agree to pay, and actually pay, substantial sums of money in royalties and damages if the agreements were entered into only as a cloak to disguise illegal conduct. If the agreements had been sham, the royalties would have been sham. Some such device as royalty rebates would have been provided for, as in the Standard Sanitary case, referred to in topic II, where the royalties were based not upon selling price but upon a flat figure per unit, 80% of which was returnable to the licensee if he abided by all of the provisions of his license. This case is discussed in greater detail in topic VIII.

Commencing as early as 1926, when the Beaver license ·was negotiated, USG of-

fered terms of settlement of infringement claims and a license to the various board manufacturers, and throughout all of its negotiations with the various companies USG insisted upon these same terms which were: payment of damages for infringement, acknowledgment of the validity of USG's patents, payment of royalties, and the right in USG to fix prices upon board made and sold under its patents. American attempted to get better terms but Avery remained firm that American should either pay in full for past infringement and for future use of the patents, or go without the benefit of using them. On May 18, 1929, shortly prior to the execution in Chicago, on or about May 22, of the license agreements with Ebsary, Certain-teed and Niagara (National had signed its agreement on May 16), Avery wired to Ebsary of Ebsary, George M. Brown of Certain-teed, Baker of National, Holland of Universal, and Gloyd of Texas, that Kling of American had sent in a contract with material changes unacceptable to USG, and that unless each of the other companies was willing to sign its proposed license without American the meeting with Avery in Chicago was futile. If Avery, as arch conspirator in an arrangement to use patent licenses as a "coverup" for illegal purposes and acts, was interested only in such purposes and acts, including price fixing, his insistence upon the execution of licenses, each of which called for payment of damages and royalties and recognition of patent validity, as well as the right in USG to fix prices of sale by the licensees of the patented product, is not understandable. In a sham transaction there would hardly be bargaining over terms, or rigid insistence by the licensor upon the same terms for all settlements and licenses. Avery's conduct in insisting upon the same terms to all licensees might be consistent with misinformation as to his right to license USG's competitors and fix the price of board made and sold by them and as to the right of the competitors to take licenses and to submit to price control, but it is inconsistent with an intention by Avery and USG and the manufacturers who took licenses to execute them as a blind or "coverup" for illegal purposes and conduct.

There was nothing furtive in the action of the parties. There was open negotiation and discussion between USG and the other companies in the industry of the proposed licenses, and there was open discussion among the companies other than USG of their mutual problems arising out of USG's ownership and insistence upon enforcement of dominant patent rights in the gypsum board field. This is consistent only with good faith in the execution of the licenses.

The conduct of USG and the licensees in respect of the enforcement of the license provisions, especially the price protective provisions, after the licenses were signed, affirmatively evidences good faith. As pointed out in the statement of facts at the outset of this opinion, USG, in 1932, set up a wholly owned corporation called the Board Survey Company to receive complaints of license violations, investigate the facts, and call them to the attention of the licensee involved, and upon occasion to the attention of the licensor—this for the purpose of bringing about compliance by all of the licensees with the minimum price provisions relating to board made and sold under the licenses. The Government urges this as improper "policing" of the industry, but it appears more reasonable to characterize it as insistence by the licensor and the licensees who lodged complaints upon obedience to the terms of the licenses. From time to time, as also pointed out in the statement of facts, a representative of USG as licensor met with representatives of the licensees to explain to them the provisions of the minimum price bulletins, and for the purpose of securing adherence to these bulletins by the licensees. These meetings were held from as early as June 6, 1929, to March, 1937. Lenci of Ebsary described such meetings held on October 17, November 15, and December 13, 1932, and April 27, 1933. Apparently the only licensee which never attended such a meeting was Texas. The formation by USG of Board Survey, its activity, the lodging by the several licensees with Board Survey of complaints con-

cerning license violations, and the holding of the licensee meetings—all for the purpose of enforcing the licenses—evidence that the licensor and licensees regarded the license agreements as valid and binding. Their conduct in these respects is inconsistent with sham or subterfuge in the execution of the agreements.

. The evidence introduced by the Government shows that the companies which became licensees did so because they desired to settle, or avoid, litigation, and to obtain the right to make the closed-edge board, considering it a business necessity to be able to do so; several of the licensees had made the closed-edge board before they acquired the right to do so from USG, for which infringement of the Utzman patents they paid substantial damages, as described in the statement of facts at the outset of this opinion. Also some of the licensees had manufactured board containing starch which was covered by the Haggerty patent. Numerous other patents included in the licenses were essential to the manufacturing of modern gypsum board. Blagden of Beaver, in describing that company's . reasons for taking a license, testified:

"Q. And what were your reasons for urging your company to take and finally taking a license as it did in 1926?

"A. Well, we had lost the patent suit on two occasions, that is, we had lost our case with the United States Gypsum Company on two occasions, and after studying the situation deeply I felt that we would lose in a higher court, and if we could possibly get together and settle the matter it would be best to do so.

"Q. Did you also consider, Mr. Blagden, that it was very important to your company to get the right to make this closed-edge product in order to satisfy the demands of your customers?

"A. We had definitely proven that the closed-edge board was the cheapest board to manufacture, and we had tried every other way, and even though we had to pay a royalty we thought it would save us money in the long run.

"Q. And what about the demand of your customers for this type of closed-edge board as opposed to open-edge?

"A. They were emphatic about that.

"Q. They wanted, it that is?

"A. They wanted the closed-edge.

"Q. And the fact is, of course, that ever since you came with the company, and indeed ever since the Beaver Company had been in existence, the only type of board it had made was a closed-edge?

"A. We made for a while a semi-closed edge.

"Q. Yes, but some type of closed edge?

"A. That is right.

"Q. And were you concerned, and was it a reason for your decision to take a license, about the contingent liability which was constantly hanging over the company's head by way of liability for damages?

"A. Yes, sir.

"Q. Was that a reason why you wanted to take a license?

"A. That was a great big reason.

"Q. And is it true to say, Mr. Blagden, that you were one of those business men who had a natural dislike for litigation?

"A. Yes, sir. I tried to see if we couldn't settle it out of court as soon as I found out the true situation, after becoming president of the company." [Tr. 1673–5]

Whittemore of Certain-teed testified:

"Q. What was the attitude of your company and yourself toward whether or not you desired to manufacture the Utzman closed-edge board?

"A. We wanted to make it.

"Q. Will you tell the Court the reasons why you wanted to make it?

"A. Well, there were a number of reasons. The board was a better board than the open-edge board; it was less subject to damage in transit because of the edge coverage by paper; it was easier to manufacture; and it was decidedly more salable.

"Q. Now when you say that it was 'decidedly more salable', do you include in that answer the fact that as of this time, at least, there was a strong customer demand in the trade for closed-edge board?

"A. Yes. If you will let me answer that question in my own way, I think I can get at what you want to develop.

"Q. I wish you would.

"A. The Certain-teed Products Corporation made an open-edge board. At the same time, the Beaver Products were making a closed-edge board; when we took over the Beaver Products we immediately discontinued the manufacture of closed-edge board in the Beaver plant, and went to an open-edge board. We found that the customer demand precluded our selling an open-edge board at the same price as the closed-edge board, and prices declined, declined and declined.

"Q. Then would you say that the primary reason for your taking this license from USG was to get the right to manufacture the product covered by the closed-edge patent?

"A. That was one reason, and also to get rid of the possibility of future litigation. You referred to the Utzman patent. The Utzman patent was only one of some fifty to one hundred patents that we were licensed to use. Some of those patents were vital in the production of closed-edge board, and had we not had a blanket license to use all of the patents of USG, we would have been subject to possible litigation, and we wanted to avoid that—we had had plenty." [Tr. 2663–4]

Chism of Texas said that the reasons which caused Gloyd to take the license of April 1927 were that before that time the company had been making an open-edge board which proved very unsatisfactory to the trade and caused the company to lose business, that the cost of manufacture was high due to loss from bad board, *i. e.,*

"peelers" and broken edges, which made it almost prohibitive. The company had decided in some way to make a better board. The trade preferred the closed-edge board and the company had to do something "pretty quick" to protect its business. Chism knew that the closed-edge board was a patented product and he and the officers of Texas knew that USG owned patents on the machine necessary to make the closed-edge board, and he understood also that USG had other patents, such as those for the recessed edge and the tongue and groove, which he concluded would be useful in the manufacture of gypsum board. The primary reason for the Texas company's taking the license was that it wanted to get the right to manufacture board under patents which USG owned. Chism indicated also that the license of February 10, 1937, was taken by Texas in order to obtain the advantages of making the light weight bubble board. He testified as follows:

"Q. And what about the attitude of your trade in 1927, as to whether they preferred the closed-edge or the open-edge type of board?
\* \* \*
"The Witness: The attitude of the trade was that they preferred the closed-edge board, and we had to do something pretty quick to protect our business. The open-edge board just wasn't proving satisfactory.
\* \* \*
"Q. And open-edge board was getting increasingly difficult to sell to the trade, wasn't it?
"A. That is right.
"Q. Now, wasn't it your understanding, also, that USG owned patents on the machine necessary to make the closed-edge board?
"A. I think I knew that at the time. I am sure that the officers of the company did.
"Q. And wasn't it your understanding, also, that USG had other patents which you concluded would be useful in the manufacture of gypsum board, such as the recessed edge, for instance?
"A. Yes, sir, I remember that.
"Q. And the tongue and groove patent?
"A. Yes, that is true.
"Q. Therefore, wasn't the primary reason of the Texas Cement Plaster Company for taking the license, the reason that it wanted to get the right to manufacture board under patents which you understood the United States Gypsum Company owned?
"A. Yes, it was.
"Q. And as soon as you took out the license, or shortly thereafter, did you commence to make the closed-edge board at your plant?
"A. Yes, sir, we did.
"Q. And have you made the closed-edge board at all times from that time down to the present time?
"A. Yes, we have.

"Q. And after you took your license of February 10, 1937, did you commence to make this so-called light-weight or foam-bubble board?
"A. Just as soon as we could change our machinery or equipment.
"Q. And have you continued the manufacture of that foam or bubble board down to the present time?
\* \* \*
"The Witness: Yes, we have.
\* \* \*
"Q. And since February 10, 1937, have you used starch to obtain bond between the paper and the core of your board?
\* \* \*
"The Witness: Yes, we have.
"Q. And isn't it the fact that after you took your license of February 10, 1937, USG sent engineers down there and instructed you how to manufacture this foam or light-weight board?
"A. They did, immediately after signing the agreement.
"Q. And they showed you the patents, and they gave you drawings and blue-prints, and supervised the installation of the new machinery and taught you how to use it, didn't they?
"A. They did.
"Q. And they gave you information with respect to the use of such patents as the recessed edge patent, didn't they?
"A. Yes, they did." [Tr. 5994–6000]

It appears also that, although there was discussion among the prospective licensees and with USG of the terms of the proposed licenses and of the advantages of signing them, nevertheless the decision to take a license was reached by each of the companies independently. Whittemore testified that the decision which Certain-teed made before going out to the Chicago meeting in May, 1929, to settle with USG and take a license had nothing to do with any other company in the business, that his company would have taken the license if it could have gotten it without regard to what any other company did or did not do. This was confirmed by George M. Brown, who said that Certain-teed had determined to go ahead with the license without regard to what other companies did about it. Nelson of Certain-teed said that he had reached the conclusion that the best thing for his company was to take out a license, and that it made no difference to Certain-teed whether other companies did or not. Lenci likewise testified that before he left to go to the Chicago meeting in May, 1929, Ebsary and the rest of the responsible officers and directors of the Ebsary company had determined to take a license from USG, Ebsary's reason for taking the license being its desire and need to manufacture a

closed-edge type of board. Griswold testified, in respect of American, National, Ebsary and Niagara, that there was no agreement among these companies to get together and take out a license. He said also that he had nothing to do with Atlantic's taking out a license (the reference is to Atlantic's first license, i. e., the 1927 license) except to answer Atlantic's questions with respect to the process of manufacture of wallboard, advising that if Atlantic was going into the board business it was best to make the closed-edge board if Atlantic could reach an agreement with Avery, and sending Atlantic a copy of the USG license; that further than recommending it, he was not responsible for the taking out of a license by Texas, which company went ahead on its own accord. Griswold also testified categorically that he did not act as agent or emissary of Avery in obtaining the license agreements, and that Avery did not tell him to go out and act for him in inducing other companies to take out a license. As pointed out in the statement of facts at the outset of this opinion, Blagden for Beaver and Avery for USG negotiated the Beaver 1926 license. But Blagden stated definitely that he had nothing to do with the taking by Universal, Atlantic and Texas of their 1926–1927 licenses except to answer questions that individuals may have asked him from time to time. Black of American testified that American signed its license without regard to what other board manufacturers "did or would not do"; that at a meeting in Ebsary's room in New York in October, 1928, there was no understanding or agreement reached that no one would sign unless all signed, and no such understanding or agreement at a subsequent meeting in the Certain-teed office.

The foregoing circumstances—execution of the licenses on the faith of the Bement and General Electric cases, payment of royalties and damages by the licensees, insistence by USG upon the same terms for all, open negotiation and enforcement, signing by the licensees to avoid litigation and to make the better, closed-edge board, and

upon independent decisions by the several licensees—all established by the Government's own witnesses, whose testimony was frank and convincing—strongly evidence good faith in the execution of the license agreements.

In the face of the foregoing the Government must rely, in the large, upon the following: In a memorandum of June 6, 1929, by C. O. Brown, sales manager of Certain-teed, which was attached to an intra-company memorandum of June 11 from Whittemore, vice-president, to Van Hagan of the production department (the two memoranda, declarations binding only upon Certain-teed, constitute Government Exhibit 227),[36] reference is made to the interference situation in which the patent applications covering the bubble board invention are involved. Brown mentions that price control on plasterboard under Certain-teed's May 1929 license expires in August, but suggests that this control may be extended if a satisfactory arrangement can be made with the bubble board patent. He states that for legal reasons the bubble patent "should not be considered from the standpoint of price control but should be gone into by each manufacturer from the standpoint of economy and benefit. Price control would naturally follow such a move." Brown then suggests that Van Hagan see Knode of USG in respect of estimated savings in manufacturing costs under the bubble patent, refers to receipt of a proposed form of license agreement, states that USG is making the bubble board and therefore knows from experience that it is practical, and then concludes that "The lawyers are very emphatic that there is a much less chance of being accused of using the patent as a subterfuge to control price—first being, it is gone into before expiration of the Basic patent on plaster board and second, it is gone into from the standpoint of economy in cost." Brown states also that the lawyers pronounce the patent a very strong one if and when issued. Whittemore, in his memorandum, refers to Brown's attached memorandum as indicating possible advantages in the bubble board, and requests Van

---

[36] Since the only exhibits in evidence are Government exhibits they will for convenience be referred to hereafter merely as Exhibit ———, rather than as Government Exhibit ———.

Hagan to investigate with Knode the possible savings in the use of the invention. Certain-teed did in fact, according to the evidence, investigate the bubble board invention and concluded, about July 3, 1929, that it had merit and that a license should be taken. This is evidenced by Exhibit 228 (a declaration binding only upon Certain-teed), an intra-company memorandum of July 3, 1929, written by C. O. Brown, and by his testimony. Certain-teed was apparently not motivated by a desire for price fixing when it determined to take this license, for George M. Brown testified that the company would always have opposed price fixing if it could have done so; that he finally agreed to submit to a price fixing provision because it was the only basis on which Certain-teed could get a license from USG; that the company had concluded that it was desirable and beneficial to have the right to use the Haggerty starch and the Roos bubble board patents, as well as others. In respect of his memorandum to Van Hagan, Whittemore testified that when he said therein "you can easily see the possibilities in this bubble patent," he was referring to the possibility of making under that patent "as cheap a product and just as good a one." He testified further that he had the final decision in respect of Certain-teed's taking out the bubble board and starch patent licenses. He said that the primary reason motivating Certain-teed was that the method of manufacturing covered by these patents was decidedly cheaper, and that the product could be made much lighter with resultant savings in transportation costs not only to Certain-teed but also to board users, i. e., that this made the freight charge paid by the purchaser less. Whittemore testified also that Certain-teed made a careful investigation of the merits of the foam invention before signing the license. It had experimented with thermocrete, an effervescent material which created bubbles in the core of board, in an effort to find something to replace sawdust as an aggregate, but thermocrete proved not adaptable in the manufacture of light weight board. Whittemore recollected that Van Hagen saw the bubble board process in operation at one of USG's plants before the license was signed. The reliance of the Government is upon the statements of C. O. Brown above quoted. They are asserted to evidence consciousness of guilt on the part of the officials of Certain-teed. With equal reason there might be inferred a purpose not to take the bubble board license unless there were economic reasons for doing so, and no illegality either in fact or appearance. When Exhibit 227 is viewed in the light of all of the evidence above set forth in respect of it, it cannot reasonably be inferred that Certain-teed was not acting in good faith. The mention by C. O. Brown that price control on board may be extended after August if a satisfactory arrangement can be made with the bubble board patent is not evidence of bad faith in taking out the November license. It could be no less lawful to take out a license extending or renewing price control than to take out the original license providing for price control. Both were legitimatized by the General Electric decision.

In an intra-company memorandum of August 9, 1929, from C. O. Brown of Certain-teed to George M. Brown reference is made to a recent meeting of gypsum board manufacturers in Chicago in respect of licenses and royalties on gypsum board patents, to the purposed purchase by USG from Universal of the starch patents and the proposal of USG to grant licenses to its own licensees to use both the starch and foam inventions in board manufacture. The memorandum states that it would be the plan to write one contract covering all patents involved, the machine patent on closed-edge board, the bubble patent, the starch patent and the bundling patent, and that the attorneys feel that such a contract would be exceptionally strong and that price control could be maintained during its life without difficulty. There is an attached memorandum of July 30, 1929, also by C. O. Brown (the two memoranda, declarations binding only upon Certain-teed, constitute Exhibit 231), in reference to a meeting in Chicago a fortnight earlier, attended by National, Atlantic and Ebsary, with their lawyers, and by C. O. Brown for Certain-teed. This memorandum refers to pro-

posed bubble and starch patent license arrangements and to the reluctance of National to sign a license until the starch patent litigation is settled; it suggests that Universal's not signing—put by Universal upon the grounds that it has not assured itself that the bubble process is more economical than the starch process, and that Universal is in the hands of receivers and therefore could not bind itself for a period beyond the receivership—is in the nature of a "holdup" to force a sale of the starch patent. The memorandum states that USG advises that it has nothing to fear from the starch patent, refers to the anxiety of Universal, being in receivership, to capitalize on the starch patent for its maximum value, and asserts that in the view of Atlantic and National the starch patent could have been bought until recently for $200,000 or less, whereas if the entire industry paid a royalty under licenses, at present price levels, until 1938, the total might be several million dollars. This memorandum of July 30 refers also to Avery's refusal to discuss what the arrangements between USG and Universal would be. It goes on to say that there is some doubt as to the strength of the starch patent and that all of the companies with the exception of National would be free to contest its validity if they did use it (that is, in the absence of a license); but that in the interest of harmony USG has been making tests to see if there was value in combining the starch and bubble processes and advises that experiments indicate that there would be benefit in using starch in a limited degree with the bubble process. The memorandum also states that it would be advantageous to combine the two patents since the starch patent has issued, whereas the bubble patent is in an application status, so that a combination of the two would give a patent to work under at once in the manufacture and sale of gypsum board, whereas under the bubble process alone there would be an interim between August 6 and the date of issuance of the bubble patent when there would be no patent control—that there is considerable benefit in having patent control continue without a break. Whittemore testified that during the negotiations for the bubble license Certain-teed had learned that USG had purchased the Haggerty and Hite starch patents, that Certain-teed had already investigated the starch situation and thought that it might be subject, on account of its own use of starch, to a claim of infringement of the Haggerty patent. He said that as a result, when the opportunity to relieve itself of such a claim was presented, Certain-teed was glad to take advantage of it. Starch was important in the manufacture of marketable gypsum board; it secured firm adhesion between the paper and the core and prevented "peelers." Whittemore denied that there was any understanding that the starch and bubble patents would be used merely as a vehicle to obtain price control. It is not apparent how the foregoing intra-company discussion evidences bad faith in taking the November license by Certain-teed, even though price control by USG was one of the objectives. It was not unlawful for USG to grant the license subject to a right to fix prices; it could not therefore be unlawful for Certain-teed to accept such a license with all of its advantages, including price control by USG, in mind. In view of the possibility of an infringement claim, and in view of the importance of starch in the manufacture of marketable gypsum board and the study made by Certain-teed of the advantages of the starch and bubble patents, it cannot fairly be concluded that the license was taken by this company only as a sham. C. O. Brown's statement that the attorneys feel that a license contract covering the machine patent on closed-edge board, and the bubble, starch and bundling patents, would be exceptionally strong, and that price control could be maintained during its life without difficulty, evidences that the attorneys were of the view that price control by USG under its patents, acquired or to be acquired, would be lawful.

As recited in the statement of facts at the outset of this opinion, Certain-teed acquired the assets of Beaver on January 20, 1928, but refused to assume the obligations of the USG-Beaver settlement agreement and license, whereupon on or about February 21, 1928, USG brought suit in the District Court of the United States in Illinois against Certain-teed and Beaver seeking an injunction against the distribu-

tion to the Beaver stockholders of the proceeds of the sale, and asserting that Certain-teed should be required to assume the liabilities of Beaver to USG. In a Certain-teed intra-company memorandum dated March 1, 1928 (Exhibit 212, a declaration binding only upon Certain-teed), apparently written by George M. Brown, this suit is referred to and the statement made that the action should be defended and an answer filed alleging that the suit was commenced "not in the interests of royalties but for the sole purpose of trade domination and monopoly and price control." On March 14, 1928, Certain-teed, by its counsel, filed in this suit an unverified answer (Exhibit 324, received in evidence only as a possible admission on the part of Certain-teed and not as binding upon any other defendant), containing allegations again to the effect that the purpose of the suit was not to collect the royalties to which USG claimed it was entitled, but to enable USG "to continue to dominate and monopolize the industry and to restrain competition by this defendant." As has also been stated in the statement of facts at the outset of this opinion, Certain-teed on May 22, 1929, settled this suit with USG and signed a patent license agreement. It is contended by the Government that Certain-teed's taking this license agreement in the face of the statements in Exhibits 212 and 324 evidences bad faith; that is to say, that if Certain-teed knew or believed that USG was attempting to dominate and monopolize the gypsum board industry and to restrain competition by Certain-teed, that company must have intended to join in such an illegal purpose when it took the license. But it can with at least equal, if indeed not greater, reasonableness be inferred that Certain-teed had before signing the license reached the conclusion that its statement concerning USG's purpose in bringing the suit was erroneous, and that Certain-teed therefore felt free to accept the license agreement. The exhibits are therefore equivocal in meaning and constitute no substantial evidence of bad faith.

As appears from the statement of facts, the perforated lath license contracts were signed by Certain-teed, American, Ebsary and Kelley on June 8, 1936, July 10, 1936, February 2, 1937, and June 23, 1937, respectively. These contracts were based upon the Roos perforated lath patent No. 1,938,354. It is asserted by the Government that these licenses were not taken in good faith. The principal reliance of the Government in respect of this charge is upon two letters, one of December 27, 1933, and one of March 4, 1936 (Exhibits 602 and 601 respectively, declarations binding only upon Certain-teed). Both were written to Certain-teed by Spencer, a patent lawyer. In each Spencer states that in his view the perforated lath patent is not valid. The Government contends that since Certain-teed took the perforated lath license in the face of this statement it must be said to have acted in bad faith, to have taken the license only as a subterfuge and cover for illegal purposes.

The evidence shows that building codes contain varying requirements in respect of the fire resistant qualities of building materials. In many localities there is a requirement in the case of plaster bases that a wall structure (the base, plus the applied coat of plaster) must stand a one hour fire test. Ordinary gypsum lath does not pass this test because upon the application of great heat the applied coat of plaster calcines and drops off the lath and the structure collapses. USG, to meet this difficulty, developed the perforated gypsum lath covered by the Roos patent. This lath contained perforations of such size and spacing as to permit a wall structure composed of it to withstand the one hour test. It appears that when plaster is applied to this type of lath some of it passes through the perforations and forms a mechanical key which, because of the size and spacing of the holes, supports the coat of plaster with the result that it will resist fire for an hour. Ingberg, an expert from the Bureau of Standards, testified that the only perforated lath which ever passed the one hour test was of the type covered by the Roos perforated lath patent, having at least ¾ inch holes, one to each sixteen square inches of surface; that in many tests performed at the Bureau no perfor-

ated lath with a hole less than ¾ inch in size successfully passed the test, and that no perforated lath passed it that did not have the holes arranged at least one to every sixteen square inches. Ingberg further testified that USG's perforated lath was submitted to the Bureau and that it passed the one hour fire test and received the Bureau's one hour fire rating; that this was the first lath ever to pass this test. Whittemore of Certain-teed testified that since USG was proposing to bring out perforated lath, it was necessary for Certain-teed to obtain a supply of the product in order to be competitive, or as he put it "to protect our mixed car business." He said that if his company had tried itself to make the lath, it would have been obliged to have it tested by the Bureau of Standards to see whether or not it would stand the one hour fire test under which the Roos patent had qualified. Certain-teed thought that the volume of business in perforated lath would be small—although in this respect the company turned out to be mistaken, as the demand in the trade became considerable. Nevertheless, not wanting itself to spend money attempting to make a fire resistant board, Certain-teed thought that the simple and easy thing to do was to take a license. Whittemore said, "We also realized that the statement that no patent is so strong that it can't be broken, and so weak that it can't be sustained, was pretty nearly true," and that "We . . . realized that in litigated matters the attorneys are always 50 percent wrong." He reiterated that Certain-teed, not desiring itself to build up an expense account in respect of development of the lath and not wishing to risk possible liability in future litigation, decided that the best thing to do was to take a license. In explaining this he referred to an episode in Certain-teed's past manufacturing experience wherein a competitor, after contesting certain patents for several years, had been subjected to three-quarters of a million dollars infringement damages and half a million in expense for attorneys' fees and costs, when his own company escaped by paying $25,000 for a license under the same patents. This, he testified, had been a lesson to Certain-teed to be careful in respect of building up possible patent infringement litigation.

Spencer, the writer of Exhibits 601 and 602, was called to the witness stand. He testified that, in advising Certain-teed that in his opinion the Roos perforated lath patent was not valid, he nevertheless also pointed out in the same letters that his opinion might be wrong, that the patent, having been issued by the Patent Office, was valid on its face, and that validity litigation which might ensue upon ignoring it might be expensive and the damages high. In Exhibit 602, the letter of December 27, 1933, he recognized the possibility that a district court might hold the patent valid and that such a decision might be affirmed by the circuit court of appeals. He admitted that in Exhibit 601, the letter of March 4, 1936, he suggested methods of avoiding the Roos patent, and told Certain-teed that it was his judgment that it would be unwise completely to ignore it. In answer to the question whether or not he meant to suggest that Certain-teed did not act in good faith in taking the perforated lath license, he replied that he thought Certain-teed's action was consistent with his opinion.

It would not be reasonable to conclude, in view of the foregoing, that Certain-teed was not acting in good faith in taking the perforated lath license. In view of the qualifications put by Spencer upon his opinions, of the experience of Certain-teed in respect of contests of the validity of patents, and in view of the need of Certain-teed for the perforated lath and the demonstrated competency of the USG product to meet building code fire tests, it appears that the company was acting providently and honestly, rather than in bad faith, in taking the perforated lath license.

In respect of Newark, Tomkins testified that his company took the perforated lath license because it desired to be competitive with the other licensees who had signed a similar agreement; that Newark found it necessary to sell perforated lath; that he felt that the company had to be in a posi-

tion to produce it and that he wished to be able to do so lawfully.[37] There appears to be nothing in the record directly relating to the question of the good faith of American or Ebsary in respect of their taking perforated lath licenses.

It cannot be concluded from the evidence that the perforated lath licenses were not executed in good faith.

Substantiation of the Government's charge, set forth in the statement of facts at the outset of this opinion, that the metallized board licenses were signed by the various licensees, except National, without any expectation that they would manufacture such board, but with the intention that they would purchase it from USG or National and then resell it at prices and under conditions fixed by USG, would evidence lack of good faith in the execution of these licenses. But this charge is not proved; on the contrary there is substantial evidence refuting it. The metallized board licenses were, as appears from the statement of facts, signed by National, Kelley, Certain-teed, Atlantic, American, Universal and Ebsary on October 5, 1934, October 12, 1934, November 2, 1934, November 30, 1934, December 4, 1934, April 4, 1935, and August 14, 1935, respectively. C. O. Brown testified that when Certain-teed executed the metallized board license it intended to manufacture such board; that Certain-teed had no agreement or understanding as to the price at which it would resell metallized board purchased from other companies; that he knew that the price bulletins sent out by USG did not apply to metallized board purchased from others, but only to such board manufactured by Certain-teed. Whittemore, of the same company, stated that price control applied only to patented products manufactured by Certain-teed, and that he understood that USG had no right to control any price except that of the manufactured product at its first sale by Certain-teed to a third party; that

the amount of metallized board which Certain-teed purchased from other manufacturers was so small that "you could wheel it out in a wheelbarrow." Neale of Atlantic testified that he talked with Fuller of that company about the desirability of executing a metallized board license and that he (Neale) favored such a license, since there was an increasing demand for that type of board. A memorandum of September 6, 1934, from Fuller to Neale (Exhibit 289, a declaration binding only upon Atlantic) states that Atlantic, realizing that much work would have to be done and much money spent to get the new type of product accepted in volume, "would rather see U.S.G. and National bear the brunt of this work, and hop on when the bus is running." Neale testified further that when Atlantic took the license it intended to manufacture metallized board, and that early in 1935 the company was taking steps to get into manufacturing immediately in the metallized board field. Neale said also that he knew that under this license the only price that could be fixed by USG was that upon such board as was manufactured by Atlantic under the patent. Black of American testified that Henning of USG thought that the board manufacturers should get behind this new insulating product, and that he (Black) agreed with this, that insulation board had developed into a strong competitor of gypsum board and that he felt that it would be a good thing for the manufacturers to enter the metallized board field. He testified further that American took the metallized board license with the expectation of manufacturing the product, and that it did manufacture the same after taking the license. Black testified also that it was his understanding at all times that the only price fixed by USG was that of board manufactured by American under the patents licensed by USG. In respect of Kelley and Newark, Tomkins stated that both of those companies manufactured metallized board. Lenci of Eb-

---

[37] On May 1, 1937, Newark purchased the stock of Kelley. On June 23, 1937, Kelley executed its perforated lath license agreement with USG. On January 3, 1939, Newark merged with Kelley.

On the same date USG granted Newark a perforated lath license, at the same time canceling the previous perforated lath license granted Kelley.

sary said that company took the metallized board license because it desired to manufacture the product; that he felt it was a matter of some importance to board manufacturers to be able to make a board and a lath with insulating qualities; that Ebsary started to make this product early in 1936. He testified further that Ebsary did not receive price bulletins on metallized board until the license had been signed, and may not have received them until it commenced manufacturing; that whatever the fact was as to this, he understood that the bulletin provisions applied only to such board as Ebsary itself made and sold. Lenci said also that there was no understanding or arrangement or agreement with USG that metallized board bulletin prices should be observed prior to the time Ebsary got into production. The testimony of these witnesses establishes the contrary of the Government's charge so far as the companies they represent is concerned. There appears to be no testimony on this subject directly relating to National and Universal.

It has been pointed out in the statement of facts at the outset of this opinion that the royalty payable for the privilege of manufacturing, using and selling gypsum board under the patents was an amount equivalent to a designated percentage of the selling price of the licensees on all gypsum board manufactured by them, whether patented or not. It is apparently urged by the Government that this evidences that the license agreements were not executed in good faith. This royalty provision is in effect a provision for a percentage of gross sales, and as such is but a convenient means of measuring the amount to be paid for the privilege of using the patents. It might with equal propriety have been a lump sum. Especially in view of the fact that it was unlikely for economic reasons that open-edge board would be manufactured after the licensees were authorized to make the superior product—a subject discussed in sub-topic (2) of this topic V— this provision in the license agreements can hardly be looked upon as an attempt to impose a royalty upon an unpatented product. For the same reason it cannot be said to have been intended to drive open-edge board off the market. In the absence of some such purpose in the royalty provision it is not seen how it can evidence bad faith in the execution of the licenses.

It is contended by the Government that the board manufactured and sold by the defendants was not covered by the patents on which the license agreements were based. If this charge were substantiated it would tend to prove bad faith in the execution of the agreements. But as pointed out in topic III the burden of proof on this aspect of the issue of bona fides, as well as upon the whole of that issue, is upon the Government. No evidence has been introduced by the Government proving or tending to prove that the board made and sold by the defendants was not made under the patents.

It is charged by the Government that not all of the agreement between USG and the licensee companies was put into formal writing; that on the contrary, in addition to the signed license agreements, informal side agreements were made between USG and its licensees that they would discontinue making open-edge board and seconds of closed-edge board, that USG would advance and stabilize the prices for board, that all companies would increase their prices for other gypsum products, and that USG would continue to control prices through the use of other patents after expiration of the Utzman product patent in August, 1929. If there were evidence that such side agreements were entered into, that would tend to prove that the license agreements themselves were not executed in good faith. But there is no evidence that such side agreements were executed, and there is affirmative evidence to the effect that they were not. Griswold of American testified that he had no understanding with Avery or any one else that price control would be extended under some other patent after expiration of the Utzman patent. C. O. Brown of Certainteed recalled no understanding that USG would find some other patent to continue price control beyond August 6, 1929, the date of expiration of the Utzman patent. Whittemore had no recollection of any agreement or understanding between Certain-teed and USG or anyone else that

USG would find a patent to continue price control upon expiration of the Utzman patent. George M. Brown testified that he never had any agreement or understanding with Avery or anyone in USG outside of those understandings which were contained in the written license agreements between Certain-teed and USG. Holland of Universal testified similarly that he never had any, understanding with USG in addition to the provisions contained in Universal's license. Lenci of Ebsary testified that at the time the first price bulletins were supplied under the May 1929 licenses, he knew that the price control could only last until August 6, and had no reason to believe that it would continue beyond that date, that he was not sufficiently familiar with USG's patents to know whether or not USG had others which would take the place of the Utzman patent. The testimony establishing the absence of side agreements on the other subjects concerning which, as above set forth, such agreements were alleged to have been made, is discussed later in this topic V.

We conclude in respect of the first aspect of the charge of lack of bona fides that the evidence introduced by the Government shows that the license agreements were executed as bona fide agreements intended to bind each party to the promises made therein, not as sham agreements to disguise illegal purposes.

*Were the license agreements non-bona fide because executed with intent to accomplish restraints of trade beyond the proper limits of the patent monopoly,* specifically (1) to raise and fix at arbitrary and non-competitive levels the price of gypsum board; (2) to accomplish improper standardization of gypsum board and its method of production; (3) to raise, maintain and stabilize the level of prices of unpatented materials—plaster and miscellaneous gypsum products; (4) to effectuate improper restriction upon distribution of gypsum board, plaster and miscellaneous gypsum products; or (5) to fix the prices at which manufacturing distributors resell gypsum board?

■ (1) *Intent to raise the price of gypsum board:* The charge in the complaint is that the defendants raised and fixed at arbitrary and non-competitive levels the price of gypsum board made and sold by them. It is to be borne in mind that within the ruling of the Supreme Court in the General Electric and Bement cases it is the right of a patentee to fix the price of his product at such level as he chooses and to require his licensees to sell at the price thus fixed. The patent law does not assume to regulate the reasonableness of the price of a patented product. Therefore, the price may lawfully be "arbitrary" in the sense that it is whatever the patentee within his discretion decides to fix, rather than a price determined by economic law. And since the licensor and licensee both lawfully sell at the price fixed by the former, that price is "non-competitive" as between them; and where there is a plurality of licensees the price will be "arbitrary" and "non-competitive" as between all of them and the licensor. All of this has been demonstrated in the discussion of the General Electric and Bement cases in topic II of this opinion. The charge of the Government, therefore, in the exact terms in which it is put, charges nothing illegal where bona fide patent licensing is involved. Nevertheless, if patent license agreements were executed with an intent by the parties that prices should be fixed at high levels, that might tend to prove that the agreements were not bona fide but were rather a disguise.

■ But the evidence fails to prove that the licenses were executed with an intent to fix prices at high levels, or at any given levels. The Government's witnesses testified that there was at no time any understanding or agreement, or even discussion, as to what the prices of gypsum board would be upon the execution of the licenses. Griswold of American testified that Avery did not discuss what prices the licensor might establish for gypsum board, that Avery told him on several occasions that the right to fix prices must be exercised by USG alone; and Griswold said that he did not have any discussion with anyone else as to what board prices would be. Blagden testified that Beaver had no understanding or even discussion with Avery as to what prices USG would fix

under the Beaver license. Holland stated that there was no agreement between Universal and USG in respect of what prices would be on board. C. O. Brown of Certain-teed testified that he did not at any time have any knowledge or receive any information from USG as to what it would do in the future with regard to establishing minimum prices under the licenses; that he had never heard Avery or anyone else state what prices would or would not be fixed; that he was given to understand by USG at all times that the fixing of prices was entirely in its discretion. George M. Brown testified similarly that there was not at any time, either prior or subsequent to taking the licenses, any understanding with Avery or with anyone else that gypsum board prices would be raised; that he never had any discussion with Avery as to what Avery would or would not do with regard to prices on gypsum board; and that Certain-teed had nothing to do with fixing prices. Nelson said that at no time in his conversation with officers and representatives of Certain-teed did he ever hear of any agreement or understanding as to what USG would do about board prices if Certain-teed took a license, and that he never heard of any commitment on the part of USG that it would raise prices. Whittemore also testified on this subject. He stated that USG never made any commitment of any kind as to any figure at which it might fix the price of board after Certain-teed took the license, and that USG never made any statement with respect to what it intended to do concerning fixing prices. He said further that Certain-teed did not enter into its license agreement with USG "for the purpose of rigging up a price-fixing scheme." With respect to Ebsary, Lenci testified that he had no knowledge at any time during the conferences at Chicago on May 21 and 22, 1929, as to what board prices would be until after the licenses were signed and the first of the price bulletins handed to the licensees. He said, further, that Ebsary had no understanding or agreement that if it took a license USG would raise or stabilize prices on patented board, that he never had any discussion at any time with Avery, or with anyone else, as to what prices Avery would establish after execution of the licenses. Lenci recognized that if USG were to fix the price of board that would naturally have the effect of establishing a uniform price for the industry at a given time, but he stated that he did not understand that there was anything in the license contract which provided that USG should raise or stabilize the price of board. In a telegram to Gloyd of Texas of May 17, 1929 (Exhibit 720, received as binding upon USG only), Avery said: "There has been much discussion of infringement settlement and license on board. Nothing has yet developed although I think it safe to say the outlook is favorable. If license were generally closed it would be desirable to discuss a reasonable market price for the licensed product. Will keep you informed in hope that you may participate if outcome favorable." But there is no evidence that the suggested discussion of a reasonable market price ever took place.

It is to be noted that discussion of prices between the patentee and the prospective licensees would not have been illegal. In the General Electric case the prices established on the patented product were a part of the license agreement itself, and must therefore have been discussed by the parties in determining their contractual obligations. Since a patentee has a right to grant a license and to fix thereunder the price of the patented product and the licensee a duty to abide by such price, the patentee is not bound to refrain from discussing with a prospective licensee what the price is to be. Nevertheless, in the instant case the evidence affirmatively shows that neither before nor after the execution of the licenses were there any discussions between the licensor and the licensees on the subject of the minimum prices at which the patented products were to be sold. Apparently the various companies taking licenses were content to abide whatever action the licensor took with respect to prices, anticipating that the same would be reasonably profitable.

It is true that the evidence shows that the gypsum industry in the "Eastern area" was in a demoralized condition in the years 1927–1929. There was litigation, bad feel-

ing, price cutting. The prices of board had fallen so low that for some manufacturers business was no longer profitable. In this situation it was important to the companies making board that prices reach a profitable level—and in signing the agreements with USG the several licensees were no doubt in part motivated not only by the desire to make closed-edge board and to settle or avoid litigation, but also by the expectation that the exercise of its price fixing right by USG as licensor would result in a price advance. Prices could not go down and business continue; any change would, as a matter of economic necessity, be upward. Indeed, it is not in dispute that it was the hope and expectation of the several prospective licensees that board prices would advance, and that they would be stabilized —in the sense that each licensee together with the licensor would be selling, at a given time, at the minimum prices fixed by the licensor. Lenci of Ebsary and Whittemore of Certain-teed both testified to the demoralized condition of the industry. Whittemore said, in reference to what he expected would happen to board prices when the May 1929 agreements were signed, that prices "couldn't decline any more. If they went any way they would have to advance." Lenci testified that at the time USG's first price bulletin was supplied to the licensees after the May 1929 licenses were executed in Chicago, someone remarked that he hoped they would get $30 wallboard. Lenci said that the price of board could not go lower than it was and his company stay in business, that all of the licensees were human enough to hope that prices were going to be stabilized and raised and that they were not disappointed. In the memorandum of July 3, 1929 (Exhibit 228), referred to above in the discussion of the first aspect of the bona fides question, C. O. Brown said: "Taking these things [outlined advantages of signing the bundling and bubble board licenses] into consideration, plus other advantages in working under the patent, we feel justified in taking a license and paying the royalty set by the Licensor"; and he explained that the "other advantages" he had in mind were "a stabilized market on gypsum lath," that is to say "price control."

Exhibit 200 (a declaration binding only upon National), the minutes of a directors' meeting of National on July 23, 1929, recites that under the license agreements (the starch and bubble board agreements of November 1929) submitted to each of the wallboard manufacturers "the prices of wall board would be fixed for the whole Industry for the term of approximately seventeen years"; and a concluding resolution authorizes the entering of a license agreement "provided that the United States Gypsum Company, by virtue of the agreement with this Corporation and with other manufacturers of gypsum wall board, shall control the price of wall board sold in the United States and its possessions." The minutes of August 27, 1929 (Exhibit 201, a declaration binding only upon National), authorized the signing of a license by the president if in his judgment such action "will result in legal stabilization of the markets." (Italics supplied)

But evidence that it was expected by the licensees that the price fixing right in USG when exercised would result in the same minimum price of board at a given time for the licensor and for all the licensees who took licenses, and evidence that it was believed that as a matter of economic necessity any prices fixed by USG would be better than the demoralized prices of 1927– 1929 and would be profitable prices, falls short of establishing an intent to fix prices at high levels and therefore short of showing lack of bona fides in the execution of the licenses.

Indeed, such evidence fails to prove any illegal intent in respect of price fixing. It is not illegal for parties negotiating a patent license agreement to hope, expect, or intend that the normal economic consequences of patent licensing will follow execution of the license. As said in topic II, a patent license agreement granting the right to make, use and vend the patented product under terms and conditions, including prices, fixed by the licensor, necessarily involves knowledge that a stabilized and presumably profitable price for the patented product will result as between the parties and therefore in the industry. The law cannot legitimatize patent licensing arrangements and at the same time stigmatize the

normal consequences thereof. To conclude that the parties to a patent license agreement, providing for sale of the patented product at a price to be fixed by the licensor, may not lawfully at the time of executing the same anticipate that such prices as are from time to time thus fixed will be profitable and the same for both licensor and licensee, *i. e.*, stabilized as between the parties, would be to conclude that the law forbids the execution of patent licenses with a price fixing provision. The General Electric case demonstrates that that is not the law. The foregoing applies as well to a plurality of patent licenses as to a single license.

(2) *Intent to accomplish such standardization of gypsum board and its method of production (specifically, by elimination of the manufacture and sale of open-edge board, seconds and No. 2 board, and by the restrictive provision of the May 1929 licenses concerning the use of the bundling process) as is beyond the proper limits of the patent monopoly:*

*Open-edge board:* Only Texas, Certain-teed and Ebsary are concerned in respect of the open-edge board issue unless a conspiracy is shown and the other defendant-licensees proved parties thereto, since only those companies had made open-edge board before signing their licenses. Beaver, Universal, National, Niagara and American had made only closed-edge or partially closed-edge board. Atlantic's commencement of manufacturing any board was coincidental with its taking a license.

The evidence establishes that there was no agreement to discontinue the manufacture and sale of open-edge board so far as Certain-teed and Ebsary are concerned. Nothing in the license agreements forbids making and selling it. Whittemore testified that Certain-teed had no agreement with USG not to make open-edge board, that according to his understanding Certain-teed was free to make any board, patented or unpatented, although it did not desire to make the open-edge variety because it could not sell it. C. O. Brown also said that Certain-teed never had any understanding or agreement that the manufacture of open-edge board would be discontinued after the license was signed, and

that there was no discussion of such a thing at the licensee meetings. Nelson testified to similar effect. Lenci of Ebsary stated that there was no understanding or agreement reached in the meetings at Chicago not expressed in the license contracts themselves, one of which he signed for Ebsary, and no agreement that the licensees would no longer make the open-edge board—that there was no agreement inside or outside the licenses that the licensees could not make such board if they desired. There is no evidence that Texas agreed not to make the open-edge board.

It may be taken for granted that those companies which had not manufactured open-edge board had no expectation of commencing its manufacture when they took the licenses granting them the right to make the closed-edge product. Likewise it is not disputed that each of the companies—Texas, Certain-teed and Ebsary—which had made the open-edge board took its license primarily to obtain the right to make the closed-edge type because this was demanded by the trade and the open-edge was not wanted. Therefore it may be inferred that such licensees did not expect, once they had secured the right to make the closed-edge board, to go forward further with the manufacture and sale of the inferior article. Lenci of Ebsary testified in this connection that when his company commenced to make board in 1928 it made the open-edge variety, "raw all the way around," and found it unsatisfactory because expensive and wasteful. After fabrication, a portion of such board had to be trimmed off by revolving saws, with resulting piles of raw edges and waste. It was extremely hard to sell the open-edge board—the dealer trade demanded the closed-edge variety at that time (1928-1929) being made by certain of Ebsary's competitors. Ebsary's primary reason for taking a license was its desire and need to make the closed-edge board, and once it got the license for this, the company was anxious to go over to closed-edge production, and independently, through Lenci and the other company officers, determined to do so. C. O. Brown testified similarly that Certain-teed took its license in order to make the less expensive and better board

and could see no reason for making the inferior type—that the trade did not want it. Chism of Texas likewise said that prior to taking its April 1927 license Texas was making an open-edge board, which proved unsatisfactory to the trade and caused loss of business; that the cost of manufacture was high due to "peelers" and broken edges, and that the open-edge product was getting increasingly difficult to sell. Texas took the license because it wanted to get the right to make board under USG's patents, and immediately after taking the license commenced the manufacture of the closed-edge board and has made that type of product ever since. In short, the primary intention of these three companies in taking the licenses was to obtain the right to make closed-edge board, and this is what they did make thereafter. But they had no agreement either with USG or with one another not to make the open-edge variety, and were legally free to make and sell it. Their expectation, incidental to the taking of the licenses for the primary purpose of making the superior board, not thereafter to manufacture and sell the open-edge variety was not illegal. The primary purpose being lawful, the incidental expectation cannot be unlawful. Those who have been making, outside of a license, an inferior product, are not bound by the Sherman Act to intend to continue its manufacture and sale in the event they take a license to make a superior product. The discontinuance of making and selling the inferior article will be the normal economic consequence, or accompaniment, of the manufacture and sale of the superior one. As stated in topic II, the law cannot legitimatize patent licensing arrangements and operations and at the same time stigmatize as unlawful the purpose to bring them about, the necessary means of bringing them about and carrying them on, or the consequences which normally flow from them. It was there pointed out also that a license to make, use and vend a superior patented product involves probable discontinuance of manufacture and sale of inferior products.

The Government appears to rely upon Exhibits 226 and 332 as evidence of an improper intent not to make and sell open-edge board. The first of these is a memorandum of June 4, 1929, by George M. Brown (a declaration binding only upon Certain-teed), referring to the benefits anticipated in stabilizing the industry by the making of a uniform product. But if it was not illegal to take a license and to make and sell thereunder the closed-edge board, it was not illegal to anticipate the benefits normally flowing from such a course. Exhibit 332 is USG's Report to Stockholders for the fiscal year ending December 31, 1929 (a declaration admitted as binding only upon USG). This report refers to the correction of infringement conditions by damage payments and licenses under royalty, and then states that the returns, while substantial, are relatively of a minor amount—that the major benefits are relief from legal contention and "increased consumption of wallboard products which should follow the quality improvements that a full and uniform use of the patented methods and products should assure." It was lawful for USG to offer to the several board manufacturers, and for them to accept, the closed-edge board license. Since all of the manufacturers took such licenses and made and sold such board there was bound to be full and uniform use thereof. That was a benefit which the patentee had a legal right to anticipate.

The Government appears to construe the provision of the licenses providing for payment as royalty of "an amount . . . equivalent to [a stated percentage] of the selling price of the Licensee of all plasterboard or gypsum wallboard of every kind, whether patented or unpatented, manufactured and sold by Licensee," as an agreement to make the patented product and no other—notwithstanding that this provision on its face impliedly recognizes the right of the licensees to make open-edge board.[38] It may be assumed, and there is support for the assumption in the testimony of Lenci, that with royalty thus measurable

---

[38] The provision in full is: "2. The Licensee further agrees to pay to the Licensor for the right, license and privilege of manufacturing, using and/or selling plasterboard or gypsum wallboard, and for the privilege of using the processes and making and using the machines and/or inventions embodying

by all board produced, whether patented or not, and with open-edge board more expensive to make than the closed-edge type, it would have been a business impossibility to continue making the open-edge board as well as the closed-edge variety. Theoretically, it may be said that such a provision in the licenses must either be intended as an indirect application of the royalty to unpatented board or an attempt to eliminate the manufacture of the latter. But under the circumstances of this case as shown by the evidence it can hardly be said to be either, since it was unlikely economically that the open-edge board would be manufactured once the right to make the closed-edge board was acquired. In view of the attitude of the trade the open-edge board would not have been marketed even if the royalty had not been measurable in part by its sale, since it was inferior board and not desired in comparison with the closed-edge type.

The fifth and sixth "whereas clauses" in the Ebsary agreement of May 22, 1929, Exhibit 5, read as follows:

"*WHEREAS*, Licensor has been unwilling to grant a license except upon the express condition that Licensee will manufacture plasterboard or gypsum wallboard only with a folded or protected edge similar to that manufactured by Licensor, so that Licensor may be protected in its own business of manufacturing and selling said patented products and realize to the fullest extent the benefits under said patents from the manufacture by said Licensee; and

"*WHEREAS*, Licensor has agreed to waive the express condition aforesaid and grant the said License in consideration of the agreement of Licensee to pay to it for the license to use the processes and make and use the machines and/or inventions set forth and claimed in all

of said patents and applications for letters patent the amounts hereinafter stated and upon the terms and conditions hereinafter set forth . . . ."

The Government contends that the language of the sixth "whereas clause" is only a "purported waiver of such condition" referred to in the fifth, and asserts that the fact is that by tacit agreement all of the companies understood in May, 1929, that the open-edge board was to be discontinued. The Government refers to the testimony of Lenci who, on being shown on direct examination only the fifth "whereas clause," said that it was the understanding of everybody who took out a license that the making of open-edge board was to be discontinued. But on cross-examination, when his attention was called to the sixth "whereas clause," Lenci corrected this statement as follows:

"Q. Now, in the light of that paragraph, isn't it clear to you that there was no understanding whatsoever on the part of anybody that the licensees would discontinue the making of open-edge board?
"A. Yes, that is right.
"Q. There was no such understanding, was there?
"A. No.
"Q. And there was no understanding that the licensees could not make open-edge board outside of this agreement, was there?
"A. No.
"Q. So that, your testimony is now, isn't it, that there was no agreement or understanding, either in the license or outside of the license, that the licensees could not make open-edge board if they wanted to?
"A. That is correct." [Tr. 5234]

The testimony thus given after both "whereas clauses" had been shown to the witness is accepted as correctly reflecting the facts.[39]

---

the inventions set forth and claimed in said Utzman Patents and in any and all of said patents and applications for letters patent described in Exhibit A, an amount (hereinafter for convenience referred to as a license fee or royalty) equivalent to five per cent (5%) of the selling price of the Licensee of all plasterboard or gypsum wallboard of every kind, whether patented or unpatented, manufactured and sold by Licensee between the date hereof and August 6, 1929, the date of the expiration of said Utzman Patent Number 1,034,746, and thereafter an amount equivalent to one and one-half per cent (1½%) of the selling price of the Licensee of all such plasterboard or gypsum wallboard from

August 6, 1929, until February 10, 1937, the date of the expiration of said Patent Number 1,330,413."

This is the language of the Ebsary license of May 22, 1929, Exhibit 5. The provisions of the Texas license of April 11, 1927, Exhibit 599, and of the Certain-teed license of May 22, 1929, Exhibit 4, are similar.

[39] In the record the "whereas clauses" above mentioned were incorrectly referred to as the third and fourth rather than the fifth and sixth. This was because what was shown the witness during the examination was page 48 of the complaint on which four "whereas clauses" appeared. But there were two previous "whereas clauses" on page 47.

■ We conclude that there is no substantial evidence that the license agreements were executed with an unlawful intent to eliminate open-edge board, and therefore no substantial evidence that the agreements were in such respect not bona fide. Each of the parties to the license agreements was, as said above, free to make and sell open-edge board. Any expectation not to do so was the normal consequence, or accompaniment, of the purpose to make and sell the superior closed-edge product. To hold that the licensees were required to continue to make and sell the inferior article, or that they could not lawfully have an expectation, or even a definite intent, not to do so would be in effect to rule that they could not take the licenses to make the superior board. The law does not at one and the same time sanction an act and penalize the normal economic consequences thereof.

*Seconds and No. 2 board:* A "second," in the parlance of the trade, is a defective board produced unintentionally in the process of manufacturing standard board. A "No. 2 board" is a board made of lower grade material than that used in the manufacturing of the standard board. Unlike open-edge board, both seconds and No. 2 board are, by definition, board made under the patents. The uncontradicted evidence is that there was no agreement or understanding that seconds and No. 2 board would not be manufactured, but on the contrary that the licensees were free at all times to make and sell such board. C. O. Brown of Certain-teed, Neale of Atlantic, and Black of Celotex were the witnesses examined on this subject.

Brown testified that Certain-teed never had any agreement or understanding that the manufacture of second grade board would be discontinued after it received its license. Neale testified, referring to a letter of May 24, 1927 (Exhibit 279),[40] written by Fuller to Avery of USG, that at all times from that date forward Atlantic sold, without restriction, such seconds as resulted from its production and that he did not recall any agreement or understanding with Avery, USG, or anyone else with respect to whether Atlantic should sell seconds. Black testified that it was his understanding that there was no provision in the licenses which prohibited Celotex from selling seconds if it wanted to, and no agreement between Celotex and USG by which Celotex agreed not to market seconds.

It is contended by the Government that the provision of the license agreements requiring seconds to be marked as such evidences an intention to accomplish their elimination.[41] On the contrary it indicates that it was expected that seconds would be made—as they inevitably are, according to the testimony—otherwise why require them to be marked. If there were to be no seconds, the marking provision would be superfluous. It is reasonably inferable that the real purpose of this provision was to prevent harming the reputation of the standard board by the confusion of seconds with it. Such a precaution was not improper.

■ We think there is no warrant in the evidence for a conclusion that the license agreements were executed with an intent to eliminate seconds and No. 2

---

The Ebsary agreement of May 22, 1929, is printed in the complaint at pages 47–57 inclusive.

[40] This letter (a declaration binding only upon Atlantic) refers to the undesirability of selling seconds in certain markets, to the restriction of sales of seconds to such territory as might absorb them with the least disturbance to the trade in general, and to the policy of Atlantic to sell as few seconds anywhere as possible. The letter refers also to the need of each wallboard manufacturer for some outlet for No. 2 board, stating that this is logical in territory fairly near the plant since this reduced price commodity cannot bear much freight.

[41] The license provision was as follows: "9. The Licensee and the Licensor each expressly covenants and agrees that all of said patented product sold by it and commonly known in the trade as 'seconds' shall be plainly invoiced as seconds and shall be plainly marked with a visible red stamp or label firmly fixed on each of said board showing the word 'seconds' in letters at least three inches in height." (Exhibit 3, paragraph 9)

board, and no warrant, therefore, for a conclusion that they were in this respect not bona fide.

*The bundling process:* USG's Birdsey patent No. 1,696,877, of December 25, 1928, covered a method of binding seven or eight pieces of gypsum board or lath together with a gummed tape which ran lengthwise along the edges of the board or lath. The May 1929 license agreements, except that with Certain-teed, granted rights under this patent and required that the licensees use this bundling process and no other.[42] As is explained in the statement of facts at the outset of this opinion, Certain-teed was first granted license rights under the bundling patent by a supplemental license agreement executed July 3, 1929. This contained the restrictive provision. The November 1929 agreements did not contain the restrictive provision.

It appears from the evidence that there is no satisfactory way of bundling gypsum board or lath except by means of the Birdsey process. C. O. Brown testified that Certain-teed wanted to bundle its lath and knew of no better or more economical way than the process covered by the bundle patent. Chism said that prior to its license of February 10, 1937, Texas did not bundle wallboard at all, and that lath was tied with wire, baling wire or a little heavier, wrapped around the bundle at both ends—about the same method as that used in baling hay; that this was not satisfactory because it caused too much breakage, and because the wire would slip and cut the lath; that after Texas took the license it used the Birdsey patent system of bundling by the use of paper strips on both board and lath—that it has used that invention ever since and is still using it.

It is inferable that the restrictive provision of the May 1929 licenses (and of Certain-teed's July 3, 1929, supplemental license) was put into the contracts for two purposes: to exploit the bundling patent and to accomplish packaging and delivery of board and lath by the licensees in a manner which would preserve quality, *i.e.,* without breakage. Delivery of board by the licensees in broken condition would tend to devalue the product and thus lessen the pecuniary reward of the patentee's monopoly. Within the principle of the General Electric decision, it would be a not improper license term to require packaging of a patented product in such manner as would sustain its quality and therefore the price. *Quaere:* Can the owner of a product patent who is also owner of a process patent covering packaging of the product insure proper packaging by requiring use of the patented process only? Is such a restriction illegal as involving a purpose beyond the proper scope of either or both such patent monopolies?

It is urged that if the effect of such a restrictive provision is to drive off the market a competing process, whether patented or not, the provision would be illegal under the principle of the Motion Picture Patents case, discussed in topics II and III, because not the incidental consequence of the proper use in its own field of the patent monopoly, but its use in restraint of trade in a field where the rights to compete are common. The ruling in National Lockwasher Co. v. George K. Garrett Co., 3 Cir., 1943, 137 F.2d 255, rehearing denied, id., is also urged as rendering such a provision illegal. In that case the plaintiff sought damages for infringement of a patent for a compression spring washer. The defendant opposed recovery upon the ground that the plaintiff had issued licenses to various manufacturers of metal washers under a form of agreement by which as licensees they undertook that they would not make or sell any form of "non-tangling" spring washers not covered by the plaintiff's patent. The court held, in view of this restriction, that the plaintiff was using its patent to sup-

---

[42] The restrictive provision was: "It is expressly understood that licensee in its business of manufacturing and selling plasterboard and/or gypsum wallboard will use only said bundle set forth and claimed in said Patent Number 1,696,877 and will not use any other bundle or method of bundling plasterboard during the term of said license." This is the language of the Ebsary agreement of May 22, 1929 (Exhibit 5).

press competition by unpatented articles, and it accordingly denied recovery. It is to be noted that this case did not involve the use of a process patent in aid of a product patent. It is contended, moreover, that even in the absence of a competing process or product such a restrictive provision would be illegal, since it would tend to stifle the use of another process or product, if such should be devised, and to discourage invention.

It is pointed out in topic VI (2) of this opinion that it is neither necessary nor proper to rule upon the question of the legality of the restrictive bundling provision in the May 1929 licenses and the Certain-teed supplemental license of July 3, 1929, for the reason that the question is moot, the provision having been eliminated in the November 1929 licenses. Assuming for the purpose of the present discussion, however, that the restriction in the May licenses and the Certain-teed July license was illegal, it would follow technically that there was in this respect an improper purpose involved in their execution and that they were in this respect, therefore, not bona fide. But since this purpose was abandoned when the November licenses were executed with the restrictive provision omitted, the provision and its purpose cannot be held to support the charge of an intent to accomplish improper industry standardization. While the earlier licenses and the negotiations concerning them and the operations under them are relevant to the purposes of the November licenses, it is the latter which are now outstanding, and under attack in this suit. An abandoned purpose, even if it was illegal while it existed, in the previous licenses, cannot be held to vitiate the present licenses.

In the May 1929 licenses and the Certain-teed July license each licensee agreed to pay to the licensor for the right to use the bundling process "a license fee or royalty of ten cents (10¢) per thousand square feet of plasterboard and/or gypsum wallboard which is sold by it in bundles of any kind."[43] In the November 1929 contracts the provision was for "an amount (hereinafter referred to as a license fee or royalty) equivalent to ten cents (10¢) per one thousand (1,000) square feet of plasterboard and/or gypsum wallboard which is sold by Licensee in bundles of any kind, whether or not the bundles shall be made according to the claims set forth and claimed in said patents . . . .. The term 'bundle' shall not include unbundled material wired or strapped for purpose of transportation or unbundled material shipped for export or coastwise trade in fiber, wooden or other crates."[44] It is urged by the Government that these provisions evidence an attempt to standardize by eliminating other methods of packaging. But in view of the fact, shown by the evidence, that no other process was available (except, for lath, the common and uneconomic method of tying with wire), this cannot be concluded.

(3) *Intent to raise, maintain and stabilize the level of prices of unpatented materials—plaster and miscellaneous gypsum products:*[45] All of the witnesses examined upon this subject testified convincingly that there was at no time any understanding or agreement that prices would be raised or fixed upon plaster or any unpatented gypsum product. Griswold of American testified that there was no discussion between him and Avery of the price of gypsum block and plaster, and no agreement with USG or with any of the other licensees about plaster, block, or tile prices; that it was understood that such an agreement would be illegal. Blagden said that the Beaver license had nothing to do with the price of plaster or miscellaneous gypsum products, and that he had no understanding with Avery, or with anyone else, as to the price of plaster or any other unpatented material. Holland testified that when he became president of Universal, he had no understanding with USG, or anyone else, with respect

---

43 This is the language of the Ebsary agreement of May 22, 1929 (Exhibit 5).
44 This is the language of the Ebsary agreement of October 18, 1929 (Exhibit 11).

45 The miscellaneous gypsum products referred to in the complaint, as specified by the bill of particulars, are gypsum block, gypsum tile, and Keene's cement.

to the prices of plaster or other unpatented products. With respect to Certain-teed, C. O. Brown stated that he had no understanding that the license agreements of either May or November 1929 would be used to raise or fix the prices of plaster or other unpatented gypsum products; that so far as he knew there was never at any time any agreement or understanding reached regarding the fixing of prices of such materials; that he knew that price fixing under the licenses was applicable only to the patented articles made by Certain-teed, and that Certain-teed was free to sell unpatented products at such prices and on such terms as it chose. George M. Brown testified similarly that Certain-teed never had any understanding with anyone about the prices it should charge for plaster, gypsum block, gypsum tile, or Keene's cement. Nelson of the same company, testifying concerning the May 1929 license, said that he had never heard of any agreement or understanding that the price control provided for therein should extend to unpatented articles such as plaster, Keene's cement, tile, or block. Whittemore also, referring to the May 1929 license, said that there was never any understanding or agreement with anyone that the prices of plaster or unpatented gypsum products would be raised or fixed; that the only prices which USG could fix under the license agreement were those of patented articles made by Certain-teed.

■ Lenci of Ebsary testified that he never had any understanding or agreement with anyone with respect to plaster prices other than what was contained in the license agreement or bulletins; that there was nothing in the license agreement concerning plaster; and that the only thing in the bulletins was the protective provision against violation of the minimum price requirements through the device, among others, of giving away plaster or other products in connection with the sale of board, or the sale of plaster or other products, in connection with the sale of board, at a price unduly below the prevailing market price of such products. Lenci testified further that there was nothing that kept Ebsary from free competition in plaster, and that in his experience such competition was extremely free during the last ten or fifteen years. Black said that Celotex never had any agreement or understanding with USG, or with any other licensee, to raise or fix the prices of plaster or other unpatented gypsum products; that he knew that the license agreements which his company had related only to patented board so far as the price fixing provisions were concerned. Tomkins of Newark stated that he at all times felt perfectly free to charge any price for plaster that he wanted to; that the only effect that the bulletins had was to prevent his making a fake or false price for plaster in order to give a rebate to a board purchaser; that Newark never had any agreement or understanding of any kind with respect to white plaster or any other gypsum product than board. Chism of Texas testified that he understood at all times that the price fixing provisions in the two licenses which Texas signed applied only to patented board manufactured and sold by Texas under the licenses, and that Texas had no agreement or understanding in respect of plaster prices or the prices of miscellaneous gypsum products. In this state of the evidence, a finding that the licenses were executed with the intention of raising and stabilizing the prices of unpatented materials, and that they were therefore not bona fide, would not be warranted.

■ It may be assumed, indeed the evidence shows, that the parties to the license agreements were aware that settlement of the litigation, by the signing of the licenses, and the ending of the price war which had demoralized the industry, and the fixing of prices by USG at levels which would presumably be profitable, would as a matter of normal economic consequence improve general conditions in the industry and therefore result in better prices for all products. In a letter written to McCrady of American on April 12, 1928, by Griswold of the same company (Exhibit 141, a declaration binding only upon American), Griswold says: "There is no question but that if the Wall Board market were fixed up the Wall Plaster market would automatically be affected at the same time." Griswold testified, when asked whether he had discussed with Avery whether a stable price

for board would have an effect upon plaster or tile prices, that "we probably exchanged views on the possibility of that being the case, because that naturally would follow, that if prices on one of the principal products of a company were at a fairly remunerative basis, and had been changed to that basis, and another article they sold was sold below the cost of manufacture, it was natural to figure that it would influence to a certain extent the lower prices, that a man wouldn't be trying to make all of his money on one product he was selling, and giving the other one away." Lenci stated frankly that, since under the price protective provisions a licensee would not be free to give away plaster or to sell it at an extraordinarily low price in order to influence the sale of board, that might have the effect of stabilizing plaster prices as compared with their condition prior to the execution of the licenses. It is, indeed, conceded by the defendants that although after the signing of the May 1929 licenses the bulletins established board prices at the levels which USG had been following just prior to the licenses, subsequently, until August 6, 1929, and (except for Texas) after the execution of the November 1929 agreements, the prices on patented gypsum board were advanced over what they had been during the price war, and that the prices of other gypsum products improved during the same period over their condition during the price war. This is discussed more particularly in topic VI(1) and (3) of this opinion. But these considerations evidence no improper intent disclosing bad faith in the execution of the license agreements. The primary purpose of USG in granting the licenses was the settlement of litigation, the collection of damages for infringement, the obtaining of royalties, the fixing of a profitable price on patented board, and the securing of the various advantages which would normally flow from the general manufacture and sale of the superior product. The primary purpose of the licensees in signing the licenses was the obtaining of the right to make the superior product and settlement or avoidance of litigation. The granting and accepting of the licenses with these primary purposes and with the normal expectation also, by the licensees, or some of them, that USG would fix a reasonably profitable price on board was, as has been demonstrated, lawful. That being true, the fact that the parties knew that as a matter of economic consequence the price of plaster and miscellaneous gypsum products would also improve cannot taint with bad faith the execution of the license agreements. A contrary view would make unlawful the incidental consequences of lawful patent licensing.

4. *Intent to effectuate improper restriction upon the distribution of gypsum board, plaster and miscellaneous gypsum products, specifically, to "eliminate" jobbers through the discontinuance of a sales discount:*

In the theoretical economic sense a jobber is a functionary in the wholesaling process. He buys from the manufacturer, or from another wholesaler who has bought from the manufacturer, and sells to the dealer. The jobber's service is that of relieving the manufacturer, or in some instances the wholesaler, from the necessity of direct contact with the dealer—this being accomplished by the jobber's sales force. As explained in the statement of facts at the outset of this opinion, in the gypsum industry USG and the several licensees are the manufacturers of gypsum products, and the dealers in such products are largely retailers of building materials and mason supplies.

The price bulletin issued by USG on May 23, 1929 (Exhibit 404, a declaration binding only upon USG), immediately after the execution of the May 1929 licenses, had fixed the minimum list price at which the licensees might sell patented board made by them to dealers. On May 24, by a further bulletin (Exhibit 408, a declaration binding only upon USG), USG authorized the sale of such board to jobbers at a 10% discount from the dealer price. On August 8, 1930, USG by a bulletin (Exhibit 430, a declaration binding only upon USG) withdrew this discount. This bulletin stated: "Effective this date the price to jobbers and distributors is the same as the price to the regular dealer trade, as per our letters . . . [of various dates]" es-

tablishing prices to dealers. The reason for the withdrawal of the discount will be discussed in topic VI (4) of this opinion.

 The evidence introduced by the Government fails to establish that the license agreements were executed with an intent to eliminate jobbers through this withdrawal of discount and that they were on that account not bona fide. The witnesses examined on this subject all testified that there was no agreement or understanding whereby jobbers would be eliminated from the gypsum board distributive system, and no understanding or agreement that a jobber discount would be discontinued and the price to jobbers made the same as the dealer price. Thus Lenci of Ebsary testified that he did not enter into or know of any agreement or understanding that jobbers would be eliminated from the distributive system. He stated further that it was not his understanding that there was anything in the license agreement executed by Ebsary, or in the bulletins, which prohibited the selling of Ebsary's goods to jobbers. He testified also that at the May meetings in Chicago, when the Certain-teed, Niagara and Ebsary licenses were signed, there was no agreement to eliminate jobbers. George M. Brown of Certain-teed stated that the only agreements he had with Avery or anyone in USG were those contained in the written licenses. Black testified that it was his understanding that there was no prohibition in the USG-American license (of November 25, 1929) against American's selling to jobbers. The issuance, immediately upon execution of the May 1929 licenses, of the bulletin of May 24 (Exhibit 408) providing for a discount to jobbers evidences that at that time it was intended that sales to jobbers should be made.

The Government refers to a letter of November 12, 1929 (Exhibit 181, a declaration binding only upon American), written by Kling to Avery before the signing of the November 25, 1929, agreement between American and USG. Kling asks Avery, among other things, for "Your approval of our (4) Jobbers—the Fairmount [sic] W. P. Co., the Toledo P. P. Co., the Cleveland Gypsum Co., and Abbey Co." To this

Avery responded under date of November 16, 1929 (Exhibit 182, a declaration binding only upon USG):

". . . You ask for our approval of your jobbers. Under paragraph 9 of the contract you have the right to sell jobbers (being those who do not manufacture but buy and sell plasterboard or gypsum wallboard in straight cars or in mixed cars with other building material and who do not sell at retail) without any approval from us. If the jobbers you name are regular jobbers as above stated, then you would have the right to sell the patented product to them. . . ."

The letter from Kling evidences that American was selling to jobbers and desired to continue doing so. Neither that letter nor the one from Avery is any evidence of an intent to "eliminate" them or withdraw the discount. On the contrary these letters indicate an intent to continue to deal with jobbers.

In the bulletin of May 24, 1929 (Exhibit 408), whereby the discount to jobbers was established, Henning of USG said: "You will please send us a list of the jobbers to whom you are selling patented board." Lenci of Ebsary testified that at a licensee meeting on June 6, 1929, Henning discussed the question of jobbers in the industry and asked the licensees to send him the names of those to whom they were selling as jobbers. The Government refers to this as a move to eliminate jobbers gotten under way as soon as the industry was once organized under the license agreements. But this request for the names of jobbers and the (undefined) discussion of the question of jobbers in the industry are equivocal in respect of any intent to eliminate them or withdraw the discount. What Henning's purpose was in obtaining the names is speculative. He may have desired them in order to satisfy himself by investigation that the persons named as jobbers were really jobbers, rather than dealers.

Although the charge in the complaint of improper restriction upon distribution includes plaster and miscellaneous gypsum products, i. e., unpatented materials, as well as gypsum board, there is no evidence concerning any dealings by USG or the licensees with jobbers in respect of plaster and miscellaneous gypsum products.

It cannot be concluded that the license agreements were executed with intent to "eliminate" jobbers, and that they were for that reason not bona fide.

(5) *Intent to fix the prices at which manufacturing distributors resell gypsum board:* The term manufacturing distributors is applicable to companies which manufacture and sell gypsum plaster but which do not, for lack of investment in the large amount of plant equipment necessary in the making of gypsum board, manufacture board. In order to be able to market a full line of products, the manufacturing distributors purchase gypsum board from USG or one or more of its licensees. The purchases are made at a discount, and the sales of the board are made to the same dealer trade as that to which USG and its licensees sell their board, and therefore are made in competition with USG and its licensees. As pointed out in the statement of facts at the outset of this opinion, both the May and the November 1929 license agreements provided that a licensee might not sell patented gypsum board to manufacturing distributors without the written consent of USG. The manufacturing distributors referred to in the evidence are the Structural Gypsum Corporation, of Linden, New Jersey; the Connecticut Adamant Plaster Company, of New Haven, Connecticut; and the Oakfield Gypsum Products Corporation, of Oakfield, New York, hereinafter referred to as Structural, Connecticut Adamant, and Oakfield, respectively.[46]

There is no substantial evidence that the license agreements were executed with intent to fix the prices at which manufacturing distributors resell gypsum board. All the witnesses examined on the subject testified that there was no understanding or agreement of any kind that the resale prices of such distributors should be regulated or controlled. Neale of Atlantic stat-

ed that neither he nor his company was ever a party to any understanding or agreement to control resale prices of manufacturing distributors. Whittemore of Certain-teed stated that he fully understood that the only prices which USG could fix under the license agreement (his reference was to the May 1929 agreement) were the prices of patented articles made by his company, that USG had no right to control any price on board except the price at the first sale made by Certain-teed, and that he understood that USG's right to fix prices did not extend to resales by either dealers or manufacturing distributors. Lenci of Ebsary said that while he at one time thought that the ownership of a patent carried with it the right to control resale prices, this misapprehension had been acquired from something he had read and was not the result of anything that had been said or done at any licensee meeting or of any understanding or agreement with USG or anyone else, and that his erroneous impression was corrected by MacLeish, USG's attorney, at one of the licensee meetings in 1932. He testified, further, that notwithstanding his impression up to that time, at no time had it been his purpose or that of Ebsary to control the prices or practices of manufacturing distributors, and that they at no time had any understanding or arrangement or agreement with anyone to the effect that Ebsary would control or attempt to control the resale prices at which manufacturing distributors or any of them sold board purchased from Ebsary. Stromquist testified that Universal never at any time had any agreement or understanding as to what resale prices should be charged by the manufacturing distributor to which it sold, to wit, Oakfield.

The clause of the licenses forbidding sales to manufacturing distributors without the written consent of USG does not,

---

[46] The bill of particulars lists as manufacturing distributors, in addition to those named in the text, the American Cyanamid & Chemical Corporation, of New York, N. Y.; The Calvin Tomkins Company, of New York, N. Y.; the Grand Rapids Plaster Company, of Grand Rapids, Michigan; the Michigan Gypsum Company, of Grand Rapids, Michigan; The Alabastine Company, of Grand Rapids, Michigan; and the Wasem Plaster Company, of Fort Dodge, Iowa. No evidence was introduced concerning those companies.

looked at by itself, constitute evidence of an intention to control the prices of such distributors. It is equivocal on that issue. How this clause was applied in practice will be commented upon in topic VI(5) of this opinion.

Nothing in the record warrants the conclusion that the license agreements were executed with intent to fix the prices at which manufacturing distributors resell gypsum board, and that they were on that account not bona fide.

We conclude in respect of the second aspect of the first question of fact in the case that the evidence fails to show that the license agreements were executed with intent to gain objectives beyond the proper limits of a patent monopoly in any of the respects charged.

It is, therefore, concluded, in respect of the whole of the first issue of fact, that the evidence fails to establish that the license agreements were entered into by the defendants not as bona fide license agreements but to give color of legality to a combination to restrain trade in violation of the Sherman Act.

## VI

### THE OPERATIONS OF THE DEFENDANTS AND THE LIMITS OF THE PATENT MONOPOLY

Notwithstanding the conclusions reached in respect of the first issue of fact, it still remains to determine whether or not the actual operations of the defendants were carried beyond the proper limits of the patent monopoly and licensing thereunder, i. e., beyond the activities contemplated by the agreements as written and into the field denounced by the Sherman Act. This is the second issue of fact in the case. It is charged (1) that the price of gypsum board was raised and fixed at arbitrary and non-competitive levels; (2) that improper standardization of gypsum board and its method of production was accomplished; (3) that the level of prices of unpatented materials—plaster and miscellaneous gypsum products—was raised, maintained and stabilized; (4) that improper restriction upon distribution of gypsum board, plaster and miscellaneous gypsum products was effectuated; and (5) that the prices at which manufacturing distributors resold gypsum board were fixed.

(1) *Raising the price of gypsum board:* It is pointed out in topic V (1) of this opinion that the charge in the complaint that the defendants raised and fixed the prices of gypsum board at arbitrary and non-competitive levels, alleges nothing illegal where bona fide patent licensing is involved, for the reason that under the patent law it is the right of a patentee to fix the price of the patented product at such levels as he chooses and to require his licensees to sell at the price thus fixed. The question whether or not at the time of the execution of the license agreements there was an intent by the parties that the price of gypsum board should be raised to high levels has been discussed only because of its possible bearing upon the question of the bona fides of the agreements. It has been concluded that no such intent is shown. It is therefore not necessary to determine whether or not the price of gypsum board was actually raised to high levels. But it may be noted that the evidence is as follows: After the signing of the May 1929 licenses by National, Certainteed, Ebsary and Niagara, the USG bulletins established board prices at the levels at which USG had been selling board just prior to the execution of these licenses. For example, the price bulletin of May 23, 1929 (Exhibit 404, a declaration binding only upon USG), set 3/8″ standard board at $20 per M square feet on the Oakfield, New York-Grand Rapids, Michigan, etc. mill base. On the New Brighton, New York, mill base the figure was $22.60; on the Charlestown, Massachusetts, mill base, $23.-65; on the Buffalo, New York, Loveland, Colorado (mixed car shipments), and Philadelphia mill bases, $22.73, $30 and $22.60, respectively. These were the first prices announced after the signing of the May licenses. Lenci of Ebsary testified that these prices were about what USG was getting for its board at the time, and higher than Ebsary had been getting. Subsequently, until August 6, 1929, and (except for Texas) after the execution of the November licenses, the prices were advanced over what they had been during the price war. This is admitted by the defendants—reference being made to Exhibits 410, 413, 414, 416

and 33 (declarations binding only upon USG), the last bringing the prices down to February 12, 1940. But it is not in dispute that these prices did not exceed those which prevailed prior to the first license (the Beaver license) and the price war. Since 1935 the prices have been lowered so that for the past several years wallboard has sold for $23 per M square feet and lath for $13, as compared with $30 and $15–$16, respectively, before the first license. This is attested by Exhibit 33 and Exhibit 34 (a declaration binding only upon USG) and by the testimony of Griswold of American.

While the charge of the Government, as stated in the complaint, is that the price of gypsum board was raised and fixed at arbitrary and non-competitive levels, the essence of the Government's contention on this subject, as made in the Government's briefs, is that it was illegal for USG to fix, and for the licensees to abide by, the board prices at all. Its reliance is upon the ruling in United States v. Socony-Vacuum Oil Co. and United States v. Bausch & Lomb Optical Co., referred to in topic III of this opinion, to the effect that price fixing, reasonable or unreasonable, is unlawful *per se*. But, as pointed out in topic III, neither of these cases involved patents. And neither of them purports to overrule the General Electric case which, as demonstrated in topic II, legitimatizes price fixing under patent license agreements and therefore permits the establishment of prices at "arbitrary" and "non-competitive" levels.

(2) *Was there such standardization of gypsum board and its method of production (specifically, by the elimination of the manufacture and sale of open-edge board, seconds and No. 2 board, and by the restrictive provision of the May 1929 licenses concerning the use of the bundling process) as is beyond the proper limits of the patent monopoly?*

■ *Open-edge board:* It is not in dispute that Texas, Certain-teed and Ebsary, the only companies which prior to their licenses had made open-edge board, discontinued its manufacture and sale once they had acquired the right to make closed-edge board. It may be assumed that the other licensees, who had not manufactured the open-edge board, did not commence its manufacture. But it was pointed out in topic V (2) that according to the evidence the open-edge board was wasteful and not desired by the trade, that the primary purpose of Texas, Certain-teed and Ebsary in taking their licenses was to acquire the right to make and sell the superior closed-edge board, and that a concomitant expectation that the open-edge board would be discontinued was not beyond the proper limits of the patent monopoly and licensing thereunder. It follows that the actual discontinuance of manufacture and sale of open-edge board by Texas, Certain-teed and Ebsary, and the non-manufacture and sale of such board by the other licensees, was not illegal. Since it was lawful to take the licenses to make the superior board, it was not unlawful not to make and sell the uneconomic open-edge variety. The normal economic consequence of what is lawful cannot be unlawful. As pointed out in topic II, at the time the General Electric-Westinghouse license was executed in 1912, about 50% of the total number of lamps sold were of the ordinary carbon filament type, but after nine years of operation under the license the percentage of tungsten filament lamps increased, because of their superior quality, to some 97% of total production, that is to say, the carbon filament lamps substantially disappeared from the market. It was not concluded in the General Electric case that on this account the operations of the parties under the General Electric-Westinghouse license had been carried beyond the proper limits of the patent monopoly.

*Seconds and No. 2 board:* The Government asserts that in 1929 USG issued bulletins under which the minimum prices at which seconds and No. 2 board could be sold were raised until they were the same as that for standard board, and that since this occurred there has been no sale of seconds and No. 2 board. The prices fixed by the bulletins are set forth in the margin.[47] It appears not to be disputed by the

---

[47] The bulletins referred to are Exhibits 404 of May 23, 1929; 410 of June 7, 1929; 411 of June 19, 1929; 413 of June 26, 1929; and 414 of July 9, 1929. (The exhibits are declarations binding only upon USG.) These bulletins show

defendants that the effect of the bulletins was to set the minimum price of seconds and No. 2 board at the same figure as that for standard board, and in the comments to follow this will be assumed, although, as will be noted from the bulletin prices set forth in the margin, No. 2 board stood on the Oakfield, New York, basing point at the same price as No. 1 only from June 26 to July 9, 1929, and seconds at no time reached the same figure as the standard board; also on the New Brighton, New York, basing point No. 2 board stood at the same price as No. 1 only from June 26 to July 9, 1929, and the seconds at no time reached the same price as the standard board.

The evidence fails to show that there was a complete elimination of either seconds or No. 2 board. C. O. Brown of Certain-teed testified that on December 3, 1929 (he was referring to Exhibit 236, a memorandum from Henley of Certain-teed to Coffin of the same company),[48] Certain-teed was making seconds and that every company unavoidably does. Neale of Atlantic testified that as his company improved in the art of board manufacturing naturally fewer and fewer seconds were made. Fuller, in a letter of May 24, 1927 (Exhibit 279, a declaration binding only upon Atlantic), referred to in topic V (2), mentioned the policy of Atlantic to sell as few seconds anywhere as possible, and pointed out that seconds will run into a much higher percentage during the period of getting a new wallboard plant running smoothly than they should later on. In the same letter he referred to Atlantic's hope of disposing of the necessary output of seconds with as little damage to established markets as possible. This is the only evidence on the subject and it shows a diminution rather than an elimination of seconds. It shows nothing concerning No. 2 board. Assuming, however, that seconds and No. 2 board went wholly off the market as a result of the bulletins, there would be no illegality.

As explained in topic V (2), a second was a defective board, and No. 2 board was made of inferior material and accordingly its sale would be harmful to the reputation of the first quality product. C. O. Brown testified that the selling of seconds is harmful to the reputation of the perfect grade of any manufactured product. Protection by a patentee manufacturer of

---

that: On May 23, 1929 (Exhibit 404), the price of ⅜″ #1 Grade (standard) wallboard f. o. b. Oakfield, New York; Gypsum, Ohio; Plasterco, Virginia; Grand Rapids, Michigan; Ft. Dodge, Iowa; Southard, Oklahoma; Sweetwater, Texas; and Acme, Texas, was $20 per M sq. ft.; of #2 Grade wallboard of the same dimension, $17.50 per M sq. ft.; and of seconds of the same dimension $15 per M sq. ft. On June 7, 1929 (Exhibit 410), the price of #2 board for the same dimension and basing points was raised to $18.75, and the price of seconds to $16.25, per M sq. ft., no change being made in the price of standard board. These same prices were continued by the bulletin of June 19, 1929 (Exhibit 411). On June 26, 1929 (Exhibit 413), #2 board was priced at $20, the same as the standard board; and seconds were priced at $17.50. On July 9, 1929 (Exhibit 414), standard board went to $22.50, seconds remained at $20, and no mention was made of #2 board, the same remaining therefore at the previous figure of $20 per M sq. ft.

On May 23, 1929 (Exhibit 404), the price of ⅜″ #1 Grade (standard) wallboard, based on New Brighton, New York, was $22.60 per M sq. ft.; of #2 Grade of the same dimension, $20.10 per M sq. ft.; and of seconds of the same dimension, $17.60 per M sq. ft. On June 7, 1929 (Exhibit 410), the #2 board was raised to $21.35 per M sq. ft.; the seconds to $18.85; and, no change being made in the standard board price, it thus remained at $22.60. On June 19, 1929 (Exhibit 411), no price change was made for the New Brighton, New York, basing point, and prices therefore remained the same on standard, #2 board, and seconds. On June 26, 1929 (Exhibit 413), the New Brighton price for ⅜″ #2 board was changed from $21.35 per M sq. ft. to $22.60; and the seconds from $18.85 to $20.10; no change was indicated in the standard board. On July 9, 1929 (Exhibit 414), the ⅜″ standard board based on New Brighton was priced at $25.10 per M sq. ft., the seconds at $22.60; no change in price of #2 board being indicated, that remained at $22.60.

The foregoing figures are given as illustrative. The bulletins refer also to prices f. o. b. other basing points.

[48] This memorandum (a declaration binding only upon Certain-teed) states that the writer is endeavoring to work out a seconds policy with USG.

the quality of his product is important commercially, for if quality and reputation for quality descend so will demand and price. It would have been lawful for USG as patentee, if it so desired, to refrain from making and selling No. 2 board and, to the extent that they were made in the normal process of manufacturing standard board, to refrain from selling seconds. Similarly, it would have been lawful for USG directly to require this of its licensees in order that their sale of inferior products would not damage the reputation of the board produced by USG. Since the No. 2 board and seconds were, as stated in topic V (2), by definition board made under the patents, it was lawful for USG to fix the minimum price at which they were sold. Accordingly, it could fix the price of all patented board products at the same figure. And if the purpose of this was indirectly to accomplish a diminution or elimination of the sale by the licensees of the inferior products, this was lawful. In the General Electric-Westinghouse license there was a restriction against selling second grade material in the form of refilled burned out lamps. If such a direct prohibition is lawful, the same end may be reached indirectly by pricing all patented products, whether inferior, defective, or standard, at the same figure. In the instant case, if the licensees desired to try to sell defective or inferior patented products at the price established for the standard board, they were free to do so, although this would have been difficult economically.

The Government refers to Standard Sanitary Mfg. Co. v. United States, referred to in topic II, as supporting its contentions concerning the elimination of seconds. That case is reviewed below in topic VIII in the course of discussion of authorities especially relied upon by the Government. It is sufficient to point out here that the "seconds" which it was purposed to eliminate from the market in that case were not patented products.

██ *The bundling process:* It has been pointed out in topic V (2) that the May 1929 license agreements and the Certainteed supplemental license of July 3, 1929, granted rights under the Birdsey patent

No. 1,696,877 and required that the licensees use this bundling process and no other, but that the November 1929 licenses did not contain this restrictive provision. Since the bundling patent covered merely a process of packaging, it obviously could accomplish no standardization of board as such. There is no evidence that during the period from May to November, when the restrictive provision was in the licenses, it drove off the market any other process of packaging, or that there was any other process (except, for lath, the common and uneconomic method of tying with wire); and the evidence shows that use of the bundling process, since the execution of the November 1929 licenses, has been on its merit, for lack of a better one. There is no evidence that the restrictive provision will be reintroduced into the presently outstanding licenses; its absence from November, 1929, until August 15, 1940, the date this action was filed, indicates that its reintroduction is unlikely. There is no evidence that the elimination of this provision in November, 1929, was in anticipation of the instant action, or of any other antitrust proceeding. Under these circumstances, the question of the legality of the restrictive provision has become moot, and its presence in the May licenses is not a foundation for equitable restraint. In Standard Oil Co. v. United States, cited in topics II and III, it appeared that certain patent license provisions the legality of which was questioned were voluntarily cancelled prior to the entry of a decree below in respect of other issues. The Supreme Court held that since the relief sought was an injunction and hence related only to the future, the question of the validity of such provisions had become moot. In Industrial Ass'n v. United States, 1925, 268 U.S. 64, 84, 45 S.Ct. 403, 408, 69 L.Ed. 849, the Court said concerning injunctive relief sought in respect of allegedly unlawful interference with freedom of sale and purchase of building supplies:

". . . whatever may have been the original situation, the practice was abandoned long before the present suit was instituted, and nothing appears by way of threat or otherwise to indicate the probability of its ever being resumed. Under these circumstances, there is no basis for present relief by injunction. United States v. U. S. Steel Corp., 251 U.S. 417, 444-445 [40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121]."

Cf. United States **v.** Hamburg-Amerikanische Packet-Fahrt-Actien Gesellschaft, 1916, 239 U.S. 466, 475–478, 36 S.Ct. 212, 216, 217, 60 L.Ed. 387.

(3) *Was the level of prices of unpatented materials—plaster and miscellaneous gypsum products—raised, maintained and stabilized:* As pointed out in topic V (3), it is admitted by the defendants that during the period of price improvement upon patented gypsum board after the signing of the licenses, the prices of other gypsum products increased over their condition in the 1927–1929 price war. If this increase was but the incidental economic result of the general industry betterment and the improvement in the prices of patented board, themselves consequent upon the settlement of the litigation and the execution of the licenses, it was not beyond the proper limits of the patent monopoly because the settlement of the litigation and the execution of the licenses were lawful. If, however, the increased price of unpatented materials was the result of some device adopted or action taken to bring about such an increase, rather than of the operation of economic law, then it was unlawful as beyond the proper limits of the patent monopoly.

The Government relies upon the bulletin provision set forth in the statement of facts at the outset of this opinion that "Any sale of patented products, though ostensibly made at or above the minimum price established by licensor, will nevertheless be considered a violation of the provisions of the license if licensee directly or indirectly reduces the actual price charged by licensee below such minimum price . . . by reducing the price of other products . . . ." (Exhibit 37, a declaration binding only upon USG, a bulletin of February 6, 1939, page 2) This, it will have been noted, is but part of a larger provision concerning rebates and allowances—a price protective provision. The Government contends that the portion quoted was but a device to raise, maintain and stabilize the price of plaster and miscellaneous gypsum products, and that it was effectively applied by the defendants to that end. To the contrary the defendants assert that the provision in question is a proper price protective measure and that it was not abused. That such a price protective provision is proper in a patent license has already been concluded in topic II of this opinion, where the terms and conditions of the licenses in the instant case were compared with those in the General Electric case. And the evidence in the instant case fails to establish that in operation this provision was used illegitimately, *i.e.,* to raise, maintain and stabilize the price of unpatented materials.

The Government introduced numerous exhibits in support of its contention that the bulletin provision was improperly applied. Those discussed below are typical. Exhibit 489 (a declaration binding only upon USG) is a letter of March 31, 1933, from Board Survey to Ebsary which advised of a complaint that Ebsary had violated the minimum price on patented gypsum board through the device of rebating by giving away plaster to a dealer, Wallace & Herring, of Alexandria, Virginia, in connection with a sale of patented board. The letter sought advice in detail as to the sales of board to Wallace & Herring and specific advice also as to any donations or credits made in conjunction with such sales.[49] Exhibit 490 (a declaration binding only upon Ebsary) is an intra-company letter of April 10, 1933, from Diegel, general sales manager of Ebsary, to Lenci, its secretary, stating that in the sales to Wallace & Herring inquired about by Board Survey, Ebsary secured "regular prices on the board and

---

[49] The body of this letter reads as follows:

"We are advised that your company has recently sold wallboard and/or plasterboard embodying the claims and inventions of the patents under which you are licensed to Wallace & Herring, Alexandria, Virginia at prices below the licensor's minimum price to you for such board in such market.

"Specifically, that you did sell this firm a mixed carload of plaster and patented board and did not invoice or charge to this firm a certain amount of plaster, and this was also handled so as to reflect to the said Wallace & Herring, Alexandria, Virginia a rebate on the patented board they purchased from you.

"Please advise in detail as to your sales of patented board to this firm, and specifically advise us of any donations or credits made in conjunction with your sales of said board."

regular prices on the plaster." Exhibit 491 (a declaration binding only upon Ebsary) is Ebsary's reply of April 12, 1933, written by Lenci in answer to the Board Survey charge of March 31, 1933. In this letter Lenci advised that Ebsary has secured from Wallace & Herring in every case the full bulletin prices for wallboard or plasterboard under the license agreement, and that no special price was made to induce board business.[50] Following this, on April 14, 1933, by Exhibit 492 (a declaration binding only upon USG), Board Survey wrote Ebsary, complained that the letter of April 12, 1933, was not a full answer to the March 31 charge, and sought advice as to whether or not Ebsary had donated plaster to Wallace & Herring so as to reflect to it a rebate on purchases of the patented board. To this Ebsary replied on April 20, 1933, by Exhibit 493 (a declaration binding only upon Ebsary), "we wish to state definitely that we have made no donation of plaster to these people. Furthermore, that we did not make them any special price on plasterboard in order to induce an order for board." Exhibit 494, a letter of June 15, 1933 (a declaration binding only upon USG), involves a similar complaint against Ebsary in respect of sales of board to the Waltham Lime Company, of Waltham, Massachusetts. This letter stated that the Waltham Company had recently sold plasterboard manufactured by Ebsary at a price which would seem not possible if Ebsary's sales of board to this dealer had been made at the minimum fixed by the licensor, and that it is alleged that Ebsary's sales of plaster had been at less than the market price in order to reflect a lower price than the licensor's minimum. In reply to this Ebsary, under date of June 20, 1933 (Exhibit 495, a declaration binding only upon Ebsary), asserted that its sales of board to the Waltham Company were strictly in accordance with the bulletins issued under the license agreement, and that sales of plaster to this dealer were made on the same basis as the prevailing prices made by Ebsary's competitors for similar business, and not with the intent to influence board sales. A letter of June 15, 1933, to Ebsary by Board Survey, Exhibit 497 (a declaration binding only upon USG), advised of an alleged sale of plaster by Ebsary to the "Liberty Coal Company, Chelsea, Massachusetts," at less than the market price in order to reflect to this customer on its purchases of patented board a price lower than the licensor's minimum. By a letter of June 20, 1933, to Board Survey, Exhibit 498 (a declaration binding only upon Ebsary), Ebsary repudiated this charge, stating that sales of board to the "Liberty Coal & Cement Company" had been strictly in accordance with the bulletins issued under the license agreement, and that the sales of plaster had been made on the same basis as the prevailing prices charged by competitors, and not with the intent to influence board sales. Again, a letter of April 24, 1934, from Board Survey to Ebsary, Exhibit 500 (a declaration binding only upon USG), advised of an alleged violation of minimum prices on sales of plasterboard to Service Masons Supply Company, of New York, by allowances on other commodities. In Exhibit 501 (a declaration binding only upon Ebsary), under date of May 3, 1934, Ebsary denied this and specified only one carload shipment of board to Service Masons Supply Company during the preceding six months, quoted the prices, and stated that this carload was charged and paid for at the proper bulletin price and that sales of other materials were paid for at the prices prevailing in the New York market, and that no special prices or concessions of any kind were made to influence the sale of this car of board.

Lenci testified that all of these letters had to do with charges that Ebsary was rebating on its board prices through the device of cutting plaster prices in combination sales. He stated that he fully understood that USG was not attempting to fix or control Ebsary's plaster prices, and that Ebsary

---

[50] The body of this letter reads thus:

"Referring to your letter of March 31st with reference to Wallace & Herring, Alexandria, Virginia, we wish to advise that we have secured from them in every case the full Bulletin price for wallboard or plasterboard under the License Agreement.

"Whatever sales of plasterboard have been made to this firm have been made at the prevailing price and no special price made to induce board business."

felt free to sell plaster at any price it saw fit provided it did not attempt to cut the price of board through the means of giving away plaster, or through charging an abnormally low price for it in a combination sale. Concerning Exhibit 500, Lenci said that it was a letter from Board Survey referring to an asserted reduction in the price of board by granting allowances in purchases of other commodities, including plaster; that Ebsary had no published price list at any time in selling plaster; that its instructions to salesmen were to sell at certain prices, but that it always felt free at any time to meet a quotation which it found existing in any territory in which it was selling. He said that to a certain extent there was such a thing as a prevailing price or general price in Ebsary's territory, but that this was always flexible; that the two largest companies operating in Ebsary's area were USG and National, and that Ebsary would naturally know about the prices those companies were selling at since its salesmen were in contact with customers at all times and kept the company well informed. Lenci stated that that influenced Ebsary in its instructions to its salesmen as to what prices they should get, since it wanted to get as much' for its product as it could—that the company would have to be influenced by the USG price on plaster in determining what it (Ebsary) could get—"it would be the condition of the market. We couldn't get more, and we naturally wouldn't want to sell for any less."

Other exhibits introduced by the Government relate to asserted violations by other companies, specifically Certain-teed and National, of the minimum price on patented gypsum board by means of gifts of, or rebates upon, plaster. The exhibits relating to Certain-teed are Nos. 727, 729–738, and 746–749. Those relating to National are Nos. 758 and 759. (Each of these exhibits was received in evidence as binding only upon USG.) None of the asserted violations referred to in these exhibits relates to gypsum block, gypsum tile or Keene's cement. The Government introduced additional exhibits which concern alleged violations of the minimum price on patented gypsum board by means of gifts of, or rebates upon, roofing products, paints, insula-tion board, building paper and fibre board. and by means of such devices as free painting of signs, sales of company stock below the market price, donations to a ball club and receiving payments for board in certificates of deposit, rather than in legal tender. But these are not embraced within the charge of the complaint for this confines itself to plaster and miscellaneous gypsum products, which, as specified in the bill of particulars, include only gypsum block, gypsum tile and Keene's cement. It is therefore unnecessary to discuss these additional exhibits.

There is no substantial evidence in any of the foregoing exhibits that the price protective provision quoted at the outset of this sub-topic was used by the defendants as a device to raise, maintain and stabilize the price of plaster. What the evidence relied upon by the Government does show is merely this: One of the licensees would hear that patented board purchased by a dealer from another licensee was being resold at such a price as would indicate that the vendor-licensee had granted the dealer a concession below the minimum price on board. A report of this would be made to Board Survey as a probable violation of the bulletins. Board Survey would make inquiry of the vendor-licensee and receive an explanation. Putting this otherwise, various licensees were insisting that USG through Board Survey require obedience to the bulletin provisions in respect of prices on patented board. But they were not seeking to sustain the price of plaster, except in the sense that they were complaining against what were believed to be fake or false sales of plaster or sales at such gross diminution below the prevailing plaster price as constituted a means of rebating from the bulletin price on board. USG, on being informed of alleged rebating, was requiring the accused licensees to explain or desist. If the effect of this was to keep the price of plaster at or about the prevailing rate in the industry, this was only the incidental result of the exercise of the right of the licensor to insist upon obedience to the bulletins so far as patented board was concerned and was therefore not illegal.

We conclude that there is no substantial evidence that the conceded advance

in the price of plaster after the signing of the licenses was the result of a device adopted, or action taken, by the defendants, or the result of anything other than the rise in board prices and the general industry betterment occasioned by the settlement of the litigation and the signing of the licenses.

(4) *Was improper restriction effectuated upon the distribution of gypsum board, plaster and miscellaneous gypsum products, by "elimination" of jobbers through the discontinuance of a sales discount:* As explained in topic V (4), jobbers in their proper function serve a useful purpose in the wholesaling process, buying from the manufacturer and selling to the dealer. Upon the execution of the May 1929 licenses, USG, by a bulletin of May 24, 1929 (Exhibit 408, a declaration binding only upon USG), applicable by its terms to patented board made by the licensees, authorized the sale of such board to jobbers at a discount of 10% below the minimum list price fixed for licensees' sales to dealers.

It appears, however, that jobbers in the gypsum industry occupy a somewhat ambiguous position. Higgins, at one time a division sales manager of National, testified that the terms "wholesaler," "jobber" and "distributor" have been "footballed and kicked around" and vary with different industries, and that there are no jobbers in the gypsum industry in the sense of persons who buy from manufacturers, sell to dealers, bill the dealers, carry the accounts and pay the manufacturers. Lenci of Ebsary said that in the gypsum board business it was difficult to know whether or not a given person was a jobber. During his direct examination Spease, of the Fairmont Wall Plaster Company, named a number of persons or firms as jobbers; but on cross-examination it appeared that his statements were somewhat reckless, that he knew little of the activities of such persons or firms in recent years. Lenci testified that Ebsary largely sold direct to dealers; that it was not particularly interested in selling to jobbers, partly because it had its own sales force and therefore jobbers had little to offer in the way of service, but also because jobbers, buying at a jobber discount, would set up an unfair artificial competition. He explained that some of them who purchased board on the representation that they were acting in their proper function as jobbers, *i. e.,* as intermediaries between the manufacturer and dealers, were in fact themselves acting as dealers, reselling to contractors and ultimate consumers, and that in so doing they could undersell the regular dealer, who received no discount, with resultant bad feeling on his part toward Ebsary. Lenci explained also that some jobbers in selling to dealers would divide the discount with them, and to that extent undersell Ebsary with its own dealer-customers.

In this situation USG, on August 8, 1930, by a further bulletin (Exhibit 430, a declaration binding only upon USG), withdrew the jobber discount—that is, made the minimum price at which licensees could sell to jobbers the same as the minimum price to the regular dealer trade. As this was put by Lenci, there came a time in 1930 when Ebsary received a bulletin which "leveled off the price to dealers and jobbers." While thereafter a jobber who purchased board from either USG or one of the licensees was obliged to pay the same price as a dealer, the discontinuance of the discount did not have the effect of forbidding sales of board to jobbers if they were willing to buy at the dealer price. The evidence shows that many jobbers continued to buy board and were nevertheless able to perform a proper jobber's function. There were small dealers who, for financial reasons or lack of warehouse space, were not able to buy or store board in the minimum quantities in which the licensees were required by the bulletins to sell it. A jobber financially able to purchase a substantial amount of board and having adequate warehouse space could, though he purchased at the dealer price, resell in small lots to such dealers at an advance, because of the service he thus rendered them. The Government asserts that the withdrawal of the discount had the effect of completely eliminating jobbers from the gypsum industry. But the record does not support this statement; there is no evidence that any jobber was put out of business altogether.

On the contrary, according to Lenci's testimony, jobbers are still in business and doing a good business.

The question for determination is whether or not USG's withdrawal of the discount was lawful. Under the ruling in the General Electric case the answer is in the affirmative. The Court there said that it was reasonable that a patentee who manufactures and vends the patented goods on his own account should say to his licensee, "you may make and sell articles under my patent, but not so as to destroy the profit that I wish to obtain by making them and selling them myself." (272 U.S. at page 490, 47 S.Ct. at page 197, 71 L.Ed. 362.) There was adequate reason for the establishment of one minimum price on patented board to all classes of trade—except manufacturing distributors, whose discount, allowed for a different reason, is discussed in sub-topic (5) (a) of this topic VI. USG as patentee had a legitimate interest in maintaining the price of the patented product by refusing to permit it to be sold to so-called jobbers at a discount with consequent disturbance of the minimum price structure by the artificial competition set up as above described. It is noteworthy, also, that, as pointed out in topic II, the General Electric plan of distribution, which was adopted by Westinghouse, was devised to enable General Electric "to deal directly with consumers and purchasers, and . . . to avoid selling the lamps owned by the [General Electric] company to jobbers or dealers, and prevent sale by these middle men to consumers at different and competing prices." (272 U.S. at page 483, 47 S.Ct. at page 194, 71 L.Ed. 362) Both jobbers and retailers were thus "eliminated." The Supreme Court found nothing illegal in this.

The Government asserts that the discontinuance of the jobber discount was by agreement between USG and its licensees and that this made it unlawful. Such an agreement would not be unlawful. As is pointed out in topic V (1), in the General Electric case the prices established on the patented product were a part of the license agreement itself. The authorization of the jobber discount was but a fixing of the licensee price on board to a certain class of trade; and the discontinuance of the discount was but a refixing of the price. But there is no substantial evidence in the instant case that USG and the licensees did agree upon discontinuance of the discount. Lenci of Ebsary testified that he did not enter into or know of any agreement or understanding that jobbers would be eliminated from the distributive system of gypsum board; that Ebsary had no understanding or agreement with anyone that at some time after 1929 the jobber price would be raised to the amount of the dealer price. He said that it was not his understanding that there was anything in Ebsary's license agreement or in the bulletins which prohibited Ebsary's selling its goods to jobbers. He stated that Ebsary had no part in making up the bulletin of August 8, 1930; that "It came as an order, as a direction in the form of a bulletin."

The Government urges that Exhibits 438, 471 and 502 evidence concerted action. Exhibit 438 (a declaration binding only upon Ebsary), a letter of May 6, 1932, from Ebsary to the Board Survey Company, refers "to the recent bulletin of the United States Gypsum Company advising the licensees that selling through Jobbers had been eliminated. We would advise that Daniel Duskis, Inc., Glendale, L. I. is still buying Certain-teed Board through Orin F. Perry, New York." Exhibit 471 (a declaration binding only upon Ebsary) is a letter written by Ebsary on November 28, 1932, to Board Survey, again concerning a purchase by Duskis from Perry; this is referred to as in violation of the bulletin "eliminating sales of licensed board through jobbers and commission men." In his testimony concerning Exhibit 438, Lenci explained the phrasing of these letters, saying that he knew when he wrote the first quoted sentence of Exhibit 438 that all that the bulletin had done was to level off the price as between jobbers and dealers, and that the letter should have read "Referring to the recent bulletin . . . advising the licensees that selling through jobbers at a discount had been eliminated." He said that he and everyone else understood that all that had been eliminated was the right of a manufacturer to sell a jobber at a discount. Lenci explained the second

sentence of the exhibit as meaning that Duskis, a Long Island dealer, was buying Certain-teed board through Perry, and that he would not do so if Perry were paying Certain-teed the dealers' prices, "which would indicate to me that Perry was still getting a jobber's discount from Certain-teed." Lenci stated that he was complaining to Board Survey about a price cut by Certain-teed, specifically, that in view of the evidence of what Duskis was doing, Ebsary felt that Certain-teed was giving Perry a discount prohibited by the USG bulletin then in effect. Lenci testified similarly concerning Exhibit 502 (a declaration binding only upon Ebsary), a telegram from Ebsary to Henning of USG, dated November 8, 1934, in which it was said "Lee Story must be eliminated immediately as a jobber." [51] Lenci explained that this was intended only as a complaint against Kelley; that he (in sending this telegram) meant that Kelley must cease giving Lee Story a jobber's discount, and that the wire should have read "Kelley must cease giving Lee Story a jobber's discount," rather than that Lee Story should "be eliminated." Lenci testified that the telegram would be thus understood by both Ebsary and the recipient. His testimony was frank and convincing, and makes clear that the correspondence above described was in the nature of complaints that particular licensees had made arrangements with jobbers or dealers to give discounts or lower prices on patented board in violation of the minimum price bulletins. His explanation is consistent with his testimony that there was no elimination of jobbers but merely an elimination of their discount, and, in view of his explanation, the correspondence is not in conflict with his testimony that there was no agreement to eliminate the discount.

The Government relies upon Eastern States Retail Lumber Dealers' Ass'n v. United States, cited in topic III, and Binderup v. Pathe Exchange, 1923, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308, both decided under the Sherman Act. The first of these cases involved a combination of associations of retailers of lumber whose members agreed not to buy from wholesalers who themselves, in competition with the retailers, sold directly to the consumer, thus undermining the retailer's trade. The Supreme Court held that a retailer had the right, individually, to stop dealing with a wholesaler, but could not lawfully do so in combination and agreement with others. In Binderup v. Pathe Exchange the defendants, who controlled the distribution of motion picture films, acted in concert in canceling exhibition contracts, and in refusing to deal in the future, with the plaintiff. The Court again ruled that, acting separately, each of the distributors could have refused to furnish films to the exhibitor without becoming amenable to the provisions of the statute, but that conspiracy and combination of all to prevent any from dealing with the exhibitor was illegal. These cases are not in point. They involve an agreement forbidden by the Sherman Act and not legitimatized by any other law. In the instant case, as above demonstrated, in view of the patent law and the General Electric decision not only was withdrawal of the discount legitimate but also its withdrawal by agreement, had there been such an agreement, would not have been unlawful.

No evidence was introduced in support of the charge that the defendants effectuated improper restriction upon distribution of plaster and miscellaneous gypsum products through jobbers. Both the bulletin establishing the jobber discount and the bulletin withdrawing it applied in terms only to patented board.

It is concluded that there is no evidence that the operations of the defendants went beyond the proper limits of the patent monopoly by improper restriction upon distribution of gypsum board, plaster and miscellaneous gypsum products, and this whether the charge of the complaint

---

[51] The full text of the telegram is: "Lee Story and Companys man in Brooklyn is quoting on Kelly [sic] board up to two dollars per thousand below license bulletin prices to lumber dealers in New York City You must investigate and correct this immediately as we look to you for protection under our contract Lee Story must be eliminated immediately as a jobber Wire us full information at once tonight."

means elimination of the jobber discount or of jobbers or of jobbing.

(5) *Were the prices at which manufacturing distributors resold gypsum board fixed by the defendants:* As stated in topic V (5), the manufacturing distributors referred to in the evidence, Connecticut Adamant, Oakfield and Structural, are engaged in making and selling gypsum plaster, but purchase the gypsum board which they sell from other manufacturers, i. e., from USG or one or more of the licensees. A discount off the bulletin price to dealers was allowed them. The Government urges that control of resale prices is evidenced by (a) the use by USG of the provision in the May and November 1929 licenses requiring USG's written consent to the sale by licensees of patented board to manufacturing distributors; (b) the supplying to manufacturing distributors by their licensee-sellers of the bulletin dealer prices on board; (c) the policing of manufacturing distributors' sales of board; and (d) the limiting of the manufacturing distributors' discount to approximately the cost of handling the board.

(a) *Use of the consent to sell clause:* The testimony is uniformly to the effect that USG freely, and without conditions attached, granted consents to the licensees to sell board to manufacturing distributors. Tomkins of Newark, Kelley and The Calvin Tomkins Company (a wholly owned subsidiary of Newark which conducted Newark's sales business), testified that USG never refused a request by any of his companies for permission to sell a manufacturing distributor, that no consent once granted was ever withdrawn, that no conditions, oral or written, were ever attached to the consents except that they were revocable, and that USG never threatened to withdraw a consent once granted. Lenci testified that the only occasion when USG ever refused a request by Ebsary to sell a manufacturing distributor was in the case of the Cardiff Gypsum Company; that all other requests had been granted by USG,

and that there were never any conditions, written or oral, attached to the granting of such consents.[52] Lenci testified, further, that there was never with respect to these consents any arrangement, understanding, or agreement with USG or anyone else that Ebsary would police, supervise, or seek to control manufacturing distributors' resale prices or practices. He said that there never was an instance in which a consent issued by USG to Ebsary was withdrawn, or where USG or anyone connected with it threatened to withdraw a consent once issued; that no statement was ever made to him by anyone connected with USG that if Ebsary did not control or seek to control the resale prices of manufacturing distributors to whom Ebsary sold under the consents, they would be withdrawn.

Similarly, the manufacturing distributors themselves testified that they never understood that the consents to sell which had been issued by USG to their respective suppliers would be withdrawn in the event that the distributors did not resell gypsum board at given prices. Thus Hansen stated that he never had any knowledge that any conditions had been attached by USG, or anyone else, to the consents given by USG to Oakfield's suppliers. McCormack could recall no threat by anyone at any time that USG's consent to Ebsary or Kelley to sell Structural would be withdrawn. Asked whether he was ever told that any conditions had been attached by USG to any consent which it had granted Ebsary or Kelley to sell Structural at a discount, McCormack replied that he did not know "until quite late in this picture that we ever were selling under a consent." Kellogg of Connecticut Adamant testified that no one from USG or any other board manufacturer ever threatened to cease to sell his company on account of prices it charged on resales of board.

(b) *Supplying to manufacturing distributors USG's minimum dealer prices on board:* It is not denied by the defendants that when the licensee-manufacturers sold

---

[52] The Government asserts that the evidence shows that the reason for USG's refusal to give its consent to Ebsary to sell the Cardiff Gypsum Company was that Cardiff was known as a price-cutter on plaster. But the evidence concerning refusal to grant the Ebsary request was received solely on the issue of whether the defendants were attempting to control the prices of plaster.

gypsum board and lath to manufacturing distributors they from time to time furnished the latter with information concerning the prices fixed by the bulletins for sale of these products by the licensees to dealers. The Government urges this circumstance as evidencing either a contractual or a coercive arrangement whereby the manufacturing distributors were themselves obliged to sell to dealers at the bulletin prices. The witnesses, however, gave a different explanation. The discount allowed to manufacturing distributors was 12½% on lath and 15% on board off the bulletin price to dealers. Tomkins, testifying in respect of the sending by Kelley and The Calvin Tomkins Company of price lists to Oakfield, Structural and Connecticut Adamant, explained that in quoting a manufacturing distributor on gypsum board a licensee did not, as a matter of practice, deduct the allowed discount from the bulletin price to dealers and then quote the resultant net price. The licensee advised the manufacturing distributor of the price it was to pay by sending it the bulletin price to dealers; this enabled the distributor to arrive at the price it must pay by deducting the discount from the bulletin dealer price for any particular sales destination. Therefore, the manufacturing distributor was informed promptly by the licensee-supplier of any change in the bulletin price to dealers on board because this would affect the manufacturing distributor's cost. Kellogg of Connecticut Adamant, which as a manufacturing distributor had purchased board from USG for about ten years and prior to that had bought from Ebsary and Kelley, testified in respect of purchases from USG that his policy was to sell to Connecticut Adamant's customers at the prices he obtained from USG—the market price—and that for that reason, as well as in order to know what Connecticut Adamant had to pay for the board, he would ask USG what the delivered price to a dealer at a particular point of delivery was. He said that he always wanted to know the dealer price, because that was what the board cost Connecticut Adamant—the dealer price less the applicable discount. McCormack said that he had never at any time received a USG licensee bulletin, but that it was necessary at all times during the relationship of Structural with USG, Ebsary and Kelley, from whom it purchased, to know in advance through price lists the supplier's dealer price for patented board, because that was the price on which Structural's discount was figured. Structural had to know what the board was going to cost before it made contracts for its resale. Hansen testified that Oakfield always bought board at a discount. Asked what its prices were and what relationship, if any, they bore to the prices of Kelley, its supplier, he responded that the price which Kelley charged Oakfield was the price Kelley charged its dealers less discount. Therefore, in order to know prior to selling to its own customers what the board was to cost it, Oakfield had to know Kelley's dealer price.

The manufacturing distributors themselves testified that they had no agreement with their suppliers to resell board at any particular prices. Thus Hansen stated that Oakfield had no arrangement, agreement, or understanding with Universal, Kelley, or any other supplier of board, as to the prices Oakfield should charge its dealer-customers when it resold the board. McCormack said that he could not honestly testify that Structural had any arrangement with any of its suppliers, Ebsary, USG, or Kelley, with respect to its resale price, that it was Structural's policy to resell the board at as near the supplier's price as was possible, that that was just a matter of business prudence; that Structural could not undersell its sources of supply and expect them to continue furnishing it board with which to undersell them. Kellogg testified that while he wanted to know the supplier's prices, not only to determine what the board cost Connecticut Adamant but also in order to know at what price to sell it, he nevertheless at no time had any arrangement, understanding, or agreement with anybody as to the prices Connecticut Adamant would charge for board and lath in resales; that this policy (of selling at the market price, *i. e.*, the licensee price to dealers) was determined without relation to any understanding with anybody, and was not the result of any arrangement with anyone in the gypsum business; that Connecticut Adamant had always been free to sell its prod-

ucts at whatever price it desired. He said, further, that no one from the gypsum manufacturing companies had ever come to him to investigate any price, and no one from Board Survey; and that no one from USG or any other board manufacturer had ever threatened to stop selling board to Connecticut Adamant on account of prices it charged on resales.

That there were no contractual or coercive arrangements by which manufacturing distributors were compelled to resell board at prices fixed by USG is confirmed by the licensees. Lenci testified that Ebsary at no time had any understanding or arrangement with anyone to the effect that it would control or attempt to control the resale prices at which the manufacturing distributors, or any of them, sold board purchased from Ebsary. Tomkins said that his companies, Kelley and Newark, never had any agreement with any of the manufacturing distributors to whom price lists were sent that such distributors would resell board at the prices in such lists or at any other prices. Stromquist stated that he at no time had any agreement, understanding, or arrangement of any kind with Oakfield as to what resale prices that company would charge on board purchased from Universal. Griswold of American testified that Avery of USG did not at any time say anything to him to the effect that control of prices by USG through the license agreement with American would extend to anything but the first sale of the patented article. Neale of Atlantic said that he recalled no effort by himself or by his company to become a party to any understanding or agreement, at licensee meetings or otherwise, to control the resale prices of distributors.

It is apparent from the foregoing that the manufacturing distributors were kept informed by their suppliers of the minimum prices fixed by the USG bulletins for sales of board by licensees to dealers in order that the distributors might figure their own cost, since that was determined by a discount off the dealer price. It is apparent also that the distributors desired to know the dealer prices in order that they might be in a position to compete. They would not be able to sell above, and on the small margin allowed by the discount (a subject discussed in sub-topic (5) (d) of this topic VI) would not be able to sell much below, the prevailing market price. But there is no evidence that they were either contractually bound or in any way coerced to resell board purchased from the licensees at either the dealer price fixed in the bulletins or any other given price. It is obvious that the prevailing market price, at which the manufacturing distributors would for business reasons desire to sell, would normally be the USG bulletin price to dealers. This was the price at which USG and each of the licensees would, under the license contracts, be obliged to sell; and since they manufactured substantially all of the gypsum board in the "Eastern area," their sale price would be the prevailing market price.

(c) *Policing of manufacturing distributors' sales of board:* The Government has introduced evidence which it asserts proves such investigation and regulation of the resale prices of manufacturing distributors on gypsum board as was tantamount to control.

*In respect of Connecticut Adamant:* In Exhibit 463 (a declaration binding only upon USG), a letter of May 8, 1933, from Board Survey by Miller, to Ebsary, Board Survey states that it is advised that Connecticut Adamant is offering patented board, manufactured and sold by Ebsary, to the New Haven Reserve Supply Company, of New Haven, Connecticut, and other New Haven dealers, f. o. b. their warehouse in any quantity, at the licensor's minimum price to Ebsary for minimum carload lots of board, delivered at New Haven. Board Survey asks Ebsary to "Please advise." This the Government apparently relies upon as evidencing policing by Board Survey for USG of Connecticut Adamant's resale price on board. But by Exhibit 467 (a declaration binding only upon Ebsary), a letter of June 13, 1933, Ebsary replied that its customer, Connecticut Adamant, had made no sales of board to New Haven Reserve Supply Company. Lenci testified that this was a complaint by Board Survey against Ebsary; that although it involved Connecticut Adamant also and though the allegation was not spelled out in the letter, Ebsary nevertheless understood that it was a complaint not against what Connecticut Ada-

mant was said to be doing, but against what Ebsary was alleged to be doing in respect of its price to Connecticut Adamant. He said that anyone in the industry would so construe the letter, including Miller, its writer. In Exhibit 464, a letter of May 11, 1933, from Board Survey to Ebsary (a declaration binding only upon USG), Board Survey informs Ebsary that it is advised that Connecticut Adamant sold gypsum board to the Southbury Lumber Company, of Southbury, Connecticut, at the licensor's minimum price to Ebsary and that "This would hardly seem possible if your sales . . . to . . . Connecticut Adamant . . . had been made at the licensor's minimum . . . ." This the Government apparently also relies upon as evidencing policing by Board Survey for USG of the resale price of Connecticut Adamant. But by Exhibit 468 (a declaration binding only upon Ebsary), a letter of June 13, 1933, Ebsary replied that Connecticut Adamant is rated as a manufacturer, and that the discount which Ebsary is accordingly permitted as a licensee to allow it on sales of board enables Connecticut Adamant itself to resell at the bulletin price. Lenci explained that the Board Survey complaint was not against Connecticut Adamant but against Ebsary upon the theory that, in view of Connecticut Adamant's resale price, Ebsary must have been violating the bulletin minimum for licensee sales to dealers; Board Survey had apparently forgotten the manufacturing distributor status of Connecticut Adamant.

It is clear from the foregoing that the "policing" was not of Connecticut Adamant's resale price but of Ebsary's price to Connecticut Adamant.

*In respect of Oakfield:* In a letter from Lenci of Ebsary to Henning of USG written March 28, 1936, Exhibit 512 (a declaration binding only upon Ebsary), and in Exhibit 513A, a complaint against Kelley addressed to Board Survey by Ebsary (a declaration binding only upon Ebsary) naming Oakfield as Kelley's customer, Ebsary alleged that the Delaware Clay Products Company, of Pittsburgh, Pennsylvania, was selling "Oakleaf Gypsum Board" to dealers at the "regular" price, and suggested that Kelley must have arrangements with Oakfield making this possible. Board Survey investigated the complaint. Kelley, on May 1, 1936, in Exhibit 514 (a declaration binding only on Kelley), stated that its sales to Oakfield were made at the scheduled (bulletin) price and that Delaware Clay Products, to whom Oakfield sold, sells board without compensation.[53] Lenci explained this situation and demonstrated that the complaint was against the licensee Kelley rather than against the manufacturing distributor Oakfield, as follows: Oakfield bought the board from Kelley at a discount and then sold it to Delaware Clay Products, which in turn offered the same board for sale at the dealer price. The margin out of which the two companies, Oakfield and Delaware Clay Products, had to make their selling expenses was small—15% on board, 12½% on lath, *i. e.,* this was the discount to manufacturing distributors allowed by the USG price bulletins. Presuming both Oakfield and Delaware Clay Products to pay expenses and make some profit, it appeared that if Delaware Clay Products was selling at the dealer price, Kelley must have been allowing Oakfield more than the discount permitted by the bulletins, thereby violating the license agreement. Thus it appears that the situation was again one in which a complaining licensee, in this instance Ebsary itself, inferred from the activities of the accused licensee's customer, the manufacturing distributor, that the accused licensee was violating the license bulletins. Again the investigation was not of the resale price of the manufacturing distributor, but of the discount allowed by the seller-licensee.

*In respect of Structural:* In a letter of May 6, 1932, Exhibit 438 (a declaration binding only upon Ebsary), Ebsary, first re-

---

[53] Kelley's explanation, although it names Oakfield as the customer involved, is made in terms of Paragon Plaster & Supply Co. The evidence shows that that company, the Paragon Plaster Company, and the American Hardwall Plaster Company were the sole owners of Oakfield, that Oakfield was the plaster producing company for them, and that it stocked plasterboard and lath for mixed car shipments for those companies.

ferring to a USG bulletin establishing a two dollar differential between board shipped in mixed carloads and board shipped in full carloads from metropolitan New York, complained to Board Survey that the Tisdale Lumber Company, of Flushing, New York, had purchased from Structural a mixed car- ad of miscellaneous plaster and board at carload prices. On its face this appears to be a complaint in respect of Structural's resale price. But Lenci explained that the licensees were required by the bulletin provision to charge $2 more per thousand feet on board shipped in mixed carloads than upon board shipped in full carloads (in a mixed carload there are other products and therefore less board than in a full carload) and that since the Tisdale Company had bought less than a full carload quantity of board at the full carload price, i. e., the lesser price, it would appear that Kelley had not charged Structural the $2 differential. The Tisdale Company was a prospective customer of Ebsary, and Kelley's apparently cut price to Structural resulted in the latter's being able to prevent Ebsary from getting the Tisdale business. Thus Ebsary was complaining of an apparent license violation by Kelley, and not of the resale price by Structural.

The Government relies also upon Exhibits 443 and 444 (declarations binding only upon Ebsary and USG, respectively) as evidencing policing of the resale prices of Structural. These exhibits appear to be part of a series of complaints by Ebsary and replies by USG or Board Survey. Neither of these two exhibits mentions Structural or the subject of resale prices. The other exhibits in this series comprise Exhibits 436, 437, 438, 447, 439, 440, 449, 441, 442, 445 and 446 (each of which is a declaration binding only upon Ebsary) and Exhibit 450 (a declaration binding only upon USG).[54] These exhibits, except for the replies by USG or Board Survey, appear on their face to be complaints by Ebsary concerning sales of gypsum board by Structural in small quantities. Lenci testified concerning this that by selling in small quantities Structural was giving a service to its dealer-customers which Eb-

sary as a licensee could not supply, because the USG bulletins required Ebsary to charge for similar deliveries a higher price than Structural was getting. Lenci had concluded from what Structural was doing that Kelley, Structural's licensee-supplier, had made a special arrangement to give Structural an excessive discount which enabled it to cut prices and indulge in the practices which rendered Ebsary non-competitive. His complaints, so Lenci testified, were based upon lack of confidence in the good faith of Kelley in selling to Structural. Lenci said that Ebsary knew that Structural had no license and no obligation with respect to maintenance of prices or other conditions binding upon the licensees. He made clear that in these complaints he was not protesting against Structural or its prices or practices but against Kelley.

It is apparent from the foregoing that when the evidence concerning the alleged control by the defendants of the resale prices on board of manufacturing distributors by "policing" such resale prices is considered as a whole, it fails to establish such control or any attempt thereat. What it does establish is that one licensee was insisting to USG that a competitor-licensee was apparently violating, and should be required to abide by, the minimum price provisions of the bulletins. As pointed out in the statement of facts at the outset of this opinion, there was a "most favored nation" clause in each of the licenses. If one licensee was permitted by USG to sell board on more favorable terms than another the license of the former was in effect being rewritten. The protest of the complaining licensee was therefore natural and one stemming from the provisions of its license agreement.

(d) *Limitation of the manufacturing distributors' discount:* USG fixed the price at which the licensees might sell board and lath (sometimes in this sub-topic referred to as board) to manufacturing distributors at, as above stated, 15% and 12½%, respectively, off the minimum price to dealers. The Government asserts that this was with the purpose of preventing the manufacturing distributors from doing more than bare-

---

[54] The exhibits are listed in chronological, rather than numerical, order.

ly staying in the board business or that, as the Government otherwise phrased it, the discount was set at a figure which would not permit the manufacturing distributors as a business matter to cut prices on their resales of board. The Government says that as a result they resold to their dealer customers at approximately the bulletin price at which USG and the licensees sold to dealers. This, as pointed out earlier in this topic, would normally be the prevailing market price, since USG and the licensees manufactured substantially all of the board and lath in the "Eastern area" and were the principal sellers. The Government contends that in effect, therefore, USG was controlling the resale price and that this was illegal.

Hansen of Oakfield testified that the discount at which the board manufacturers sold to manufacturing distributors gave Oakfield a very small margin of gross profit in reselling; further, that Oakfield could not get more for its board from its dealer-customers than the amount at which the latter could buy the same board from Oakfield's supplier, Kelley, and that Oakfield did not want to take any less than it could obtain. McCormack said that the only reason Structural sold board was to aid its plaster sales; that it was an accommodation to Structural to get the board from the suppliers because Structural needed it to round out its sales to dealers; that Structural, he thought, did not ever make any great profit out of the board business, although no cost study was ever made to determine that definitely. He would not say that Structural was not in the business of buying and reselling board because of the profit involved, as the company evidently made a small profit, but it was not much since a good part of the discount would have to be charged off to selling expense, handling and warehousing. He admitted, however, that, although the margin of profit was very low, Structural sometimes split its discount on board with jobbers. Lenci of Ebsary testified that generally speaking the 15% margin on board would be used up by a manufacturing distributor in overhead and handling charges; that the basic reason for the discount was to enable the manufacturing distributors to avail themselves of the accommodation of being able to offer board in mixed carloads to their dealer-customers; that it was never designed to permit the distributors to make a profit, but to give them board which they could ship to their customers along with their other products.

Since Hansen said nothing as to net profit and McCormack said that there was a profit, though small, and Lenci's testimony, although to the effect that the discount was designed not for profit but for accommodation, indicates nothing as to the actuality of profit or loss in manufacturing distributors' resales, it cannot be concluded that there was no profit whatever. And while the testimony shows that it was an advantage to the distributors to stock the board for resale along with their plaster products, there is no evidence that it was necessary for them to have board to remain in business, none that they were threatened that board would be withheld unless they resold at the dealer price, and none that they were parties to any contract to resell at the dealer price. They were legally free to resell at any price they chose, although economically it would have been difficult for them to resell at more than the market price, other conditions being equal, and they would probably not wish to sell at less if that would entail a loss. It may be assumed that as a normal economic consequence of the setting of the discount at a figure approximating the cost of handling the board, the manufacturing distributors ordinarily resold at approximately the price, if not, indeed, at the exact price, at which USG and the licensees sold direct to dealers, i. e., the prevailing market price; and it may be assumed that USG contemplated that this would occur and had in mind the protection of its minimum price structure.

But the Sherman Act does not condemn the normal economic consequences of acts which are themselves legitimate under the patent laws. Therefore the contention of the Government that USG is guilty of illegal control of the resale prices of manufacturing distributors necessarily rests upon the premise that it was unlawful for USG to fix the discount on an approximate cost of handling basis, rather

than on one which would allow the distributors a substantial profit and thereby enable them to resell at less than the market price. This premise cannot be sustained. As a patent owner USG, under the doctrine of the General Electric case, had a right to license the making, using and vending of the patented product upon any condition the performance of which was reasonably within the reward which the patent owner by the grant of the patent is entitled to secure. One of such rewards is extended marketing of the product. This will be promoted by additional outlets. USG might therefore properly give a discount incentive to manufacturing distributors to buy board from USG or the licensees and thereby the advantage of handling it in connection with their plaster products. But a patent franchise does not constitute the patentee a public utility whose product must be sold at the same, regulated, price to all who offer to buy. USG was not obligated under either the patent laws or the Sherman Act to sell board or to permit its licensees to sell board to manufacturing distributors. As has been noted in sub-topic (4) of this topic VI, the decision in the General Electric case sanctioned patent licensing arrangements whereunder all sales of the patented product were to be made to consumers only and not to jobbers or dealers. And USG was under no duty, if it did make or permit sales to manufacturing distributors, to set a licensee price which would assure the distributors a profitable margin for resales; it could set such price as it chose.

The Government's contention that USG exercised illegal control over the resale prices of manufacturing distributors on board and lath cannot be sustained. There is no evidence of contractual or coercive control. Reselling by the manufacturing distributors at or about the dealer price was but the normal economic consequence of limitation of the discount to an approximate cost of handling margin. This limitation was lawful; the normal economic result cannot be unlawful.

█ It is concluded that there is no substantial evidence that the defendants either by use of the consent clause, by supplying the manufacturing distributors with information as to dealer prices on board, by policing manufacturing distributors' sales, by limiting the discount to approximately the cost of handling, or in any manner, fixed the prices at which manufacturing distributors resold gypsum board.

█ It is therefore concluded, in respect of the whole of the second issue of fact, that the evidence fails to establish that the operations of the defendants were carried beyond the proper limits of the patent monopoly and licensing thereunder, i.e., beyond the activities contemplated by the agreements as written and into the field denounced by the Sherman Act.

## VII

### SIGNIFICANCE OF THE EVIDENCE, ASSUMING THE DECLARATIONS CONNECTED; THE ASSERTED PLAN TO BLANKET THE INDUSTRY UNDER PATENT LICENSES

█ *Significance of the evidence, assuming the declarations connected:* In topics V and VI of this opinion we have been at pains, in examining the evidence which the Government appears to rely upon as proving the combination and conspiracy charged in the complaint, to consider as binding only upon the declarant the declarations which were received in evidence subject to connection. This was our duty, the limitations upon the declarations rule having been invoked by the defendants and the Government having failed, as shown in topic IV, to prove by evidence outside the declarations the existence of the conspiracy charged. But in view of the importance of this case and the consequent probability that it will reach a higher tribunal, we think it desirable also to state our views as to the meaning of the evidence when the declarations are considered as binding not merely upon the declarant but also upon all of the alleged co-conspirators. We have considered the evidence in this light, and we think the Government still has not proved that the license agreements were executed not as bona fide license agreements reasonably designed to secure to USG the pecuniary rewards of its patent monopoly but only as sham agreements to give color of legal-

ity to the illegal purposes alleged in the complaint, and has not proved that the operations of the defendants were carried beyond the proper limits of the USG patent monopoly, and therefore has not proved the combination and conspiracy charged. The evidence discussed in topics V and VI no more proves lack of bona fides in the execution of the license agreements, or operations beyond the limits of the patent monopoly, when the declarations are regarded as binding upon all of the alleged co-conspirators, than it does when such declarations are considered as binding only upon the declarant. This is necessarily so —in the view we take of the significance of the declarations. Since, as demonstrated in topics V and VI, they fail to convict the declarants themselves of lack of bona fides in the execution of the licenses, or of operations beyond the proper limits of the USG patent monopoly, they cannot convict others thereof.

There is, however, in the record additional evidence, including declarations, not heretofore alluded to because aggregated and relied upon by the Government as relevant to a special contention to be discussed below. This evidence consists in the large of intra and inter-company correspondence relating to the terms upon which USG was offering to settle litigation and extend licenses, and the advantages and disadvantages of taking licenses; included is testimony explanatory of this correspondence. The following items sufficiently illustrate the character of this evidence:[55]

(a) Exhibit 185, a memorandum sent by Blagden of Beaver to Avery of USG in December, 1925. This suggests, as an alternative to possible reversal of the USG-Bestwall-Beaver decision of July 21, 1925, a settlement and license enabling USG to maintain "a lawful price control" through the "legitimate means of patent licenses," Blagden to endeavor to induce other manufacturers to accept licenses and permit USG to take a "dominating position."

(b) Testimony by Blagden that after the Beaver-USG license was signed in July, 1926, in conversations from time to time with some of the other members of the industry, upon their inquiring about the Beaver license, he advised them to "join up."

(c) Exhibit 189, a letter of October 1, 1926, from Blagden to Avery in which Blagden said that "the 'entente cordial' that has started between our companies is only a beginner and

. . . if we play the game right, it should bring about big things."

(d) Testimony of Blagden that he advised George M. Brown of Certain-teed that he could not afford to make board without the superior folded edge and advised him to take a license for his own best interests and get "with the others" the benefit of price stabilization, i. e., "the benefit of the license price, which would be the same price" to all.

(e) Exhibit 123, a letter of October 15, 1926, in which Griswold of American wrote Avery that a committee from American expected "to meet with all other Manufacturers of board who have not yet signed the License Agreement. . . . with the object in view of getting united action . . . ."

(f) Exhibit 124, a letter of October 19, 1926, in which Avery replied expressing appreciation for Griswold's interest and for the "broad-visioned manner with which you [Griswold] have proceeded with this important subject" and said that he would be interested in hearing from Griswold after the meeting.

(g) Exhibit 132, a letter of January 3, 1927, in which Griswold wrote Avery that he had started out "to deliver 100 per cent of the manufacturers of board that would be willing to sign up on a license agreement with your company . . . ."

(h) Exhibit 136b, a letter of March 24, 1927, from Griswold to Williams of National in which Griswold reported that Texas had recently decided to take a USG license and since that decision had "reached the decision to join in our proposition so they will become one of the group which we are merging," and that Atlantic signed and that if Certain-teed which was considering it "comes in" and National, that "will make it 100% with all manufacturers who will be operating under the license agreement and will do away with the legal complications which have existed in the past and which are so unpleasant as well as expensive."

(i) Exhibit 104, a letter of May 12, 1926, by Griswold to McCrady of American stating that Blagden had had interviews with Avery in respect of settlement of disputes and litigation between the wallboard manufacturers by a licensing arrangement and that (according to Griswold) the outlook is favorable and "According to the plans we have we figure that there is a possibility of us holding the price steady on wall board for the next fourteen or fifteen years which means much to the industry."

(j) Testimony of Holland of Universal that he suggested to Griswold in September, 1928, that American ought to take a USG license like Universal's—so that the industry might make the better board since the open-edge board was giving wallboard generally "a black eye."

(k) Exhibit 204, a letter of January 7, 1929, in which Holland wrote Haggerty of National that an effort should be made to hold another meeting of those interested in the board situation; that American cannot hope to gain by delaying the settlement because this will demoralize prices throughout 1929.

(l) Exhibit 206, a letter of January 12, 1929, wherein Holland tells Haggerty that he thinks that the matter of future prices after the Utzman patent ran out was not keeping American

---

[55] This evidence is discussed on pages 9 to 43 in the Government's Memorandum filed May 5, 1944, in opposition to the motions now under consideration.

out because Avery had other patents, and that "it is my opinion that if you and the others interested in the settlement of the wallboard controversy bring enough pressure to bear on the American crowd . . . something can be done."

(m) Testimony of Holland that he "kept trying to talk these people [other manufacturers] into taking out a [closed-edge] license."

(n) Testimony of Griswold that in a conversation in April, 1928, with George M. Brown, Griswold discussed with him the advisability of Certain-teed's taking a license and making closed-edge instead of open-edge board which was then selling at a rather low price, and that Brown said that if all the other manufacturers took out a license, or certain of them, he might consider it, but that he felt that Certain-teed's competitors, especially Ebsary, since it was a "pretty hot" competitor of Certain-teed's "in that territory," should also be licensed.

(o) The fact that Texas signed its 1927 license after Griswold in Exhibit 157, a letter of April 9, 1927, receipt of which Gloyd of Texas acknowledged in Exhibit 158 (dated April 11), advised that Certain-teed was willing to take a license and that Avery, who had been opposed, had yielded to the persuasion of Blagden and himself and would consider Certain-teed's application, and that National would file application and that with American that "will make the matter one hundred percent."

(p) Exhibit 198, minutes of a May 14, 1929, directors' meeting of National reciting a statement by the chairman that he had been "informed that all other manufacturers of gypsum products , . . except . . . American . . . had agreed to sign the license contract in substantially the form as submitted to this Board," and setting forth a resolution authorizing the proper officers to execute a license agreement with USG in the form submitted.

(q) Exhibit 716, a telegram of May 17, 1929, from Baker of National to Avery in which Baker advised that National was "working with Ebsary with hope of everybody being set by Saturday to justify your calling meeting all board makers Monday if you like," and that Reeb of Niagara was ready.

(r) Exhibit 205, a letter of January 9, 1929, in which Haggerty wrote Holland that it was a question in his mind "whether or not the other four board makers, who are outside the license agreement, feel that it would be advantageous to go in without the American Gypsum Company," and that "the chief value in a meeting would be to discuss that point," and that "If this price control feature was discontinued in August, as is the case in the present form of the agreement, how could we expect the cooperation of the United States Gypsum Company in anything bearing upon a discussion of price"; that USG's position would then "be exactly what it is now, and rightly so," i. e., unwillingness to discuss price before a license agreement with the price control feature is signed.

(s) The admission in Ebsary's answer that "prior to May, 1929 Ebsary had conferred with others concerning the contemplated license", and that in May, 1929, prior to the meeting of the 22nd, "there was a meeting or conference between these defendants and U.S.G. and others, at which there was discussed the granting by U.S.G. to the defendant Ebsary and others of a license . . . .."

(t) Testimony of Lenci that he went to Chicago for the May, 1929, meeting pursuant to a previous arrangement.

(u) The fact that Channing attended the May, 1929, meeting in Chicago, notwithstanding that Atlantic was already a licensee, having executed its license in March, 1927.

This evidence, even when silhouetted, i. e., looked at out of context with the other evidence in the record which has been reviewed in topics IV, V and VI, and considering the declarations as binding upon all, does not prove the conspiracy charged for there is nothing in it, as inspection of the foregoing illustrative items will show, indicating that the licenses which USG was willing to grant were to be, or that when executed they were, sham licenses signed to give color of legality to illegal purposes, or that the operations of the defendants were carried beyond the proper limits of the USG patent monopoly. Indeed, Exhibit 185 (item (a)), especially emphasized by the Government, refers to "a lawful price control" by USG through the "legitimate means of patent licenses"; and the very openness of the intra and inter-company discussions and suggestions with respect to the advantages and disadvantages of taking USG licenses bespeaks good faith in the execution of the licenses. There is nothing at all in this evidence to indicate that there was to be improper standardization, price fixing upon unpatented materials, improper restriction upon distribution of gypsum products through jobbers, or control of resale prices of manufacturing distributors. The references to price stabilization are no evidence of illegal purpose in the absence of a showing of lack of good faith in the execution of the license agreements, for under the Bement and General Electric cases price control by a patent owner is lawful; hence it could not be unlawful for USG as patent owner or the (prospective) licensees to desire and anticipate its results.

If the evidence above referred to does not, when looked at by itself, prove the elements of lack of bona fides in the license agreements and intent to accomplish objectives beyond the proper limits of the USG patent monopoly necessary to establish the conspiracy charged, a fortiori it does not do so when looked at in context with the other evidence in the case, even though the declarations in this and the other evidence :

are considered, in disregard of the limitations upon the declarations rule, as binding upon all of the alleged co-conspirators.[56]

*The asserted plan to blanket the industry under patent licenses:* What the Government especially contends that this additional evidence proves is that the defendants "have . . . associated themselves together in a common plan or enterprise to blanket the gypsum industry under . . . license agreements" and "stabilize prices." But assuming, *arguendo,* that this evidence does show a common plan under which the defendants and their predecessors in the "Eastern area" were to take patent licenses from USG with price restrictions and consequent price stabilization, this, in the absence of sham licenses and an intent to accomplish objectives beyond the proper limits of the patent monoply, would not be illegal. It is not unlawful to agree to do what is not unlawful when done. It has been demonstrated in topic II that the parties to a patent license agreement containing a price control provision have in the negotiation and execution of the same "conspired" and "combined" to restrain trade actually, but not unlawfully because the patent laws permit this so long as the license is bona fide and not intended to accomplish objectives beyond the proper limits of the patent monopoly. Under such a license there is actual restraint of trade, but no illegal restraint. If two such licenses (a plurality of licenses) were severally executed, each bona fide and without objectives beyond the proper limits of the patent monopoly, the totality thereunder of actual restraint of trade in the patented product would be the sum of the actual restraints under each, and the totality of illegal restraint none. And if in the case of two such licenses (a plurality), the two (prospective) licensees and the patent owner were in advance to agree with each other (associate themselves together in a common plan) that the two licenses should be executed, and if they were executed, still the totality of actual restraint under such licenses would be no more than if they had been executed without prearrangement; and the totality of illegal restraint would, again, be none—for each license when executed would in itself be lawful. Into howsoever large a plurality this be carried, the result is the same, *i. e.,* the totality of actual restraint of trade in the patented product is the sum of the actual restraints under each of the license agreements, and no more; and the totality of illegal restraint is none. If A, B, C, D, E and F agree in advance with each other and with P, a patent owner, that each shall sign a bona fide patent license to be granted by P, with control of the price of the patented product in P, the only additional restraint, as compared with the totality of restraint if the same licenses were executed severally, *i. e.,* without prior agreement, would be the disablement of A, B, C, D, E and F, in view of their contract to take licenses from P, to take them from X, *i. e.,* some other patent owner. But the instant case does not, under the complaint, concern itself with interstate trade in patent licenses; it has to do only with interstate trade in gypsum products.

In short, the contention of the Government that the additional evidence referred to in this topic VII proves that the defendants associated themselves together in a common plan "to blanket" the gypsum industry under patent licenses and stabilize prices, and that this is unlawful, fails for want of support in law in view of the Bement and General Electric cases, even if proved in fact—unless the licenses were to be sham and the objectives under them be-

---

[56] It is, indeed, doubtful that the Government even contends that this additional evidence proves lack of bona fides in the licenses or operations beyond the proper limits of the patent monopoly. Throughout the introduction of evidence and the oral argument, in which emphasis was placed by the Government on the charge of lack of bona fides in the licenses, they were variously referred to as "sham," "subterfuge," "coverup," "not bona fide." In the Government's briefs filed in opposition to the present motions there is little on this subject or in these terms, and in that part of the memorandum which aggregates the additional evidence now under discussion (pages 9 to 46 of the Government's Memorandum of May 5, 1944) there is nothing; and nothing concerning operations beyond the proper limits · of the patent monopoly.

yond the proper limits of the USG patent monopoly. Given a right under the patent law to grant a plurality of bona fide licenses with price control provisions but no objectives beyond the proper limits of a patent monopoly, it can make no difference in either totality of actual restraint, or in law, whether the several licenses are executed with, or without, prearrangement between the patentee and the prospective licensees as a group. The vice in the Government's contention in this respect is that it assumes that agreement or action in concert by competitors in industry is under all circumstances inherently and necessarily unlawful, when the fact is that it is not unlawful unless it has an unlawful end or contemplates unlawful means.[57]

We have assumed above, *arguendo*, that there is proof of the contention that the defendants associated in a common plan "to blanket" the gypsum industry under patent licenses and stabilize prices. But though it may be said that the evidence especially aggregated by the Government in proof of this contention tends to support it if looked at alone, it cannot be looked at alone. As said in topic III under the subtopic "Principles of Proof," an inference to be reasonable must be warranted from all the evidence, otherwise a fact reasonably inferable from a single fact, or group of facts, might be inconsistent with the totality of proven or conceded subsidiary facts. National Labor Relations Board v. Union Pacific Stages, 9 Cir., 1938, 99 F.2d 153, 177. "Testimony is the raw material out of which we construct truth and, unless all of it is weighed in its totality, errors will result and great injustices be wrought." National Labor Relations Board v. Thompson Products, 6 Cir., 1938, 97 F.2d 13, 15.

When the evidence referred to above in this topic VII is considered in connection with other related items, it fails to prove that the defendants associated in a plan to blanket the industry under patent licenses and stabilize prices:

The Government especially emphasizes Exhibit 185, the memorandum sent by Blag-

den of Beaver to Avery of USG in December, 1925, suggesting a settlement and license enabling USG to maintain a lawful price control and to take a dominating position in the industry (item (a) set forth above in this topic). Segregating this memorandum from other evidence to which reference is made below, the Government couples it with the facts that after several meetings between Avery and Blagden in June and July, 1926, the Beaver-USG license agreement was signed (on July 29); that Blagden testified that he talked with other members of the industry on the subject of a license and advised them to "join up" (item (b)), and specifically with George M. Brown whom he advised to take a license and get the benefit with the others of price stabilization, *i.e.,* of the license price which would be the same price to all (item (d)); that Blagden referred in correspondence with Avery to the "'entente cordial' that has started between our companies," Exhibit 189 (item (c) ); that Avery, according to a statement by Griswold, had yielded to the persuasion of Blagden and himself and would consider Certain-teed's application for a license (item (o) ); and that ultimately the various other companies took licenses. And the Government urges that from this an inference should be drawn that there was an agreement between Beaver and USG that an industry wide license system would be promoted. But when such evidence is looked at in context with other related evidence, including uncontradicted and unimpeached testimony, the inference which the Government draws is seen not to be justified. In the first place the evidence shows that the right to the use of USG's patents covering the closed-edge gypsum board, a superior product cheaper to make and demanded by the trade, was needed by the other manufacturers. This is made to appear in greater detail in topic V of this opinion. The decisions in the USG infringement suits against Bestwall and Beaver had, however, made it impossible for competitors of USG to manufacture the closed-edge board without infringing USG's

---

[57] It is common knowledge that there are numerous national trade associations which agree upon and carry out plans for industry betterment without coming within the condemnation of the Sherman Act.

patent rights. The trial court decision in USG's favor in the second suit was rendered on July 21, 1925. Recognizing the difficulty of Beaver's position and the approach of the time when a final judgment for large damages might be entered (the ultimate settlement with Beaver involved a $250,000 damage payment), Blagden made overtures to Avery to settle the litigation and at a meeting between them in December, 1925, Avery specified the terms upon which USG would settle as described in the statement of facts at the outset of this opinion. At the time of this discussion and offer of settlement on the basis later adopted for the USG-Beaver settlement Blagden did not have with him the memorandum, Exhibit 185—it had been in course of preparation by Blagden's lawyer; and there is no evidence that the subject matter in it was ever discussed by Blagden or Avery or that the memorandum was ever seen or its contents discussed by any other persons in the industry. Blagden testified that he did not discuss with Avery the matter of all companies' settling disputes and taking licenses. The evidence shows that Beaver settled its lawsuit and took a license without regard to the other companies. Blagden so testified, and he testified also that he had nothing to do with the taking of licenses by Universal in September, 1926, Atlantic in March, 1927, and Texas in April, 1927—and these were the only licenses which were executed while Blagden remained in the gypsum business; indeed, until after Certain-teed had taken over the Beaver company on January 20, 1928, and repudiated the USG-Beaver settlement and license. He testified that he left this business in 1928. In this early period USG had patent infringement suits against other gypsum board manufacturers —as appears in the statement of facts at the outset of this opinion—suits similar to that which had been prosecuted against Bestwall and Beaver. Except for USG, Beaver was the largest gypsum board manufacturer in the industry at the time and therefore the other companies were naturally interested in what Beaver was going to do about a settlement and license and what terms it would be able to get

from USG. As Blagden put it, his company was regarded as the "guinea pig" of the industry. When other companies inquired about the USG-Beaver settlement and license, Blagden as a matter of course answered the inquiries and, since he disliked litigation and regarded the Beaver license as an advantageous contract because it permitted the manufacturer to supply the demand of the trade with a superior product at less cost, he usually recommended that the other companies settle and take a license. All this appears from his testimony. And it is in this context that he said that he suggested that the other companies "join up," and in the same context that he advised George M. Brown to take a license and get with the others the benefit of price stabilization.

In respect of Exhibit 189 (item (c) ) and the "entente cordial," Blagden testified that he meant that the "bickering and squabbling and fighting" which had been going on between Beaver and USG was over upon the signing of the license agreement, and that the two companies were again friendly; that the phrase "entente cordial" was merely his expression in respect of the better feeling that probably would result from the settlement and license; and that by "if we play the game right" he meant only living up to the license agreement and obeying the published prices of USG and that in this respect he was referring only to Beaver's agreement with USG.

The Government stresses Griswold's letter to Avery of October 15, 1926, Exhibit 123 (item (e) ), referring to a committee from American which expected "to meet with all other Manufacturers of board who have not yet signed the License Agreement. . . . with the object in view of getting united action," and Avery's reply stating that he would be interested in hearing from Griswold after the meeting, Exhibit 124 (item (f) ), and the letter of January 3, 1927, in which Griswold wrote Avery that he had started out "to deliver 100 per cent of the manufacturers of board that would be willing to sign up on a license agreement with your company," Exhibit 132 (item (g) ), and the letter of March 24, 1927, from Griswold to Williams of National referring

to Texas' "decision to join in our proposition so they will become one of the group which we are merging" and that with Atlantic which had signed and Certain-teed which was considering coming in and National that "will make it 100% with all manufacturers who will be operating under the license agreement," Exhibit 136b (item (h) ), and Griswold's statement in a letter of April 9, 1927, to Gloyd advising that National would file application and that with American and Certain-teed whose application would be considered by Avery, that "will make the matter one hundred percent," Exhibit 157 (item (o) ). But again when these items of evidence are looked at in the context of other related items it is seen that they do not prove that the defendants associated themselves together in a plan to blanket the industry under licenses. In the first place the correspondence between Griswold and Avery in the fall of 1926 and the early part of 1927 indicates that, while Griswold discussed the matter of a license agreement with various gypsum board manufacturers, some of the companies, including Griswold's own company, American, told him that they were not satisfied with the license offered and that USG refused to make any concessions from the terms of the settlement and license which had been given to Beaver and Universal. This especially appears from Exhibits 123 through 135 and Exhibit 191. Avery made clear that he would not change the terms which he had announced at the time of the Beaver settlement and license. As he said in Exhibit 134, a letter of February 2, 1927, to Griswold, "I can hold out no encouragement to you for any change in our position." Thus there was no unanimity. Next it is made clear by Griswold's testimony that he was not an agent or emissary of Avery's. His statements to this effect were categorical and convincing. They have been referred to in topic V of this opinion. Griswold testified that he had nothing to do with the taking of the Universal and Texas licenses and nothing to do with the taking of Atlantic's license except to answer Atlantic's questions with respect to the process of manufacture of wallboard, advising that if Atlantic was going into the board business it was best to make the closed-edge board, if Atlantic could reach an agreement with Avery, and sending Atlantic a copy of the USG license. Still further, it is to be noted that the Government's emphasis of the items just mentioned leaves out of account Griswold's interest in a merger. Throughout the period of time covered by these items Griswold was working on a merger of American and most if not all of the other manufacturers except USG, the merged company to take a license, and the evidence convincingly indicates that at all times the thing which was uppermost in Griswold's mind was the success of this merger. He makes continual reference to the subject throughout his correspondence, including Exhibit 157 and Exhibit 136b above referred to. The evidence fails to show that either Avery or USG had anything to do with the origination of this venture. It was Griswold's enterprise. But Griswold knew that his plan for a merger could not be consummated with outstanding infringement suits and the existence of a very real possibility of judgments for infringement damages against some or all of the proposed constituent companies. Griswold's testimony shows that he had a firm conviction that a gypsum board manufacturer must make a closed-edge board in order satisfactorily to continue in business. This made it imperative that he remain in a position to obtain a license for his merged company. His testimony also indicates that he believed that the litigation and bad feeling throughout the industry would bring about increasing bitterness and turmoil and eventually result in price wars and chaotic conditions generally. It is fairly inferable also from his testimony and the circumstances that he was not without hope that he might get special concessions in connection with USG's damage claims against his own company by giving Avery the impression that he was promoting USG's interests. The amount Avery first had in mind, according to the evidence, for infringement damages to be paid by Beaver, was a million dollars. Especially in respect of Exhibit 136b, Griswold testified that when he wrote it he had talked to Williams as to the possibility of National's becoming

part of his contemplated merger. Therefore what he meant by "our proposition" and "make it 100%" in this letter, and by the phrase "deliver 100 per cent" in Exhibit 132, and by "united action" in Exhibit 123, was the getting of all of the companies other than USG into his proposed merger. Obviously Griswold recognized that this would settle the unpleasant and expensive litigation, or, as he put it in Exhibit 136b, do away "with the legal complications which have existed in the past and which are so unpleasant as well as expensive."

As evidencing a plan to blanket the industry under licenses the Government refers to the testimony of Holland that he suggested to Griswold in 1928 that American ought to take a USG license like Universal's (item (j) ), to the letter of January 7, 1929, in which Holland suggested to Haggerty of National that an effort should be made to hold another meeting of those interested in the board situation and that American could not hope to gain by delaying the settlement, Exhibit 204 (item (k) ), to Haggerty's reply indicating that in his view the chief value in a meeting would be to discuss whether or not the other four board makers who were outside the license agreement would think it advantageous to go in without American, Exhibit 205 (item (r) ), to Holland's letter of January 12, 1929, telling Haggerty if he and the others interested in the settlement of the wallboard controversy "bring enough pressure to bear on the American crowd" something can be done, Exhibit 206 (item (1) ), and to Holland's testimony that he "kept trying to talk these people [other manufacturers] into taking out a license" (item (m) ). But these items of evidence when looked at in connection with other related evidence in the case are seen not to indicate such a plan, but to involve Holland's interest in accomplishing a merger of his own. Holland became president of Universal early in 1928. The evidence shows that he regarded closed-edge board as a product much superior to the open-edge variety. He was struggling to keep Universal out of receivership and he recognized that the future of the company was endangered by the chaotic conditions in the industry, which he attributed primarily to the litigation and dissension. His testimony shows that he sought to save Universal from bankruptcy through an attempted merger of various of the smaller manufacturers, and that the merger proposal had been promoted by New York underwriters. Holland's testimony shows that his interest in this merger was solely on account of his own company. It appears also that he sought to clear up the litigation in the industry, and that, thinking that the closed-edge board was a better product, he would have liked to have all the companies making that variety of board rather than the open-edge which was giving wallboard generally "a black eye"—in Holland's language; that is to say, he was interested in promoting better conditions so far as marketability of gypsum board was concerned in order to help his company as well as the other manufacturers out of their unfortunate financial situation due to the litigation and the price war. In view of Holland's interest in a merger and in improvement of the condition of his own company, his comments in Exhibit 204, in respect of the desirability of holding another meeting and American's delaying the settlement, and in Exhibit 206 concerning bringing pressure to bear upon American, are understandable and it is clear that they have no reference to an alleged USG plan to blanket the industry under patent licenses. Holland testified that he was at no time a representative of USG and that he never had an understanding or agreement with USG or with anyone in that company that he would promote any plan looking toward the licensing of all of the industry under price fixing agreements. Indeed, it appears that he found Avery on several occasions when he talked with him in 1928 and 1929 somewhat disinclined to discuss the matter of settlement and license —"a very hard man to reach, he rather ignored me most of the time in my efforts to bring about a discussion." Holland stated further, categorically, that whatever he did during this period 1928–1929 in connection with license agreements he did on behalf of the Universal company or himself and no one else, except possibly in respect of his proposed merger in which

of course other companies would be involved.

As evidencing a common plan or enterprise to blanket the industry under licenses and stabilize prices, the Government refers to the letter of May 12, 1926, written by Griswold of American to McCrady of the same company stating that Blagden had had interviews with Avery in respect of settlement of disputes and litigation between the wallboard manufacturers by a licensing arrangement and that "According to the plans we have we figure that there is a possibility of us holding the price steady on wall board for the next fourteen or fifteen years," Exhibit 104 (item (i) ). But Griswold testified that when he wrote that letter he assumed that USG would fix prices under the Birdsey patent which had issued in 1920 and had therefore, out of twenty years to · run (Griswold's understanding of the life of a patent), fourteen years remaining, and Griswold said that he figured that if "the different parties" took out a license agreement with USG and the law gave USG the right to establish the price at which a licensee could sell the product, the price of wallboard would remain fairly stationary unless disturbed by competition of other products. But he testified further that he did not mean by the statement in the letter to McCrady that he had any understanding with Avery or anyone else that price control would be extended under some patent after the expiration of the Utzman patent; that he never had any discussion with Avery or anyone else about Avery's finding some patent other than the Utzman patent to give a longer price control, his understanding being that the price control would end at the expiration of the patent. Griswold testified also that the reference in this letter to holding the price steady was his own statement, not Blagden's. Blagden testified that he did not discuss with Avery the matter of all companies' settling disputes by taking licenses, and that he did not have a plan for holding the price steady for fourteen or fifteen years.

The testimony of Griswold to the effect that George M. Brown of · Certain-teed had said that if all the other manufacturers, or certain of them, took out a license he might consider it but that he felt that Certain-teed's competitors, especially Ebsary, should also be licensed (item (n) ), is apparently relied upon by the Government as evidencing an insistence on the part of Certain-teed that all in the industry must be licensed. But Certain-teed's license when executed was not conditioned, under the evidence, upon any other manufacturer's taking a license. Moreover, Griswold testified that at no time did National, Certain-teed, Ebsary and Niagara agree with one another that they would take out a license. Whittemore of Certain-teed testified, as has been pointed out in topic V of this opinion, that the decision which he and George M. Brown and the · management of Certain-teed made to settle with USG and take a license had nothing to do with any other company in the business, and that Certain-teed took the license because it desired to manufaucture the Utzman closed-edge board and also to get rid of the possibility of future litigation. George M. Brown testified in respect of taking the May 1929 license that Certain-teed "had determined . . . to go ahead with it without regard to what other companies did about it." Indeed, Brown testified that "we didn't care what others did, and we would have preferred, if · we could have had the say about it, that some of them shouldn't have the right to make it, because we didn't think they would respect the obligations that we had to respect." Brown thought that some of Certain-teed's competitors "if they took licenses, would not respect the price which United States Gypsum fixed" and that that "would be annoying."

The recital in the minutes of the May 14, 1929, directors' meeting of National of the chairman's statement that he had been "informed that all other manufacturers of gypsum products . . . except . . . American had agreed to sign a license contract in substantially the form submitted to this Board," and the resolution authorizing execution of a license agreement with USG in the form submitted, Exhibit 198 (item (p) ), are equivocal. It is without dispute that the various companies

were at about this time considering the May 1929 licenses. It is no more inferable from these minutes that the various (prospective) licensees had agreed with each other to sign the license contract with USG than it is that they had agreed severally with USG to do so. Moreover the chairman's statement recited in the minutes is mere narrative.

The Government urges that the telegram of May 17, 1929, in which Baker of National advised Avery that National was "working with Ebsary with hope of everybody being set by Saturday to justify your calling meeting all board makers Monday if you like," and that Reeb of Niagara was ready, Exhibit 716 (item (q) ), and the admission in Ebsary's answer that prior to the Chicago meeting of May 22, 1929, Ebsary had conferred with others concerning the contemplated license and that Ebsary and USG and others had met and discussed the granting by USG of a license (item (s) ), and the testimony of Lenci that he went to the May, 1929, meeting in Chicago pursuant to a previous arrangement (item (t) ), and the fact that Channing attended the Chicago meeting notwithstanding the fact that Atlantic was already a licensee (item (u) )—all tend to evidence that the Chicago meeting was pre-arranged. It seems not to be disputed by the defendants that this meeting was pre-arranged. But this is not necessarily evidence of an association of National, Certain-teed, Ebsary and Niagara in a common plan or enterprise to blanket the entire gypsum industry with licenses and stabilize prices. Under the evidence every company in the industry was interested in settlement or avoidance of litigation and in securing a right to make the closed-edge board, and each company which contemplated taking a license was interested, in view of the "most favored nation" clause in the contracts already executed, i.e., the 1926-1927 contracts, to see that the others got no better terms. This may well account for the attendance of Channing at the May, 1929, meeting. Moreover, each of the companies contemplating taking licenses would naturally be interested in attending the meeting in order to know whether the others were

going to settle with USG. But Lenci testified that there was no general understanding at the Chicago meeting, and that so far as he knew the other (prospective) licensees each determined to take a license before going to Chicago. He testified also that Ebsary's conclusion to take a license was reached independently, without regard to what other companies would or would not do. Whittemore testified that notwithstanding the fact that representatives of other companies were in attendance at the May, 1929, meeting, Certain-teed made its agreement with USG independently, that the Certain-teed negotiations were conducted with USG individually, and that there was no agreement or understanding or concerted action of any kind among the manufacturers.

## VIII

### AUTHORITIES RELIED UPON BY THE GOVERNMENT

The Government especially relies in the substantive aspects of the case upon United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461, rehearing denied, 1942, 316 U.S. 713, 62 S.Ct. 1302, 86 L.Ed. 1778; Interstate Circuit v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20, 33 S. Ct. 9, 57 L.Ed. 107; and American Equipment Co. v. Tuthill Bldg. Material Co., 7 Cir., 1934, 69 F.2d 406. These cases have been briefly mentioned in various contexts in previous topics of this opinion, but will now be discussed at greater length.

In the American Equipment case the American Equipment Company, owner of a patent upon a mechanical brick handler used to move small quantities of brick from car to kiln and kiln to car but which did not affect the shape, size, quality or color of the brick, an unpatented product, granted a license for its use to brick manufacturers who made 90% of the brick used in the Chicago area. The patent owner assigned each licensee a production quota and instituted a royalty of a given price per thousand of brick made and delivered from the licensee's yard; but if the quota was either exceeded or not

reached a substantial penalty royalty upon the amount of the deviation was added. Prior to the establishment of this license and quota system the price of brick in the Chicago area had varied from $3.75 to $10 per thousand; thereafter it was stabilized, remaining for one ten year period at $12, notwithstanding wide and continual fluctuation in the price of brick materials. During a period of twenty-one years the various licensees complied with the quota or paid the penalty for deviation. But during the succeeding two year period one licensee (Tuthill Building Material Company), although it sold brick much in excess of its quota, paid only the quota royalty, and the patent owner brought an accounting suit for the penalty royalty due upon the brick which exceeded the quota. Recovery was denied upon the ground that the parties to the licenses had, by means of the rigid limitation upon output, fixed prices upon an unpatented product and that such price fixing, not the use of the brick handling machine, was the dominant purpose of the license agreements. The Circuit Court of Appeals approved the doctrine of the General Electric case but held it not applicable.

The distinction between the American Equipment case on the one hand and the General Electric case and the instant case on the other is obvious. The General Electric case warrants price control by the owner of a product patent in order that he may secure the pecuniary reward of his patent monopoly. There is a normal relation between that reward and restriction upon the licensee's selling price, for unless that price can be controlled by the patent owner the latter's profit in making and selling the patented product may be destroyed. In the American Equipment case the patent was upon a machine, not a product, and the price was fixed, through the limitation of output, upon the brick, an unpatented product; and this was the dominant purpose of the licensing arrangements. In view of the limitation upon output there was no normal relation between the control of the price of brick and the securing of the reward of the machine patent monopoly; the patent licenses were, therefore, in a broad sense, subter-

fuge. In the instant case the patents upon which the licenses were principally founded are product patents; USG, the patent owner, was itself a manufacturer and seller of the patented product, and the price control was upon the sale price of that product when also made and sold by the licensees. The purpose of USG in granting the licenses was to settle infringement litigation, collect infringement damages, secure royalties, and protect its own profit in the manufacture and sale of the patented product; the purpose of the licensees in accepting licenses was to settle or avoid litigation and obtain the right to make the superior product demanded by the trade. These purposes were legitimate. If the licensees, or some of them, also anticipated and desired the benefit of a stabilized price, that was not wrongful because a stabilized price would be the normal economic consequence of the exercise of USG's right as patent owner to protect its own profit by price control.

In respect of the Masonite, Interstate Circuit and Standard Sanitary cases: None of these cases purports to overrule the Bement or General Electric cases (the Standard Sanitary case was decided after the Bement case but before the General Electric decision). Hence, unless the instant case on the one hand and the Bement and General Electric cases on the other are distinguishable—and it is demonstrated in topic II of this opinion that they are not —these three cases, Masonite, Interstate Circuit and Standard Sanitary, cannot require a result in the instant case different from that which we reach. And each of the three cases is distinguishable on its facts from the instant case and the Bement and General Electric cases.

The Standard Sanitary case: In that case one Wayman, a defendant, but not himself a manufacturer, on condition of the elimination of unpatented hard enameled "seconds," secured from Standard Sanitary and other manufacturers options upon process patents for enameling iron sanitary utensils. A committee of six, including Wayman and five manufacturers' representatives, worked out, to be incorporated in license contracts, a plan for manufacturers' prices and jobbers' and dealers'

resale prices. Under the plan the manufacturers were not to sell jobbers who did not also take a license and submit to a price schedule. Royalties were a given sum per day for furnace use, but 80% was returnable as "cash bail" if a licensee abided by all of the provisions of its license. Having obtained approval of this plan by a sufficient number in the industry, Wayman exercised his options, became the owner of the patents, and issued the licenses as planned. Eighty-five percent of the manufacturers and ninety percent of the jobbers were parties to the arrangements. In answer to a charge that these arrangements were in violation of the Sherman Act, it was sought to justify them under the Bement case and upon the ground that an undue number of the (unpatented) seconds were being produced, with consequent harm to the reputation of the superior patented product and to the consumer—since the seconds were "palmed off" as not defective. The seconds were said to be "discrediting the ware and demoralizing the market and business." The Court held that the licensing arrangements were illegal. Quoting from the Bement case, it recognized that the Sherman Act " 'clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. Such a construction of the act we have no doubt was never contemplated by its framers.' " (226 U.S. at page 40, 33 S.Ct. at page 11, 57 L.Ed. 107) But the Court held that the Wayman license agreements "transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman law. . . ." (226 U.S. at page 48, 33 S.Ct. at page 14, 57 L.Ed. 107)

The case is distinguishable from the Bement, General Electric and instant cases. The price control in the Standard Sanitary case did not bear a normal relation to protection, or even to exploitation, of the patent monopoly in Wayman, for the prices were not fixed by him but by a committee of manufacturers' representatives of which he (not a manufacturer) was but one of six, and the royalties were to be 80% rebated if the license terms were complied with. Therefore, as in the American Equipment case, the licenses were, broadly, subterfuge. In the Bement, General Electric and instant cases the price control was normally adapted to the protection of the patent rights of the several licensors since they were themselves manufacturers and sellers of the patented product. Moreover, in the Standard Sanitary case the license arrangements extended to the unpatented seconds and to the resale prices of jobbers and dealers on the patented product. As we have demonstrated in topic VI, there was no control of unpatented materials or of resale prices in the instant case; and there was none in the Bement or General Electric cases.

The Interstate Circuit case: The trial court in that case found that distributors of copyrighted moving picture films had entered into a contract with each other and with, and at the instance of, exhibitors who operated first run theatres—and who dominated the motion picture business in the territory where their theatres were located—providing that the distributors' licenses granted second run theatres in the same territory should restrict the licensees from exhibiting at a lower admission price than 25¢ and from running double features. The Supreme Court held this finding supported by evidence and the contract a violation of the Sherman Act. The decision was reached in part upon the holding in Straus v. American Publishers' Ass'n, 1913, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A.1915A, 1099, and Paramount Famous Lasky Corp. v. United States, 1930, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145, that competing distributors may not lawfully agree to limit their individual freedom of action by a contract binding them, in the marketing of their superior copyrighted product, to do business with their customers in uniform manner—in the Straus case by selling books only to those who would maintain resale prices, in the Paramount case by using a standard form of film license contract with exhibitors pro-

viding for compulsory arbitration of disputes. The Court distinguished the Bement and General Electric cases, saying: "Appellants argue that the distributors were free to license the films for exhibition subject to the restrictions, just as a patentee in a license to manufacture and sell the patented article may fix the price at which the licensee may sell it. Bement v. National Harrow Co., 186 U.S. 70 [22 S. Ct. 747, 46 L.Ed. 1058]; United States v. General Electric Co., 272 U.S. 476 [47 S.Ct. 192, 71 L.Ed. 362]. That the parallel is not complete is obvious. Because a patentee has power to control the price at which his licensee may sell the patented article, it does not follow that the owner of a copyright can dictate that other pictures may not be shown with the licensed film or the admission price which shall be paid for an entertainment which includes features other than the particular picture licensed. Cf. Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502 [37 S.Ct. 416, 61 L.Ed. 871, L.R.A1917E, 1187, Ann.Cas.1918A, 959]; Carbice Corporation v. American Patents Development Corp., 283 U.S. 27 [51 S.Ct. 334, 75 L.Ed. 819]; Leitch Manufacturing Co. v. Barber Co., 302 U.S. 458 [58 S.Ct. 288, 82 L.Ed. 371]." (306 U.S. at page 228, 59 S.Ct. at page 475, 83 L.Ed. 610) But the Court held it not necessary "to pass upon these or related questions" because granting that "each distributor, in the protection of his own copyright monopoly, was free to impose the present restrictions upon his licensees . . . they were not free to use their copyrights as implements for restraining commerce in order to protect" a first run exhibitor's picture theatre monopoly "by suppressing competition with it" by the second run theatres. (306 U.S. at page 228, 59 S.Ct. at page 475, 83 L.Ed. 610)

The case is distinguishable from the Bement, General Electric and instant cases: In the Interstate Circuit case the price and double feature restrictions of the license contracts with the second run exhibitors were not purposed to secure to the distributor-copyright-owners the pe-cuniary reward of their copyright monopolies, because they were not themselves exhibitors of pictures; the restrictions were intended, as said by the Court, to suppress the competition of the second run theatres against the first run exhibitors. Whereas in the Bement, General Electric and instant cases the price restrictions in the several license agreements were for the protection of the patent monopoly of the respective licensors, and were not purposed to suppress competition between the licensees and third parties. Even assuming a general agreement between USG and its (prospective) licensees that the several license contracts should be executed, the net result of all of the individual license agreements when executed would not exceed the right of USG to fix the prices at which the patented product should be sold by any or all in the industry who made it under USG patents; as said in topic VII of this opinion, the totality of illegal restraint would be none. Moreover, as also stated in topic VII, we find in the instant case no general agreement.

The Masonite case: The Masonite Corporation owned patents on a product known as "hardboard" and itself manufactured and sold the same. It constituted competing manufacturers of building materials its del credere "agents" for the vending of hardboard, through their respective sales organizations, at prices and under terms and conditions fixed by Masonite and to be followed by it. Masonite also agreed to issue to the "agents" at their request "a license to manufacture and sell hard boards" under its patents upon specified terms and conditions and for a cash consideration, but this option was not exercised by the "agents." The Court, treating the "agencies" for the purpose of the decision as bona fide del credere agencies, nevertheless held that the form in which the parties chose to cast the transaction was not to govern and that the "agency" arrangements in reality presented a Bloomer v. McQuewan,[58] Adams v. Burke,[59] Hobbie v. Jennison[60] pattern wherein when a patented product " 'passes to the hands of the purchaser, it is no

---

[58] 1852, 14 How. 539, 14 L.Ed. 532.
[59] 1873, 17 Wall. 453, 21 L.Ed. 700.

[60] 1893, 149 U.S. 355, 13 S.Ct. 879, 37 L.Ed. 766.

longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress.'" (316 U.S. at page 278, 62 S.Ct. at page 1077, 86 L.Ed. 1461, quoting from Bloomer v. McQuewan, 14 How. at page 549, 14 L.Ed. 532) The Court said:

". . . Doubtless there is a proper area for utilization by a patentee of a *del credere* agent in the sale or disposition of the patented article. A patentee who employs such an agent to distribute his product certainly is not enlarging the scope of his patent privilege if it may fairly be said that that distribution is part of the patentee's own business and operates only to secure to him the reward for his invention which Congress has provided. But where he utilizes the sales organization of another business—a business with which he has no intimate relationship —quite different problems are posed since such a regimentation of a marketing system is peculiarly susceptible to the restraints of trade which the Sherman Act condemns. And when it is clear, as it is in this case, that the marketing systems utilized by means of the *del credere* agency agreements are those of competitors of the patentee, and that the purpose is to fix prices at which the competitors may market the product, the device is, without more, an enlargement of the limited patent privilege and a violation of the Sherman Act. In such a case the patentee exhausts his limited privilege when he disposes of the product to the *del credere* agent. He then has, so far as the Sherman Act is concerned, no greater rights to price maintenance than the owner of an unpatented commodity would have. Dr. Miles Medical Co. v. John D. Parks & Sons Co., 220 U.S. 373 [31 S.Ct. 376, 55 L.Ed. 502]. . . ." [316 U.S. at pages 279, 280, 62 S.Ct. at page 1078, 86 L.Ed. 1461]

The Court distinguished the decision in the first part of the General Electric case by saying that the Court thought in that case that the purpose and effect of the marketing plan were to secure to the patentee only a reward for his invention, but that that was not true in the Masonite case. In respect of the decision in the second part of the General Electric case, the Court said: "We do not have here any question as to the validity of a license to manufacture and sell, since none of the 'agents' exercised its option to acquire such a license from Masonite. Hence we need not reach the problems presented by Bement v. National Harrow Co., 186 U.S. 70 [22 S.Ct. 747, 46 L.Ed. 1058], and that part of the General Electric case which dealt with the license to Westinghouse Company. Rather, we are concerned here only with a license to vend. . . ." (316 U.S. at page 277, 62 S.Ct. at page 1077, 86 L.Ed. 1461)

The distinctions thus taken by the Court as to the Bement and General Electric cases are valid in respect of the instant case (as they must be if, as we hold, the instant case parallels those two cases). In the instant case, as in the Bement and General Electric cases, the patent owner USG, although a manufacturer and seller of gypsum board, is not one that sells through the sales organizations of its competitors; although it manufactures board, it does its own selling. It is to be noted further that horizontal operation of price control is necessarily implied in the ruling in the General Electric case that the owner of a product patent may grant a license to manufacture and sell with restrictions upon the licensee's price, for one who takes and operates under such a license will *ipso facto* be a competitor.

## IX

## CONCLUSION

In the previous topics we have discussed with particularity the evidence and the contentions of the parties in respect of the issues of fact and law in the instant case, and have set forth in some detail the reasons for the decision which we reach. This has required an extended opinion. The case may now be summarized.

The complaint of the Government charges violations of Sections 1, 2 and 3 of the Sherman Act and seeks, under Section 4, an injunction. It alleges that the defendants are parties to contracts in restraint of trade and commerce, and that they have combined and conspired to restrain, and have attempted to monopolize and have monopolized, trade and commerce in gypsum products, by means of the execution of sham patent licenses granted by the defendant USG and accepted by the other defendants and designed only to give color of legality to the combination and conspiracy charged. It alleges that the defendants have combined and conspired to fix prices upon gypsum board and upon miscellaneous gypsum products made and sold by them, to standardize such board and its method of

514

production, to eliminate jobbers from the distribution of gypsum products, and to induce manufacturing distributors to resell at prices fixed by the defendants gypsum board purchased from them; and it is alleged that these unlawful purposes were effectuated. All of this is asserted to have taken place in interstate commerce in the "Eastern area" of the United States, comprising, roughly, all of the states east of the Rocky Mountains, and the state of Wyoming and a part of the state of Montana. The defendants admit the execution of patent licenses to make, use and sell gypsum board under terms and conditions, including minimum prices, to be established by USG, and admit that they sold such board under such terms and conditions; but they assert that this is legitimate under the patent laws. In respect of the charge of monopoly the defendants do not deny that they make and sell substantially all of the gypsum board in the "Eastern area," but they assert that to the extent that they have a "monopoly" upon the production and sale of such board it is legitimatized by the patent laws and the license agreements. They deny that the licenses were sham or that they were entered into to disguise an illegal combination. They deny all of the other charges. The defendants rely upon the Bement and General Electric cases. The Government relies principally upon the Standard Sanitary, Masonite, Interstate Circuit and American Equipment cases. At the close of presentation of evidence by the Government the defendants moved to dismiss under Rule 41(b) of the Federal Rules of Civil Procedure. This is the frame of the case in its substantive aspects.

In the adjective aspects of the case: The Government urges that on motions to dismiss under Rule 41(b) and despite the absence of a jury the court must determine only whether the case presented is sufficient to submit to a jury, and if so put the defendants to their proof. The defendants contend that the court is to weigh the evidence and if it finds it insufficient render judgment of dismissal on the merits. The Government contends that the burden is upon the defendants by way of confession and avoidance to justify under the patent licenses the restraints of trade charged.

The defendants urge that the burden of proving lack of bona fides in the license agreements is upon the Government. On these two issues we sustain the contentions of the defendants. (Topics I and III) The defendants have moved to strike certain declarations of alleged co-conspirators received in evidence subject to connection by proof, independent of the declarations, of the existence of the conspiracy charged. The Government contends that such proof has been made, the defendants that it has not. We hold that there is no evidence independent of the declarations of the conspiracy charged and that the motions to strike are therefore well taken. (Topic IV)

On the substantive side of the case and in respect of the law: The Bement and General Electric cases sanction price fixing by a patent owner on sales of a patented product by one or more licensees if—as in those cases—the terms and conditions of the licenses are reasonably adapted to securing the rewards of the patent monopoly, and if —as in those cases—the licenses are bona fide. We think that the Bement and General Electric cases and the instant case are substantially parallel on their facts so far as the nature of the patents upon which the licenses were founded, the terms and conditions of the license agreements, and the extent of control of manufacture and sale of the respective products are concerned; and we hold therefore that the licensing arrangements, including price fixing, in the instant case are lawful unless the licenses are sham. (Topic II) This leaves for determination two principal questions of fact, one, were the licenses sham or were they bona fide; the other, were the operations of the defendants carried beyond the license terms, i.e., beyond the proper limits of the USG patent monopoly, or were they not. We hold, weighing the evidence, and whether the declarations of the alleged co-conspirators be considered, because not connected, as binding only upon the declarants, or whether they be considered as binding upon all, that the evidence fails to show the licenses sham—on the contrary shows that they are bona fide—and fails to show that the operations of the defendants went beyond the proper limits of the USG patent monopoly. We hold that the evidence

shows no improper standardization of gypsum board, no price fixing on plaster and miscellaneous gypsum products, no elimination of jobbers, no fixing of the prices at which manufacturing distributors sold gypsum board purchased from the defendants. The evidence shows price fixing by USG on board manufactured and sold by the defendants, but we hold that since the licenses are bona fide this is sanctioned by the Bement and General Electric decisions. (Topics V, VI and VII) We think the Standard Sanitary, Masonite, Interstate Circuit and American Equipment cases distinguishable from the instant case and the Bement and General Electric cases. (Topic VIII)

In respect of a special contention of the Government that the evidence shows a plan participated in by the defendants "to blanket" the industry under patent licenses and stabilize prices and that this is illegal: We hold that even if proof of such a plan be assumed, *arguendo,* the contention as to its illegality cannot be sustained in the absence of sham licenses and an intent to accomplish objectives beyond the proper limits of the patent monopoly. But we hold also that the evidence fails to prove that the defendants associated themselves in a common plan to execute patent licenses and stabilize prices. (Topic VII)

It is apparent upon a review of the record in this case that the licensing arrangements which are the subject of the action, rather than being part of a scheme to circumvent the Sherman Act, were entered into as the result of a confluence of certain legal and economic factors. During the period from 1912 to 1937, that is, from the development and patenting of the Utzman closed-edge board to the execution of the Kelley perforated lath license, the last of the so-called subordinate contracts, USG was, or became, the owner of patents or patent applications covering gypsum products whose superior qualities gave that company a substantial competitive advantage over other manufacturers. These patents were, notably, including those for the Utzman closed-edge board and for the process and the machine for making it, the Birdsey partially closed-edge board patent, the Roos foam or bubble board patents, the starch board patents of Hite and Haggerty, and the Roos metallized board and perforated lath patents. The products covered by these patents eliminated trimming and wastage, lightened the board for handling and freight, made unnecessary the use of the unsatisfactory sawdust aggregate in board, solved the "peeler" problem, provided a thermal insulating element, and satisfied fire regulations. In short they accomplished modern mechanized high speed gypsum board production. The trade demanded these superior products. Without the right to make, use and sell them the manufacturers other than USG would be distinctly disadvantaged. In this situation copying commenced. USG showed a determination to protect its patents in the courts, and in the litigation against Bestwall and Beaver in the early nineteen twenties in respect of the Utzman product and process patents it succeeded in doing so. After the decisions favorable to USG in that litigation closed-edge board could not be manufactured and sold by others without infringement of USG's rights. Also, in 1926, USG secured judicial affirmance of an award of priority for its Birdsey patent, over Clark. USG sued American for infringement of both the Utzman closed-edge and the Birdsey partially closed-edge patents; sued Universal for infringement of the Utzman patents and made a claim against it for infringement of the Birdsey patent; filed two suits against National; and served upon Niagara a notice of infringement. This litigation extended to 1928, when the second suit against National was filed. The manufacturers other than USG must, it was now obvious, in view of the trade demand, either copy and litigate, themselves devise successfully competitive products, cut prices on inferior products, such as open-edge board, at business loss, or pay damages (those that had infringed) and take licenses. USG was willing, upon terms of payment of damages (where infringement had occurred), acknowledgment of the validity of its patents, payment of royalties and the right in USG to fix the prices on gypsum board made and sold under the licenses, to grant licenses. The Supreme Court had in the General Electric case in 1926, confirming the ruling of the Bement

case in 1902, recognized licensing and price control under the patent laws, notwithstanding the Sherman Act. In the foregoing situation, various of the expedients or alternatives open to the manufacturers other than USG were availed of. Beaver, Universal, Atlantic and Texas in the early period 1926–1927 took licenses and made the closed-edge board, Beaver and Universal paying damages. National and American both suffered the litigation. Some of the companies, eventually all, cut prices—in the price war of 1927–1929—with distressing results. Universal fell into receivership. American attempted to develop a competitive product in the semi-protected edge board of Clark, but this failed in the interference proceeding in which priority was awarded to Birdsey. After the two years of price war, Certain-teed, National, Ebsary and Niagara were ready for licenses. They needed the closed-edge board; they desired to settle or avoid litigation; they anticipated a price advance under USG bulletins. Certain-teed, believing that it could continue to press the open-edge board upon the trade, had long been unwilling to take a license with price control. But the trade demanded the closed-edge board. Certain-teed, moreover, had a million dollar overhanging bond in a suit brought by USG to compel Certain-teed to assume the liabilities of Beaver under its settlement and license, Certain-teed having purchased the assets of Beaver. National settled the two infringement suits pending against it, paying damages. Ebsary found it extremely hard to sell the open-edge board and therefore took a license. Niagara disposed of USG's claim against it by taking a license and paying damages. These were the so-called May 1929 licenses.

USG then offered licenses under the Roos foam board patent applications to its outstanding licensees. Discussions concerning the advantages and disadvantages of this board and negotiations in respect of the offered licenses followed. Universal, though it took a license under the Utzman patents in 1926, had acquired the Hite and Haggerty starch patents, and there had been copying. It secured a judgment against National in 1927 establishing the validity of the Haggerty patent. In the summer of 1929 Universal claimed that USG, in the use of starch in its board to obtain adhesion between core and liners, was infringing. Universal now, in order to obtain funds with which to get out of receivership, sold the Hite and Haggerty patents to USG. After USG thus became the owner of these starch patents, one of which had been validated, and included them in its offer, licenses were, between October, 1929, and February, 1937, accepted by Niagara, Certain-teed, National, Ebsary, Atlantic, Universal, American, Kelley and Texas. American had attempted to get more favorable license terms than the other companies and had, as said above, attempted to develop, for competition with the closed-edge board, the semi-protected edge board of Clark. But USG's pending suit against American for infringement of the Birdsey partially closed-edge patent, once postponed, but reinstated, had by now, the summer of 1929, been decided in favor of USG; and the USG Utzman patent infringement suit against American was still pending. American renewed its efforts at concessions, but finally in November, 1929, and on the terms originally offered by USG at the time of the Beaver license, settled the outstanding suits and took a license from USG, paying damages. The Texas license was the last of what have been called the November 1929 contracts, under the Roos foam patent applications, the Hite and Haggerty starch patents, and others.

Finally the perforated lath and metallized board licenses were offered by USG. The licensees needed these products to be competitive and in 1934-1935 National, Kelley, Certain-teed, Atlantic, American, Universal and Ebsary took the metallized board licenses; and in 1936-1937 Certain-teed, American, Ebsary and Kelley signed the perforated lath contracts. Thus over a period of eleven years, 1926-1937, the licensing arrangements in the instant case were completed.

In this running account of the development of the licensing arrangements is seen the operation of legal and economic factors which naturally, if not, indeed, inevitably, brought the arrangements about—the superiority of the products to which USG had patents, the validation of patents in the

courts in favor of USG and Universal, the difficulties of litigation actual and threatened, the demand of the trade for the superior products, price cutting, the failure, except in the case of Universal, which sold its patents to USG, to develop competing products, the force of the Bement and General Electric rulings, and finally the decision of USG, under those cases, to share its patent monopoly. We think it clear, in the light of these factors which were operating upon the industry over the years in question, that the licenses were not a part of a scheme to restrain trade in violation of law by subterfuge as charged, but the result of a choice by the manufacturers other than USG to follow under bona fide licenses the pathway recognized by the Supreme Court, *i.e.*, to accept licenses subject to price control. All that was done, including the intra and inter-company discussions of the advantages and disadvantages of licensing, and including the negotiations for licenses, was necessarily incident to the granting and acceptance of a plurality of patent licenses.

In view of the parallel between the General Electric and Bement cases and the instant case, and in view of the failure of proof that the licenses were sham or that the operations of the defendants went beyond the proper limits of the USG patent monopoly, the case of the Government is reduced to the contention that a plurality of licenses is wrongful—that under the Bement and General Electric cases but a single license may be granted with price fixing provisions. In respect of this we reiterate that it would be an irrational fixation to construe the Bement and General Electric decisions as limiting licensing with price fixing restrictions to a single licensee, since the public is equally excluded and equally subjected to the patent owner's price whether there is no licensee, one licensee, or more. If USG had granted no licenses, all of the patented board would then have been made and sold by USG at its own price, and without competition in sales service. In the instant case if all but one license were stricken down, upon the theory that a plurality is wrongful, USG and the single licensee would then make and sell all of the patented product at the prices determined by USG. The extent of the monopoly is not altered by its division. In the General Electric case there was a plurality of licenses. While only the Westinghouse license contained a price restriction, the group of licenses granted by General Electric to Westinghouse and its other licensees contemplated a prorating of business between the licensor and all of the licensees, and included also type restrictions. Prorating and type restrictions are, as fully as price fixing, violations of the Sherman Act in the absence of legitimatizing patents. There was a plurality of licenses in the Standard Sanitary case and also in the Interstate Circuit case, but the holding in those cases that the licensing arrangements violated the Sherman Act was not upon that ground. The same is true of the American Equipment case.

Although, for the reasons set out in topic IV, we consider as well taken the defendants' motions to strike the declarations which were received in evidence subject to connection, it is not necessary formally to rule upon those motions. Since we have considered the declarations both as binding upon the declarants alone and as binding upon all of the alleged co-conspirators, the exhibits and testimony received subject to connection may remain in the record.

The motions to dismiss the Government's complaint will be granted. Counsel for the defendants will prepare, serve upon the Government and present to the court proposed findings of fact, conclusions of law and judgment of dismissal upon the merits.

I am authorized to state that Judges GARRETT and JACKSON concur in this opinion.